# Exhibit C

ANDREA ISSOD (CA Bar No. 230920)
ELENA SAXONHOUSE (CA Bar No. 235139)
MARTA DARBY (CA Bar No. 310690)
Sierra Club Environmental Law Program
2101 Webster St., Ste. 1300
Oakland, CA 94612
andrea.issod@sierraclub.org
elena.saxonhouse@sierraclub.org
marta.darby@sierraclub.org
(415) 977-5544

Attorneys for Plaintiff Sierra Club

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SIERRA CLUB, | CASE NO. 3:18-cv-3472-EDL |
| Plaintiff, | **DECLARATION OF MARTA DARBY IN SUPPORT OF SIERRA CLUB'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ___ |
| Defendant. | |

I, MARTA DARBY, declare as follows:

1.     I am an Associate Attorney at Sierra Club. I have been employed at Sierra Club since September 2016. This declaration is based on my personal knowledge and experience.

2.     In my role as an associate attorney, I have managed Sierra Club's litigation docket and work on in-house litigation, including for Sierra Club's Beyond Coal Campaign and on matters arising under the Freedom of Information Act ("FOIA"). Through this work, I have become familiar with the breadth of Sierra Club's litigation, regulatory advocacy, policy work, and public organizing.

3.     In *Sierra Club v. EPA*, Case No. 3:18-cv-3472-EDL (N.D. Cal.) ("*Sierra Club v. EPA*"), I have worked to narrow the four FOIA requests at issue, identified priority records, developed Sierra

Club's highest priority tiers, and coordinated with counsel for the U.S. Environmental Protection Agency ("EPA"). This declaration addresses: (a) the broad scope of Sierra Club's advocacy relevant to the requests; (b) the lists of domain names provided by the EPA that are associated with e-mail communications responsive to Sierra Club's four FOIA requests and Sierra Club's highest priority tiers; and (c) FOIA requests from other parties that overlap with Sierra Club's four FOIA requests, one of which has resulted in the production of a limited subset of responsive calendars.

A.     **Sierra Club's Far-Reaching Advocacy**

4.     Sierra Club is one of the nation's largest grassroots environmental organizations, with over 775,800 members. Sierra Club has more than sixty chapters located in all fifty states and Puerto Rico, numerous volunteer-led grassroots organizing groups, and several campaigns led by national Sierra Club staff. Each of these arms works to advocate for clean air, safe water, land protection, a vibrant natural world, and healthy communities. Sierra Club pursues this work through public organizing, targeted communications, litigation and regulatory advocacy, and policy work at the federal, state, and local levels.

5.     For example, Sierra Club's Beyond Coal, Dirty Fuels, and Our Wild America Campaigns, alongside chapters, organizers, and Sierra Club's Labor Program, work to reduce harmful air and water pollution from power plants and the extraction of fossil fuels (*e.g.*, coal mining and oil and gas development). They advocate for strict pollution limits, bring enforcement actions, and support the development of a clean-energy economy. These campaigns also have worked to clean up the transportation sector by promoting the rollout of electric vehicles, seeking to decrease the sector's reliance on oil.

6.     Sierra Club chapters and volunteer-led organizing groups also have worked for years to protect communities from toxic pesticide and other chemical exposures, air and water pollution from agriculture and industrial-scale animal feeding and breeding operations (commonly known as "CAFOs"), air and water pollution from manufacturing and other industrial facilities, and pollution from mining operations that extract metals and other natural resources, including copper and uranium mining.

7.     Examples of Sierra Club chapter and volunteer-led advocacy include:

DECLARATION OF MARTA DARBY
CASE NO. 3:18-cv-3472-EDL                    2

a. <u>Agriculture and CAFOs</u>: Sierra Club chapters and volunteers across the country are advocating for stricter limits on pollution from agricultural operations, including through community organizing and legal advocacy before judicial and administrative forums. On September 28, 2018, Sierra Club and its allies filed a federal lawsuit challenging EPA guidance, updated in late April 2018, that exempted CAFOs from requirements to inform state and local officials about releases of dangerous levels of pollutants, despite the requirements of the Emergency Planning and Community Right-to-Know Act.[1] On October 30, 2018, according to EPA's website, the agency now has developed a proposal to amend the emergency release notification regulations to add a reporting exemption for air emissions from animal waste at farms.[2]

b. <u>Dangerous chemical exposure</u>: Sierra Club, in partnership with its allies, has been challenging EPA rules, issued under the Trump Administration, that fail to adequately protect people from toxic chemical exposures. This advocacy includes submitting detailed legal and technical comments, as well as challenging misguided rules in court.[3] Sierra Club and its partners also have aggressively pushed back, through litigation and detailed legal comments, against recent EPA efforts to undercut the Chemical Disaster Rule, a set of safety standards aimed at keeping first responders and communities near chemical facilities safe. EPA's fall 2018 regulatory plan, which was posted to the Office of Information and Regulatory Affairs website (reginfo.gov), identified the rule as one of its primary regulatory targets in the coming year.[4]

---

[1] *See* Compl. at 1, *Rural Empowerment Ass'n for Cmty. Help v. EPA*, No. 1:18-cv-02260 (D.D.C. Sept. 28, 2018).

[2] EPA, Pre-publication Copy of Proposed Rule: Amendment to Emergency Release Notification Regulations on Reporting Exemption for Air Emissions from Animal Waste at Farms (Oct. 30, 2018), https://www.epa.gov/epcra/pre-publication-copy-proposed-rule-amendment-emergency-release-notification-regulations.

[3] *See, e.g.*, Pet. for Review at 1-2, *Safer Chems. Healthy Families v. EPA*, No. 17-72260 (9th Cir. Aug. 10, 2017) (challenging EPA's "framework rules" issued under the Toxic Substances Control Act).

[4] Ex. 1, Office of Information & Regulatory Affairs, Fall 2018 Agency Statements of Regulatory

DECLARATION OF MARTA DARBY

CASE NO. 3:18-cv-3472-EDL                    3

8.      Sierra Club also has been pushing back against EPA's proposal to replace the Clean Power Plan, commenting on EPA's proposals[5] and educating the public about EPA's plans. According to a Sierra Club tracker, 56,179 Sierra Club supporters signed on to Sierra Club comments opposing EPA's plan to scrap the rule.[6] EPA's website highlights replacing the Clean Power Plan as one the agency's highest priorities in the coming year.[7]

9.      As explained below, the breadth of Sierra Club's advocacy was carefully considered when developing Sierra Club's list of highest priority documents.

**B.     EPA-Provided List of E-mail Domain Names**

10.     On September 11, 2018, EPA's counsel e-mailed an Excel workbook that identified, in seven spreadsheets, the e-mail domain name—*i.e.*, the part of an e-mail address following the "@" symbol—associated with a partial collection of e-mail correspondence responsive to the four FOIA requests at issue in *Sierra Club v. EPA*. The spreadsheet also identified the number of records (e-mail chains) associated with each domain name. This list, according to EPA's counsel, included the domain names found in at least one of the following fields: the "To," "From," "cc," or "bcc" fields. The list included e-mail addresses ending in .com, .org, .edu, .net, .int, .biz, and .info. There were thousands of domain names in total. The next day, EPA's counsel e-mailed an Excel workbook that identified the number of responsive records associated with each state domain name that Sierra Club had identified in order to facilitate EPA's search. Around that time, EPA's counsel indicated that the number of responsive e-mail chains thus far identified totaled 271,439 records.

---

Priorities, *Environmental Protection Agency*, https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET_STATEMENT_LIST &currentPub=true&agencyCode=&showStage=active&agencyCd=.

[5] *See, e.g.*, Ex. 2, Comments on EPA Administrator Scott Pruitt's Improper Prejudgment of Outcome of Proposed Repeal of Clean Power Plan (Jan. 29, 2018); Sierra Club Request for Public Hearings on Proposed Repeal of the Clean Power Plan (Oct. 31, 2017).

[6] Ex. 3, Sierra Club, *Our Nation's Biggest Climate Action is Under Attack. Defend the Clean Power Plan!*, https://act.sierraclub.org/actions/National?actionId=AR0120389 (last visited Nov. 9, 2018).

[7] Ex. 4, News Release, EPA, *EPA Releases Fall 2018 Unified Agenda and Regulatory Plan Shows Commitment to Strong Environmental Protection and Regulatory Reform* (Oct. 17, 2018), https://www.epa.gov/newsreleases/epa-releases-fall-2018-unified-agenda-and-regulatory-plan-shows-commitment-strong (identifying the Affordable Clean Energy Rule as one of three top priorities).

DECLARATION OF MARTA DARBY
CASE NO. 3:18-cv-3472-EDL             4

11.     On or about September 11, 2018, I began working with a litigation assistant, Katherine Chamberlain, to identify domain names that could be excluded from the production and to identify domain names of interest. In doing so, I carefully considered the breadth of Sierra Club's work, ensuring that the list of priority domains reflected Sierra Club's current and near-term advocacy across the organization's broad array of stakeholders. The list of highest priority domain names is designed to capture records that likely will be relevant in the near term to Sierra Club's litigation, regulatory advocacy, efforts to hold EPA officials accountable for abuses of office, and work to ensure that the next EPA Administrator leads the agency in a transparent manner.

12.     On September 28, 2018, Sierra Club provided its list of highest priority domain names to EPA. The list was separated into ten sequential tiers, with Tier One containing Sierra Club's highest priority documents. That day, Sierra Club also identified domain names that EPA could eliminate from the production. The total number of records associated with those domain names, based on the numbers EPA provided in September, was about 131,621 records.

13.     On October 19, 2018, Sierra Club agreed to exclude incoming and outgoing e-mails from Mr. Wheeler's public-facing e-mail account after he became Acting Administrator on July 5, 2018, thereby significantly narrowed the scope of the production. According to EPA, after that date any substantive e-mails would be captured by other e-mail accounts within the scope of Sierra Club's four FOIA requests.

14.     On November 5, 2018, EPA counsel provided Sierra Club with an estimate of the total number of documents included within each of the ten tiers that Sierra Club had identified on September 28. Based on these numbers, there are a total of about 18,706 e-mail records across all ten tiers, and each tier includes approximately 1,870 e-mail records on average.

15.     Sierra Club's current list of ten highest priority tiers is the same as the list that Sierra Club provided to EPA on September 28 absent two changes. First, Sierra Club previously had divided one of the domain names, hunton.com, into Tier One and Tier Two, seeking only the records of Mr. Wheeler and Mr. Wehrum associated with that domain name in Tier One and the records of the remaining twenty-three custodians in Tier Two. Because EPA informed Sierra Club that dividing the

DECLARATION OF MARTA DARBY
CASE NO. 3:18-cv-3472-EDL                    5

domain name in that manner would be technically difficult, hunton.com is now included in Tier One only across all custodians. Based on the numbers EPA provided in September, there are approximately 760 records associated with hunton.com. Second, I added the domain name to which text messages are forwarded (vzwpix.com) to Tier Three, after EPA's counsel informed me on November 8 that EPA policy requires that text messages be forwarded to that domain. Based on the numbers EPA provided in September, there are approximately 204 records associated with vzwpix.com. Sierra Club's list of highest priority domain names is attached as Exhibit 5.

**C.   Overlapping FOIA Requests Submitted by Other Parties**

16.     On November 5, 2018, EPA provided Sierra Club with partial calendars for four of the twenty-five custodians identified in Sierra Club's FOIA requests: Nancy Beck (May 2017 to February 2018), Brittany Bolen (April 2017 to February 2018), Justin Schwab (February 2017 to May 2018), and Byron Brown (March 2017 to March 2018). Sierra Club's FOIA requests seek the schedules for these custodians from January 20, 2017 onward.

17.     According to FOIAOnline.gov, the website to which EPA directed Sierra Club, the partial release of calendars was produced in response to a request from the Environmental Defense Fund submitted on June 20, 2017. The Environmental Defense Fund request sought records related to former Administrator Pruitt's schedule, and those of his senior managers, since Mr. Pruitt's assumption of office.[8]

18.     I also reviewed FOIAOnline to determine whether there were any FOIA requests that sought information similar to the Sierra Club requests at issue in *Sierra Club v. EPA*. In addition to the Environmental Defense Fund request above, I identified the following requests:

a.   On July 11, 2017, Center for American Progress submitted a request for certain correspondence and schedules of numerous EPA staff, including Mr. Brown, Ms.

---

[8] Ex. 6, FOIA Request EPA-HQ-2017-008622 from Benjamin Levitan, Environmental Defense Fund, to National Freedom of Information Officer, EPA (June 20, 2017), https://www.foiaonline.gov/foiaonline/action/public/submissionDetails?trackingNumber=EPA-HQ-2017-008622&type=request.

DECLARATION OF MARTA DARBY
CASE NO. 3:18-cv-3472-EDL                    6

Bangerter, and Ms. Hupp, with certain entities affiliated with Robert Murray and Murray Energy Corporation.[9]

    b.   On July 11, 2017, Center for American Progress submitted a request for schedules of Mr. Brown, Ms. Bangerter, and Ms. Hupp from February 15, 2017 to the present.[10]

    c.   On June 30, 2017, Center for Biological Diversity submitted a request for Dr. Beck's schedule and correspondence since she began working at EPA.[11]

    d.   On July 11, 2018, Center for Biological Diversity submitted a FOIA request seeking Mr. Wheeler's communications since April 1, 2018.[12]

       I declare under penalty of perjury under the laws of the United States that the above is true and accurate. Executed this 9th day of November, 2018 in Oakland, California.

      DATED: November 9, 2018

Marta Darby
Associate Attorney
Sierra Club
2101 Webster St. Suite 1300
Oakland, CA 94612

---

[9] Ex. 7, FOIA Request EPA-HQ-2017-009262 from Yule Kim, Center for American Progress, to National Freedom of Information Officer, EPA (July 11, 2017), https://www.foiaonline.gov/foiaonline/action/public/submissionDetails?trackingNumber=EPA-HQ-2017-009262&type=Request.

[10] Ex. 8, FOIA Request EPA-HQ-2017-009280 from Yule Kim, Center for American Progress, to National Freedom of Information Officer, EPA (July 11, 2017), https://www.foiaonline.gov/foiaonline/action/public/submissionDetails?trackingNumber=EPA-HQ-2017-009280&type=request.

[11] Ex. 9, FOIA Request EPA-HQ-2017-008997 from Margaret E. Townsend, Staff Attorney, Center for Biological Diversity, to FOIA Officer, EPA (June 30, 2017), https://www.foiaonline.gov/foiaonline/action/public/submissionDetails?trackingNumber=EPA-HQ-2017-008997&type=request.

[12] Ex. 10, FOIA Request EPA-HQ-2018-009476 from Ann K. Brown, Coordinator, Center for Biological Diversity to FOIA Officer, EPA (July 11, 2018), https://www.foiaonline.gov/foiaonline/action/public/submissionDetails?trackingNumber=EPA-HQ-2018-009476&type=request.

DECLARATION OF MARTA DARBY
CASE NO. 3:18-cv-3472-EDL       7

# Exhibit 1

**ENVIRONMENTAL PROTECTION AGENCY (EPA)**

**Statement of Priorities**

**OVERVIEW**

The U.S. Environmental Protection Agency (EPA) administers the laws enacted by Congress and signed by the President to protect people's health and the environment. In carrying out these statutory mandates, the EPA works to ensure that all Americans are protected from significant risks to human health and the environment where they live, learn and work; that national efforts to reduce environmental risk are based on the best available scientific information; that Federal laws protecting human health and the environment are enforced fairly and effectively; that environmental protection is an integral consideration in U.S. policies concerning natural resources, human health, economic growth, energy, transportation, agriculture, industry, and international trade, and these factors are similarly considered in establishing environmental policy; that all parts of society-communities, individuals, businesses, and State, local and tribal governments-have access to accurate information sufficient to effectively participate in managing human health and environmental risks; that environmental protection contributes to making our communities and ecosystems diverse, sustainable and economically productive; and, that the United States plays a leadership role in working with other nations to protect the global environment.

To accomplish its goals in the coming year, the EPA will use regulatory authorities, along with grant  and incentive-based programs, technical and compliance assistance and tools, and research and educational initiatives to address its statutory responsibilities  All of this work will be undertaken with a strong commitment to science, law and transparency.

**HIGHLIGHTS OF EPA'S REGULATORY PLAN**

The EPA's more than forty years of protecting public health and the environment demonstrates our nation's commitment to reducing pollution that can threaten the air we breathe, the water we use, and the communities we live in. Our nation has made great progress in making rivers and lakes safer for swimming and boating, reducing the smog that clouded city skies, cleaning up lands that were once used as hidden chemical dumps and providing Americans greater access to information on chemical safety. To achieve continued positive environmental results, we must foster and maintain a sense of shared accountability between states, tribes and the federal government. This Regulatory Plan contains information on some of our most important upcoming regulatory and deregulatory actions  As always, our Semiannual Regulatory Agenda contains information on a broader spectrum of the EPA's upcoming regulatory actions.

**Improve Air Quality**

As part of its mission to protect human health and the environment, the EPA is dedicated to improving the quality of the nation's air  From 1970 to 2017, aggregate national emissions of the six criteria air pollutants were reduced over 70 percent, while gross domestic product grew by over 260 percent. The EPA's work to control emissions of air pollutants is critical to continued progress in reducing public health risks and improving the quality of the environment. The Agency will continue to deploy existing regulatory tools where appropriate and warranted  Using the Clean Air Act, the EPA will work with States and tribes to accurately measure air quality and ensure that more Americans are living and working in areas that meet air quality standards. The EPA will continue to develop standards, as directed by the Clean Air Act, for both mobile and stationary sources, to reduce emissions of sulfur dioxide, particulate matter, nitrogen oxides, toxics, and other pollutants.

**Electric Utility Sector Greenhouse Gas Rules**

The EPA will continue its review of the Clean Power Plan suite of actions issued by the previous administration affecting fossil fuel fired electric generating units (EGUs)  On October 23, 2015, the EPA issued a final rule that established first-ever standards for States to follow in developing plans to reduce carbon dioxide ($CO2$) emissions from existing fossil fuel fired EGUs  On the same day, the EPA issued a final rule establishing $CO2$

emissions standards for newly constructed, modified, and reconstructed fossil fuel fired EGUs. The Agency has proposed an alternative approach that is appropriately grounded in the EPA's statutory authority and consistent with the rule of law. This alternative approach would appropriately promote cooperative federalism and respect the authority and powers that are reserved to the States; promote the Administration's dual goals of protecting public health and the environment, while also supporting economic growth and job creation; and appropriately maintain the diversity of reliable energy resources and encourage the production of domestic energy sources to achieve energy independence and security.

**Safer Affordable Fuel-Efficient Vehicles Rule**

On August 1, 2018, the National Highway Traffic Safety Administration (NHTSA) and the Environmental Protection Agency (EPA) proposed to amend certain existing Corporate Average Fuel Economy (CAFE) and greenhouse gas emissions standards for passenger cars and light trucks and establish new standards, covering model years 2021 through 2026. The proposed rule published in the Federal Register on August 24, 2018 (83 FR 42986), and the EPA docket is currently open for submittal of public comments. NHTSA and EPA will jointly hold three public hearings on this proposal, which were announced in a supplemental Federal Register notice also published on August 24, 2018 (83 FR 42817).

**New Source Review and Title V Permitting Programs Reform**

The CAA establishes a number of permitting programs designed to carry out the goals of the Act. The EPA directly implements some of these programs through its regional offices, but most are carried out by States, local agencies, and approved tribes. New Source Review (NSR) is a preconstruction permitting program that ensures that the addition of new and modified sources does not significantly degrade air quality. NSR permits are legal documents that the facility owners/operators must abide by. The permit specifies what construction is allowed, what emission limits must be met, and often how the emissions source may be operated. There are three types of NSR permits: (1) Prevention of Significant Deterioration (PSD) (CAA part C) permits, which are required for new major sources or a major source making a major modification in an attainment area; (2) Nonattainment NSR (NNSR) (CAA part D) permits, which are required for new major sources or major sources making a major modification in a nonattainment area; and (3) Minor source permits.

CAA title V requires major sources of air pollutants, and certain other sources, to obtain and operate in compliance with an operating permit. Sources with these "title V permits" are required by the CAA to certify compliance with the applicable requirements of their permits at least annually.

In accordance with the President's goal to streamline permitting regulations for manufacturing facilities, the EPA has initiated an effort to issue a series of targeted improvements, including guidance memos and, as necessary, associated rulemakings, to simplify the New Source Review (NSR) process in manner consistent with the Clean Air Act.

We have recently highlighted flexibilities in the implementation of NSR regulations available to manufacturing facilities for the permitting of new projects. Two recent memos, for example, clarified that project emissions accounting can take place in the first step of the NSR applicability process for all project categories and that the EPA will not "second guess" preconstruction analysis that complies with procedural requirements. In FY19, the EPA intends to follow-up these memos with rulemaking to codify these policies. Based on the recommendations of a number of state environmental agencies as well as small businesses under the air toxics program, the EPA has also rescinded its "once-in, always-in" policy. A major source which takes enforceable limitations on its potential to emit (PTE) hazardous air pollutants (HAP) emissions below the applicable thresholds becomes an area source (strike ",") and is no longer subject to maximum achievable control technology (MACT) standards, no matter when the source may choose to take measures to limit its PTE. In early 2019, EPA anticipates that it will publish a *Federal Register* notice to take comment on adding regulatory text to reflect EPA's plain language reading of the statute.

**Oil and Gas**

The EPA is reviewing the Agency's Oil and Gas New Source Performance Standards  In June 2017, the EPA granted reconsideration of some specific requirements under the 2016 New Source Performance Standards, and indicated that the Agency would also look broadly at the entire rule, including the regulation of greenhouse gases through an emission limitation on methane. The EPA is issuing a proposal for public review and comment in the fall of 2018

## Provide for Clean and Safe Water

The nation's water resources are the lifeblood of our communities, supporting our economy and way of life  Across the country we depend upon reliable sources of clean and safe water. Just a few decades ago, many of the nation's rivers, lakes, and estuaries were grossly polluted, wastewater sources received little or no treatment, and drinking water systems provided very limited treatment to water coming through the tap. Since the enactment of the Clean Water Act (CWA) and the Safe Drinking Water Act (SDWA), tremendous progress has been made toward ensuring that Americans have safe water to drink and generally improving the quality of the Nation's waters  While progress has been made, numerous challenges remain in such areas as nutrient loadings, storm water runoff, invasive species and drinking water contaminants. These challenges can only be addressed by working with our State and tribal partners to develop new and innovative strategies in addition to the more traditional regulatory approaches. The EPA plans to address the following challenging issues, in part, in rulemakings

## Waters of the U.S.

In 2015, the Environmental Protection Agency and the Department of the Army (the agencies) published the "Clean Water Rule: Definition of 'Waters of the United States'" (2015 Rule) (80 FR 37054, June 29, 2015). On October 9, 2015, the U S  Court of Appeals for the Sixth Circuit stayed the 2015 Rule nationwide pending further action of the court. On February 28, 2017, the President signed Executive Order 13778, "Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the 'Waters of the United States' Rule" which instructed the agencies to review the 2015 Rule and rescind or replace it as appropriate and consistent with law. The agencies have determined to address the Executive Order in a comprehensive two step process  On July 27, 2017, the agencies published a Federal Register notice proposing to repeal (Step 1) the 2015 Rule and recodify the pre existing regulations; the initial 30 day comment period was extended an additional 30 days to September 28, 2017. The agencies signed a supplemental notice of proposed rulemaking on June 29, 2018 clarifying and seeking additional comment on the Step 1 proposal

In Step 2 (Revised Definition of 'Waters of the United States'), the agencies plan to pursue a public notice-and-comment rulemaking in which the agencies would conduct a substantive reevaluation of the definition of "waters of the United States." As part of this reevaluation, the agencies are considering defining "navigable waters" in a manner consistent with the plurality opinion of Justice Scalia in the Rapanos decision, as instructed by Executive Order 13778.

On February 6, 2018, the agencies issued a final rule adding an applicability date to the 2015 Rule of February 6, 2020, to provide continuity and certainty for regulated entities, the States and Tribes, and the public while the agencies conduct Step 2 of the rulemaking  Until the new definition is finalized, the agencies will continue to implement the regulatory definition in place prior to the 2015 Rule consistent with Supreme Court decisions and practice, and as informed by applicable agency guidance documents

## Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category

On November 3, 2015, under the authority of the CWA, the EPA issued a final rule amending the Effluent Limitations Guidelines (ELG) and Standards for the Steam Electric Power Generating Point Source Category (i.e., 2015 Steam Electric ELG). The amendments addressed and contained limitations and standards on various waste streams at steam electric power plants  fly ash transport water, bottom ash transport water, flue gas mercury control wastewater, flue gas desulfurization (FGD) wastewater, gasification wastewater, and combustion residual leachate  In early 2017, the EPA received two petitions for reconsideration of the Steam

Electric ELG rule, one from the Utility Water Act Group and one from the Small Business Administration Office of Advocacy. On August 11, 2017, the Administrator announced his decision to conduct a rulemaking to potentially revise the Best Available Technology Economically Achievable (BAT) effluent limitations and pretreatment standards for existing sources in the 2015 rule that apply to bottom ash transport water and FGD wastewater. In light of the reconsideration, the EPA views that it is appropriate to postpone impending deadlines as a temporary, stopgap measure to prevent the unnecessary expenditure of resources until it completes reconsideration of the 2015 rule. Thus, the Administrator signed a final rule on September 9, 2017, postponing the earliest compliance dates for the BAT effluent limitations and PSES for bottom ash transport water and FGD wastewater in the 2015 Rule, from November 1, 2018 to November 1, 2020. The EPA expects to publish a notice of proposed rulemaking for the Steam Electric reconsideration in March 2019.

**National Primary Drinking Water Regulations for Lead and Copper - Long Term Revisions**

The Lead and Copper Rule (LCR) reduces risks to drinking water consumers from lead and copper that can enter drinking water as a result of corrosion of plumbing materials. The LCR requires water systems to sample at taps in homes with leaded plumbing materials. Depending upon the sampling results, water systems must take actions to reduce exposure to lead and copper including corrosion control treatment, public education, and lead service line replacement. The LCR was promulgated in 1991 and, overall, has been effective in reducing the levels of lead and copper in drinking water systems across the country. However, lead crises in Washington, DC, and in Flint, Michigan, and the subsequent national attention focused on lead in drinking water in other communities, have underscored significant challenges in the implementation of the current rule, including a rule structure that, for many systems, only compels protective actions after public health threats have been identified. Key challenges include the rule's complexity; the degree of flexibility and discretion it affords systems and primacy states with regard to optimization of corrosion control treatment; compliance sampling practices, which in some cases, may not adequately protect from lead exposure; and limited specific focus on key areas of concern such as schools. There is a compelling need to modernize and clarify implementation of the rule to strengthen its public health protections and to make it more effective and more readily enforceable. The EPA is evaluating the costs and benefits of the potential revisions and assessing whether the benefits justify the costs.

**National Primary Drinking Water Regulations for Perchlorate**

Perchlorate is an inorganic chemical produced for use in rocket propellants, fireworks, road flares, and explosives. Perchlorate is also formed naturally in the environment, particularly in arid climates, and may be present as an impurity in hypochlorite solutions (bleach). In February 2011, the EPA announced its decision to regulate perchlorate under SDWA. The EPA determined that perchlorate meets SDWA's three criteria for regulating a contaminant: 1) perchlorate may have adverse health effects because scientific research indicates that perchlorate can disrupt the thyroid's ability to produce the hormones needed for normal growth and development; 2) there is a substantial likelihood that perchlorate occurs with frequency at levels of health concern in public water systems because monitoring data show over four percent of public water systems have detected perchlorate; and 3) there is a meaningful opportunity for health risk reduction since between 5.1 and 16.6 million people may be provided with drinking water containing perchlorate. In 2013, the Science Advisory Board recommended that the EPA use models, rather than the traditional approach to establish the health based Maximum Contaminant Level Goal (MCLG) for a perchlorate regulation. The EPA and FDA scientists worked collaboratively to develop biological models in accordance with SAB recommendations. The EPA will utilize the best available peer reviewed science to inform regulatory decision making for perchlorate.

**Peak Flows Management**

Wet weather events (e.g., rain, snowmelt) can impact publicly owned treatment works (POTWs) operations when excess water enters the wastewater collection system. The increased wet weather flows can exceed the POTW treatment plant's capacity to provide the same type of treatment for all of the incoming wastewater. The treatment plant's secondary treatment units are the most likely to be adversely affected by wet weather because the biological systems can be damaged when too much water flows through them. POTWs employ a variety of operational practices to ensure the integrity of their secondary treatment units during wet weather, and the EPA plans to propose updates to the regulations which will seek to clarify permitting procedures for POTWs with

separate sanitary sewer systems under wet weather operational conditions. The goal of these updates will be to ensure a consistent national approach for permitting POTWs that provides for efficient treatment plant operation while protecting the public from potential adverse health effects of inadequately treated wastewater.

## Clean Water Act Section 404(c) Regulatory Revision

Section 404(c) of the Clean Water Act authorizes the Administrator "to prohibit the specification (including withdrawal of the specification) of any defined area as a disposal site" as well as to "deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site . . . whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." In June 2018, the EPA announced that it would initiate an update to the regulations governing the EPA's role in permitting discharges of dredged or fill material under section 404 of the CWA. The EPA's current regulations on the implementation of section 404(c) of the CWA allow the Agency to veto - at any time -a permit issued by the U.S. Army Corps of Engineers (USACE) or an approved state that allows for the discharge of dredged or fill material at specified disposal sites. The goal of this effort would be to increase predictability and regulatory certainty for landowners, investors, businesses, and other stakeholders. This rulemaking will consider, at minimum, changes to the EPA's 404(c) review process that would govern the future use of the EPA's section 404(c) authority.

## Revitalize Land and Prevent Contamination

The EPA works to improve the health and livelihood of all Americans by cleaning up and returning land to productive use, preventing contamination, and responding to emergencies. The EPA collaborates with other federal agencies, industry, states, tribes, and local communities to enhance the livability and economic vitality of neighborhoods. Challenging and complex environmental problems persist at many contaminated properties, including contaminated soil, sediment, surface water, and groundwater that can cause human health concerns. The EPA's regulatory program recognizes the progress made in cleaning up and returning land to productive use, preventing contamination, and responding to emergencies, and works to incorporate new technologies and approaches that allow us to provide for an environmentally sustainable future more efficiently and effectively.

## Reconsideration of the Accidental Release Prevention Regulations under Clean Air Act

Both the EPA and the Occupational Safety & Health Administration (OSHA) issued regulations, as required by the Clean Air Act Amendments of 1990, in response to a number of catastrophic chemical accidents occurring worldwide that had resulted in public and worker fatalities and injuries, environmental damage, and other community impacts. OSHA published the Process Safety Management standard in 1992, and the EPA modeled the Risk Management Program (RMP) regulation after it. The EPA published the RMP rule in two stages: (1) a list of regulated substances and threshold quantities in 1994, and (2) the RMP final regulation with risk management requirements in 1996. Both the OSHA standard and the EPA RMP regulation aim to prevent, or minimize the consequences of, accidental chemical releases to workers and the community.

On January 13, 2017, the EPA amended the RMP regulations in order to (1) reduce the likelihood and severity of accidental releases, (2) improve emergency response when those releases occur, and (3) enhance state and local emergency preparedness and response in an effort to mitigate the effects of accidents.

Prior to the effective date of the RMP Amendments rule, the EPA received petitions for reconsideration under Clean Air Act Section 307(d) (7) (B). Petitioners sought reconsideration of the RMP Amendments based on what they view as either EPA's failure to coordinate with OSHA and DOT as required by paragraph (D) of CAA section 112(r)(7) or at least inadequate coordination. Furthermore, petitioners indicated that the arson findings from the Bureau of Alcohol, Tobacco and Firearms and Explosives regarding the West Fertilizer 2013 explosion undercut EPA's basis for the proposed rule. Petitioners also raised security concerns related to sharing information with local emergency planning and response organizations and concerns about EPA's economic analysis and the economic burden associated with certain rule provisions. Having considered the concerns regarding the RMP Amendments rule raised in these petitions, the EPA subsequently delayed the effective date

of the RMP Amendments rule to February 19, 2019, in order to give the EPA time to reconsider it  On May 30, 2018, the EPA published proposed changes to the rule and sought public comment on the proposed revisions and other related issues

## Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residues from Electric Utilities: Remand Rules

The EPA is planning to modify the final rule on the disposal of Coal Combustion Residuals (CCR) as solid waste under subtitle D of the Resource Conservation and Recovery Act issued in 2015  As a result of a settlement agreement on this final rule, the EPA is addressing specific technical issues remanded by the court. Further, the Water Infrastructure Improvements for the Nation Act of 2016 established new statutory provisions applicable to CCR units, including authorizing states to implement the CCR rule through an EPA-approved permit program and authorizing the EPA to enforce the rule  Therefore the EPA is proposing to amend certain performance standards in the CCR rule through several rulemaking efforts to offer additional flexibility to state permitting authorities with an approved program  The EPA proposed the first of these rulemaking efforts, the Phase One rule, in March 2018. The EPA then finalized a small number of the proposed Phase one rule provisions in the July 2018 Phase One Part One rule

## Designation of Per-and Polyfluoroalkyl Substances as Hazardous Substances

On May 22, 2018, the EPA held a two day National Leadership Summit on per and polyfluoroalkyl substances (PFAS). The Administrator announced that the EPA will begin the process to propose designating perfluorooctanoic acid (PFOA) and perfluorooctanesulfonic acid (PFOS) as "hazardous substances" through one of the available statutory mechanisms, including section 102 of the Comprehensive Environmental Response, Compensation, and Liability Act  The EPA is currently evaluating the various statutory mechanisms, such as the Clean Water Act Section 307(a) and Section 311. However, the Agency has not yet made a final decision on which mechanism is most appropriate

### *Ensure Safety of Chemicals in the Marketplace*

Chemicals and pesticides released into the environment as a result of their manufacture, processing, use, or disposal can threaten human health and the environment. The EPA gathers and assesses information about the risks associated with chemicals and pesticides and acts to minimize risks and prevent unreasonable risks to individuals, families, and the environment. The EPA acts under several different statutory authorities, including the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), the Federal Food, Drug and Cosmetic Act (FFDCA), the Toxic Substances Control Act (TSCA), the Emergency Planning and Community Right-to-Know-Act (EPCRA), and the Pollution Prevention Act (PPA)  Using best available science, the Agency will continue to satisfy its overall directives under these authorities and highlights the following efforts underway in FY 2019:

## Implementing TSCA amendments to enhance public health and chemical safety

The amendments to TSCA that were enacted in June 2016 now require the EPA to evaluate existing chemicals on the basis of the health risks they pose including risks to vulnerable groups and to workers who may use chemicals daily as part of their jobs. If unreasonable risks are found, the EPA must then take steps to eliminate these risks  However, during the risk management phase, EPA must balance the risk management decision with potential disruption based on compliance to the national economy, national security, or critical infrastructure.

The 2016 amendments to TSCA also require the EPA to take expedited regulatory action without a risk evaluation for persistent, bioaccumulative, and toxic (PBT) chemicals from the 2014 update of the TSCA Work Plan for Chemical Assessments that meet a specific set of criteria  Under the conditions of use for each PBT chemical, the EPA will characterize likely exposures to humans and the environment; this information is undergoing peer review and public comment  The exposure assessments will then be used to develop regulatory actions that address the risks of injury to health or the environment that the EPA determines are presented by the chemical substances and that reduce exposure to the chemical substances to the extent practicable  TSCA

requires the EPA to issue proposed rules no later than June 22, 2019, and final rules no more than 18 months later.

The 2016 amendments to TSCA also authorize the EPA to cover a portion of its annual costs for the TSCA program by collecting user fees from chemical manufacturers and processors when they submit test data for the EPA review; submit a premanufacture notice for a new chemical or a notice of new use; manufacture or process a chemical substance that is the subject of a risk evaluation; or request that the EPA conduct a chemical risk evaluation. In Fiscal Year 2019, the EPA expects to take final action on the 2018 proposed fees rule.

### Review of Lead Dust Hazard Standards under TSCA

In June 2018, EPA proposed strengthening the dust-lead hazard standards on floors and window sills. These standards apply to most pre-1978 housing and child-occupied facilities, such as day care centers and kindergarten facilities. Per a court order deadline, EPA intends on taking final action in June 2019.

### Reconsideration of Pesticide Safety Requirements

In Fiscal Year 2019, the EPA expects to take a final action on amendments to pesticide safety regulations that address requirements for the certification of pesticide applicators and established agricultural worker protection standards, which EPA intends on proposing in 2018. Specifically, the EPA is considering amending changes to the Certification of Pesticide Applicators regulations that EPA issued in 2017, and changes to the agricultural Worker Protection Standard regulations that EPA issued in 2015.

### *Annual Regulatory Costs*

Section 3 of Executive Order 13771 (82 FR 9339, February 3, 2017) calls on agencies to "identify for each regulation that increases incremental cost, the offsetting regulations...and provide the agency's best approximation of the total costs or savings associated with each new regulation or repealed regulation." Each action in the EPA's fall 2017 Regulatory Plan and Semiannual Regulatory Agenda contains information about whether an action is anticipated to be "regulatory" or "deregulatory" in fulfilling this executive directive. Based on current schedules and expectations regarding whether or not regulatory actions are subject to Executive Order 12866 and hence Executive Order 13771, in fiscal year 2019, the EPA is planning on finalizing approximately 30 deregulatory actions and fewer than ten regulatory actions.

### *Rules Expected to Affect Small Entities*

By better coordinating small business activities, the EPA aims to improve its technical assistance and outreach efforts, minimize burdens to small businesses in its regulations, and simplify small businesses' participation in its voluntary programs. Actions that may affect small entities can be tracked on the EPA's Regulatory Flexibility Web site (https://www.epa.gov/reg-flex) at any time.

# Exhibit 2

January 29, 2018

*Via U.S. Mail and Submission to Regulations.gov*

U.S. Environmental Protection Agency
EPA Docket Center
William J. Clinton West Building, Room 3334
1301 Constitution Avenue, NW
Washington, D.C. 20004

>    **Attention: Docket ID No. EPA-HQ-OAR-2017-0355, Repeal of Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units**

>    *Re*: **Comments on EPA Administrator Scott Pruitt's Improper Prejudgment of Outcome of Proposed Repeal of Clean Power Plan**

>    On behalf of their organizations and members throughout the United States, Environmental Defense Fund; Appalachian Mountain Club; Center for Biological Diversity; Clean Air Council; Clean Air Task Force; Clean Wisconsin; Conservation Law Foundation; Earthjustice; Environmental Law and Policy Center; National Parks Conservation Association; Sierra Club; and the Union of Concerned Scientists hereby submit this initial comment on the Environmental Protection Agency's proposal to repeal the Clean Power Plan ("CPP"), 82 Fed. Reg. 48,035 (Oct. 16, 2017) ("Proposed Repeal Rule"). Our organizations intend to file detailed comments on the substance of the proposal, but submit these comments separately to notify the Agency that the administrative process for this rulemaking is irredeemably tainted by the involvement of Administrator E. Scott Pruitt.

>    As explained in more detail below, Administrator Pruitt has made public statements that he has already decided to repeal the CPP – even that he has already done so – when in fact he has only *proposed* a repeal, and (as of the time the statements were made) had not yet even received public comment. These statements cross a clear line and show that Administrator Pruitt has a fixed position on the repeal of the rule, making his participation inconsistent with the Due Process Clause, which protects the public from rulemakings that are empty formalities because they are presided over by officials with an "unalterably closed mind." Administrator Pruitt's participation in these circumstances flouts the public rulemaking procedures set out in the Clean Air Act, 42 U.S.C. § 7607(d), and Administrative Procedure Act, 5 U.S.C. §§ 551-53, which require agency officials to adopt rules based on reasoned evaluation of the law, record evidence, and public comment. The rulemaking process fails to satisfy its statutorily required function when an official has already prejudged the matter before the public process is initiated and completed.[1]

---

[1] Ex. 1: On January 9, 2018, a coalition of state and local governments submitted initial comments in this proceeding documenting in detail the actions and statements demonstrating that Administrator Scott Pruitt has improperly prejudged the Proposed Repeal Rule. States of California, Delaware, Hawaii, Illinois, Maine, Maryland, New Mexico, New York, Oregon, Vermont, and Washington, the Commonwealth of Massachusetts, the District of Columbia, the County of Broward (Florida), and the Cities of Boulder (Colorado), Chicago (Illinois), New York

Differences on important matters of public policy are normal and to be expected in our democratic society, and successive presidential administrations should and do enjoy the ability to re-evaluate and change prior policies consistent with the Constitution, governing statutes and applicable case law.  We also recognize that people who have been involved in, and taken positions on, legal and policy issues outside of federal service are not for that reason alone foreclosed from later work on those same issues as part of their federal service.  Public officials deserve a strong presumption of good faith and regularity, and the great majority, whatever their backgrounds or general outlook, prove to merit such trust.  However, as explained below, Administrator Pruitt does not – he has departed egregiously from constitutional and statutory norms meant to protect the public's ability meaningfully to participate in rulemakings and has undermined the integrity of the administrative process.

Accordingly, the Proposed Repeal Rule that Administrator Pruitt signed must be withdrawn, and he must be recused from any further such proceeding.

A. **Administrator Pruitt's Participation in the Proposed Repeal Rulemaking Violates the Due Process Prohibition Against Rulemakings Administered by Officials with Unalterably Closed Minds**

The public has a right to "fair and open" rulemaking proceedings, including the right to an "impartial decisionmaker."[2]  Due Process is violated if an agency decision-maker presiding over a rulemaking proceeding has "an unalterably closed mind on matters critical to the disposition of the [rulemaking]."[3]  The standard for showing improper prejudgment is properly a demanding one, requiring a "clear and convincing" demonstration that the decisionmaker's mind is firmly closed.[4]  But Administrator Pruitt meets even this demanding test.

1. *Administrator Pruitt's Statements as Administrator Demonstrate Unlawful Prejudgment*

On multiple occasions since becoming EPA Administrator, Scott Pruitt has made public statements that he has already decided to repeal the CPP – even that he has already done so – and has numerous statements demonstrating a fixed hostility to the CPP that is clearly inconsistent with overseeing a fair rulemaking process.

- On February 18, 2017, the day after being sworn in as EPA Administrator, Administrator Pruitt used his official EPA Facebook account to republish a *Wall Street Journal* interview given on the eve of his swearing in, in which he stated that the "past administration didn't bother with statutes" and "disregarded the law" and explained that he expected to withdraw the CPP.[5]

---

(New York), Philadelphia (Pennsylvania), and South Miami (Florida), Comments on Administrator Scott Pruitt's Improper Prejudgment of Outcome of Proposed Repeal of Clean Power Plan, EPA-HQ-OAR-2017-0355-7861 (Jan. 9, 2018) (hereinafter "State/Local Initial Comments").

[2] *Ass'n of Nat'l Advertisers v. FTC*, 627 F.2d 1151, 1174 (D.C. Cir. 1979).

[3] *Ass'n of Nat'l Advertisers*, 627 F.2d at 1170, 1174; *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1179-80 (D.C. Cir. 1980).

[4] *Ass'n of Nat'l Advertisers*, 627 F.2d at 1170, 1174; *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 183-84 (D.C. Cir. 2015); *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1564 (D.C. Cir. 1991).

[5] Ex. 2: Scott Pruitt, Facebook (Feb. 18, 2017), https://www.facebook.com/EPAScottPruitt/posts/1408365892541915 (linking to Ex. 3: Kimberley A. Strassel, *Scott*

- On February 25, 2017, at an appearance at the Conservative Political Action Conference, Scott Pruitt asserted that the CPP is not "within the framework that Congress has passed," and promised that he would therefore "roll back" the rule.[6]

- In a March 26, 2017, interview on national television, Mr. Pruitt accused the Obama Administration of intentionally trying to "kill jobs throughout the country through the Clean Power Plan," a statement EPA then highlighted in a press release.[7]

- In a March 29, 2017, interview, Mr. Pruitt described the Administration's reconsideration of the CPP as "cleaning up the mess, you know, clearing the decks, if you will."[8]

- At a Fox News interview on April 2, 2017, Pruitt claimed that his predecessors "made. . . up" and "simply re-imagine[d]" their legal authority to promulgate the CPP.[9]

- On May 11, 2017, from his official EPA Administrator Twitter account, Administrator Pruitt tweeted a link to an article on The Daily Caller website quoting his own explanation of why, as Attorney General of Oklahoma, he had repeatedly sued EPA over the CPP: "They deserved it and they deserved it because they exceeded their statutory authority, they exceeded their constitutional authority."[10]

---

*Pruitt's Back-to-Basics Agenda for the EPA*, WALL ST. J. (Feb. 17, 2017), https://www.wsj.com/articles/scott-pruitts-back-to-basics-agenda-for-the-epa-1487375872).

[6] Scott Pruitt Speech at Conservative Political Action Conference (Feb. 25, 2017), https://www.youtube.com/watch?v=QxHk4vM0qLY ("We have to send a message across the country . . . that we're going to provide certainty by living within the framework that Congress has passed. And so, we're going to see regulations roll back that aren't consistent with that. WOTUS, Clean Power Plan, the methane rule, there are several.")

[7] Ex. 4: Press Release, EPA, *EPA Administrator Pruitt Previews President Trump's Executive Order on Energy Independence* (Mar. 26, 2017), https://www.epa.gov/newsreleases/epa-administrator-pruitt-previews-president-trumps-executive-order-energy-independence (quoting March 26, 2017 interview on ABC's *This Week with George Stephanopolous*, http://abcnews.go.com/Politics/week-transcript-26-17-sen-chuck-schumer-rep/story?id=46372022; *see also* Ex. 5: Scott Pruitt (@EPAScottPruitt), Twitter (Mar. 26, 2017), https://twitter.com/EPAScottPruitt/status/846008281260834816; Ex. 6: Scott Pruitt, Facebook (Mar. 26, 2017), https://www.facebook.com/EPAScottPruitt/posts/1444794498899054.

[8] Ex. 7: Hugh Hewitt Interview with Scott Pruitt, *EPA Adminstrator* [sic] *Scott Pruitt: "The Days Of 'Sue And Settle'...Have Ended."* (Mar. 29, 2017) (transcript available at: http://www hughhewitt.com/epa-adminstrator-scott-pruitt-days-sue-settle-ended/) (audio available at: http://www.hughhewitt.com/wp-content/uploads/03-29hhs-pruitt mp3).

[9] Ex. 8: Chris Wallace Interview with Scott Pruitt, *Scott Pruitt on balancing environmental, economic priorities,* Fox News (Apr. 2, 2017), http://www foxnews.com/transcript/2017/04/02/scott-pruitt-on-balancing-environmental-economic-priorities-mitch-mcconnell-on-gorsuch-nomination-health-care-reform html).

[10] *See* Ex. 9: Scott Pruitt (@EPAScottPruitt), Twitter (May 11, 2017, 2:05 PM), https://twitter.com/EPAScottPruitt/status/862745467679121408 (linking to Ex. 10: Michael Bastasch, *Scott Pruitt Explains Why He Sued EPA So Many Times: 'They Deserved It,'* THE DAILY CALLER (May 11, 2017), http://dailycaller.com/2017/05/11/scott-pruitt-explains-why-he-sued-epa-so-many-times-they-deserved-it/). EPA also issued a press release on the article: Ex. 11: Press Release, EPA, *EPA's Weekly Round-Up* (May 12, 2017), https://www.epa.gov/newsreleases/epas-weekly-round. This statements and others Pruitt has made show a mind clearly already made up concerning the precise legal theories on which the proposed Clean Power Plan repeal itself is based. *See* Ex. 1: State/Local Initial Comments at 3-11.

- On October 9, 2017, a day before his announcement of the Proposed Repeal Rule, speaking to a gathering of coal miners in Hazard, Kentucky, Administrator Pruitt proclaimed: "Here's the president's message: The war on coal is over."[11] Administrator Pruitt has repeatedly referred to the CPP as part of a "war on coal,"[12] so his meaning here could not be clearer – to repeal the Clean Power Plan.

- EPA's October 10, 2017, press release announcing the Proposed Repeal Rule included a statement from Administrator Pruitt claiming that the CPP would impose "devastating effects" on the public and describing the proposed repeal as "righting the wrongs of the Obama administration by cleaning the regulatory slate."[13]

- On October 10, 2017, the day that he signed the Proposed Repeal Rule, Administrator Pruitt retweeted from his official EPA account a statement from the Senate Majority Leader, Mitch McConnell: "Thank you @POTUS and @EPAScottPruitt *for repealing Obama-era harmful anti-coal job regulations*."[14]

- On October 11, 2017, he discussed future administrative actions regarding power plant emissions with radio host Hugh Hewitt, noting that "we had to provide clarity first and foremost *about the deficiency of this particular rule*."[15]

- In an October 29, 2017, interview, Mr. Pruitt described the CPP administrative process as "[t]he Clean Power Plan rollback that we're engaged in."[16]

- On November 9, 2017, in his welcome video for the Heartland Institute Energy Conference, made just after the release of EPA's proposal to repeal the Clean Power Plan, Administrator Pruitt stated: "Just to update you a little bit on what we've been doing.  We've been providing clarity – regulatory reform in areas that matter.  *We've*

---

[11] Ex. 12: *EPA chief to sign rule on Clean Power Plan exit on Tuesday*, REUTERS (Oct. 9, 2017), http://www.reuters.com/article/us-climatechange-usa-epa/epa-chief-to-sign-rule-on-clean-power-plan-exit-on-tuesday-idUSKBN1CE1RV.

[12] John Catsimatidis Interview with Scott Pruitt, *EPA Administrator Scott Pruitt – Saving billions for U.S. business*, The Cats Roundtable (Oct. 29, 2017), http://www.catsimatidis.com/epa-administrator-scott-pruitt-savings-billions-u-s-business/; Ex. 13: Rob Bluey Interview with Scott Pruitt, *Trump's EPA Chief Charts a New Course: An Interview With Scott Pruitt*, The Daily Signal (Oct. 20, 2017), http://dailysignal.com/2017/10/20/trumps-epa-chief-charts-new-course-interview-scott-pruitt/ ("Where is it in the Clean Air Act that the EPA has the authority to declare war on any sector of our economy?")

[13] Ex. 14: Press Release, EPA, *EPA Takes Another Step To Advance President Trump's America First Strategy, Proposes Repeal Of "Clean Power Plan"* (Oct. 10, 2017), https://www.epa.gov/newsreleases/epa-takes-another-step-advance-president-trumps-america-first-strategy-proposes-repeal; Ex. 15: Scott Pruitt, Facebook (Oct. 10, 2017), https://www.facebook.com/EPAScottPruitt/posts/1649983501713485.

[14] Ex. 16: Scott Pruitt (@EPAScottPruitt), Twitter (Oct. 10, 2017), https://twitter.com/SenateMajLdr/status/917813566484381698 (Retweet of Mitch McConnell (@SenateMajLdr), "Thank you @POTUS and @EPAScottPruitt for repealing Obama-era harmful anti-coal job regulations http://bit.ly/2yekzRQ ") (emphasis added).

[15] Ex. 17: Hugh Hewitt Interview with Scott Pruitt, *EPA Administrator Scott Pruitt On Clean Power Plan Rulemaking* (Oct. 11, 2017) (transcript available at: http://www.hughhewitt.com/epa-administrator-scott-pruitt-clean-power-plan-rulemaking/) (emphasis added) (audio available at: http://www.hughhewitt.com/wp-content/uploads/10-11hhs-pruitt.mp3); *see also* Ex. 1: State/Local Initial Comments at 19-20.

[16] John Catsimatidis Interview with Scott Pruitt, *EPA Administrator Scott Pruitt – Saving billions for U.S. business*, The Cats Roundtable (Oct. 29, 2017), http://www.catsimatidis.com/epa-administrator-scott-pruitt-savings-billions-u-s-business/.

*withdrawn the Clean Power Plan.*  And we're providing, you know, certainty and clarity there."[17]

These are not the words of an Administrator positioned to give fair consideration to public comment on *whether* to repeal the rule.  Administrator Pruitt has continued to demonstrate a "single-minded commitment to a particular position that makes [him] totally incapable of giving fair consideration to the issues that are presented for decision."[18]  He has proceeded repeatedly to describe the Proposed Repeal Rule in terms that reflect a disregard for the public comment process – and even as something that has already been accomplished.

Administrator Pruitt's statements overwhelmingly show that the administrative proceedings are heading toward a predetermined result, and that the rulemaking process that Congress intended to be the basis of important Clean Air Act policies is being treated as nothing more than a cynical, *pro forma* ritual to make sure that required boxes are checked.[19]

2. *Administrator Pruitt's Conduct and Statements as Oklahoma Attorney General Provide Relevant Background to His Prejudging Statements as Administrator*

Scott Pruitt's conduct and statements concerning the Clean Power Plan while he was Oklahoma Attorney General provide important background for his recent conduct as EPA Administrator, further demonstrating that statements revealing a single-minded intent to repeal the rule are no casual misstatements.  As Attorney General of Oklahoma, Mr. Pruitt was a leading proponent of legal challenges to the Clean Power Plan, initiating improper, premature lawsuits even before the CPP was finalized, and acted as an outspoken advocate, both in court and in public, during the litigation challenging the final rule.[20]  Attorney General Pruitt characterized himself as a leader of the opposition to the CPP, launching an aggressive multi-year series of court filings, press releases, and social media posts.[21]

For example, after the D.C. Circuit unanimously dismissed a lawsuit brought by Mr. Pruitt and others seeking to challenge the *proposed* Clean Power Plan, *In re Murray Energy Corp.*, 788 F.3d 330 (D.C. Cir. 2015), Attorney General Pruitt filed a new pre-promulgation lawsuit, without support from any other state, in federal district court in Oklahoma.  The Court summarily dismissed the lawsuit.  His filings described the proposed CPP as "ultra vires," based on "bogus authority," "blatantly unlawful," "simply incompatible with the requirements of Section 111(d)" and in excess of "EPA's authority under the Clean Air Act and . . . the Constitution."[22]  Mr. Pruitt argued that the proposed CPP was "unlawful because it relies on

---

[17] Scott Pruitt Welcome Video, Heartland Institute Energy Conference, (Nov. 9, 2017), https://www.youtube.com/watch?v=OpGYQ3W9tF4 (at 1:04-1:08) (emphasis added).

[18] *Lead Industries Ass'n v. EPA*, 647 F.2d 1130, 1179 (D.C. Cir. 1980).

[19] Administrator Pruitt's characterizations of the repeal of the Clean Power Plan as a *fait accompli* reinforce similar public statements by President Trump:  Shortly before the proposal was signed, the President claimed that the Clean Power Plan was already repealed: "Did you see what I did to that? Boom, gone."  Ex. 18: Lisa Friedman, *Trump Wants to Repeal Obama's Climate Plan. The Next Fight: Its Replacement*, N.Y. TIMES. (Sept. 28, 2017), https://www.nytimes.com/2017/09/28/climate/clean-power-plan.html?_r=0.

[20] Ex. 1: State/Local Initial Comments at 3-11.

[21] *See, e.g.*, Ex.1: State/Local Initial Comments at 4-5 nn. 7, 10, 12-13.

[22] Complaint (ECF #2) at ¶¶ 1, 67, 69, *Oklahoma v. McCarthy*, No. 4:15-cv-00369 (N.D. Okla. July 1, 2015); Br. in Support of P.'s Mot. for Preliminary Injunction (ECF #6) at 1, 17, *Oklahoma v. McCarthy*, No. 4:15-cv-00369 (N.D. Okla. July 1, 2015). That suit too was promptly dismissed, Opinion and Order (ECF # 28), *Oklahoma v. McCarthy*, No. 4:15-cv-00369 (N.D. Okla. July 17, 2015), and a unanimous panel of the Tenth Circuit declined Pruitt's motion

'beyond-the-fenceline' measures that do not concern the emissions performance of individual sources and are therefore outside the regulatory scope of Section 111(d)," urging that "EPA lacks authority under the CAA to regulate beyond-the-fenceline," and that "consistent with plain meaning, 'best system of emission reduction' must be limited to on-site measures."[23]

In the D.C. Circuit litigation, Mr. Pruitt filed a stay motion on behalf of the State of Oklahoma arguing that the CPP "clash[es] with the statutory text" and "impose[s] unconstitutional burdens."[24]  At each step Mr. Pruitt voiced adamant opposition to the CPP and its legality, declaring that the CPP "will. . . not survive [Obama's] presidency."[25]  As noted above, even as Administrator, Pruitt has continued to praise his own litigation campaign against the CPP.[26]

Shortly after the November presidential election, Mr. Pruitt went on Facebook and Twitter to declare that he had "done [his] part, fighting tirelessly against" the CPP and other Obama Administration policies.[27]  When Donald Trump announced Mr. Pruitt as his nominee for EPA Administrator, Trump's transition team described Mr. Pruitt as a "national leader against EPA's job-killing war on coal."[28]

As state attorney general, Mr. Pruitt was free to litigate and campaign against the Clean Power Plan.  But he is now Administrator of the Environmental Protection Agency, responsible for administering the Clean Air Act on behalf of the entire United States and all of its residents. The Clean Power Plan is the law, and (absent Act of Congress or a vacatur by a court) may only be changed according to the rulemaking procedures set out in the Clean Air Act.  Those procedures contemplate an important role for the public, including the opportunity to comment and submit information before a decision is made.  Far from acknowledging his new role and showing respect for the public comment process, as shown above, as Administrator of EPA, Scott Pruitt has demonstrated that his mind is firmly closed with respect to the Clean Power Plan repeal rulemaking.

---

for a preliminary injunction blocking the proposed rule, Order (ECF #01019480173), *Oklahoma v. McCarthy*, No. 15-5066 (10th Cir. Aug. 24, 2015).

[23] Br. in Support of P.'s Mot. for Preliminary Injunction (ECF #6) at 13, *Oklahoma v. McCarthy*, No. 4:15-cv-00369 (N.D. Okla. July 1, 2015). *Id.* at 19, 24.

[24] *See* Pet. Okla.'s Mot. for Stay of EPA's Existing Source Performance Standards for Electric Generating Units (ECF #1580577) at 7, *Oklahoma v. EPA*, No. 15-1364 (D.C. Cir. Oct. 28, 2015).

[25] Ex. 19: Paul Monies, *ICYMI: U.S. Supreme Court grants stay on implementing Clean Power Plan*, THE OKLAHOMAN (Feb. 10, 2016), https://www.ok.gov/triton/modules/newsroom/newsroom_article.php?id=258&article_id=18424.

[26] *See supra* n. 10.

[27] Ex. 20: Scott Pruitt, Facebook (Nov. 17, 2016), https://www.facebook.com/ScottPruitt/posts/10153988260521643; *see also* Ex. 21: Scott Pruitt (@ScottPruittOK), Twitter (Nov. 17, 2016, 10:51 AM), https://twitter.com/ScottPruittOK/status/799293948611203072 ("I've fought for 6 yrs against . . . the Clean Power Plan.")

[28] Ex. 22: Press Release, Donald J. Trump, *President-Elect Donald J. Trump Intends to Nominate Oklahoma Attorney General Scott Pruitt to Serve as the Administrator of the Environmental Protection Agency* (Dec. 8, 2016), http://www.presidency.ucsb.edu/ws/index.php?pid=119781.

3. *Administrator Pruitt's Recusal from the CPP Litigation Does Not Cure the Illegality of His Participation in the Administrative Proceeding Concerning the Proposed Repeal*

Administrator Pruitt is recused from participating in the ongoing Clean Power Plan litigation, *West Virginia v. EPA*, No. 15-1363 (D.C. Cir.).[29]  But his recusal from the *litigation* does not erase his obligations to the public in the conduct of the *rulemaking* concerning the proposed repeal of the CPP.  On the contrary, Administrator Pruitt's background as a leading litigant and public campaigner against the CPP made it incumbent upon him to assure the public that he at least would maintain ordinary standards of fairness in superintending rulemaking relating to the CPP.  Unfortunately, as explained above, he has done the opposite.

B. **Administrator Pruitt's Prejudgment of the Clean Power Plan Repeal Proposal Flouts the Clean Air Act's Rulemaking Process**

The facts recounted above also demonstrate that Administrator Pruitt has violated the Clean Air Act's rulemaking requirements.

The rulemaking process set forth in the Clean Air Act guarantees that decisions affecting regulated parties and the public health and welfare will be made based upon a careful consideration of law, evidence, and comments from the public.[30]  It "ensur[es] that agency regulations will be tested by exposure to diverse public comment," and provides "notice and the opportunity to be heard . . . an essential component of 'fairness to affected parties.'"[31]  It also "enhances the quality of judicial review" by "giving affected parties an opportunity to develop evidence in the record to support their objections to a rule."[32]

The Clean Air Act's rulemaking process – an expansion of the preexisting Administrative Procedure Act framework – gives the public robust rights to participate in, comment on, and submit information and legal arguments concerning, proposed EPA rules (including rules that repeal existing rules).  42 U.S.C. §§ 7607(d)(3)-(7).  The entire premise of the public comment process is that the agency will carefully consider public comments before it reaches a final decision, and will respond to public comments as part of the final decision.[33]  The process is subverted if the agency decision-maker has committed to a decision before consideration of public comment submissions.  Indeed, pronouncements by the agency head prejudging the

---

[29] *See* Ex. 23: Kevin Bogardus and Amanda Reilly, *Pruitt Recuses Himself from Clean Power Plan*, *WOTUS Suits*, E&E News (May 5, 2017), https://www.eenews.net/stories/1060054153.

[30] 42 U.S.C. § 7607(d).

[31] *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Circ. 1983) (quoting *Nat'l Ass'n of Home Health Agencies v. Schweiker*, 690 F.2d 932, 949 (D.C. Cir. 1982) (other citations and internal quotation marks omitted). *See Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (citation omitted). *See also Batterton v. Marshall*, 648 F.2d 694, 703-04 (D.C. Cir. 1980); *N.C. Growers' Ass'n v. United Farm Workers*, 702 F3d. 755, 763 (4th Cir. 2012) ("The important purposes of this notice and comment procedure cannot be overstated," as public comment both affords the public an opportunity to participate in important governmental decisions and helps to ensure more informed public policy.).

[32] *Small Refiner Lead Phase-Down Task Force*, 705 F.2d at 547.

[33] *See N.J. Dep't of Envtl. Prot. v. EPA*, 626 F.2d 1038, 1049–50 (D.C. Cir. 1980) (explaining why allowing public comment after a decision has already been made is not consistent with the Administrative Procedure Act or Clean Air Act) (citing, among other cases, *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979)).

outcome of the rulemaking – or even asserting that the rulemaking is already done – inevitably suppress the public's interest and engagement in the public process.

Under the Clean Air Act and the Administrative Procedure Act, the public's right to comment must be "meaningful."[34]  When a decisionmaker has prejudged a given matter, the public comment process does not perform its congressionally intended function – that "meaningful" due process opportunity becomes a meaningless exercise.  The agency officials might still review the comments, but the public's contributions can have no real bearing on the decision.  And the agency's response to comments is not a sincere interchange, but a cynical exercise in rationalization of a decision made without public input.  Pronouncements by the agency head, before comments are even received or considered, that the rule in question is not lawful, is being rolled back or has already been withdrawn inevitably suppress public interest and engagement.  Such administrative prejudgment flouts the fundamental precepts of rulemaking under federal statutes including the Clean Air Act.[35]

## CONCLUSION

The Clean Air Act's rulemaking process depends upon robust public participation concerning legal, factual, and policy issues.  The agency's commitment to full participation from all stakeholders affected by Clean Air Act rules has contributed to the Act's remarkable success over almost 50 years of saving lives, protecting the nation's natural resources, and contributing to a robust economy.[36]  Public confidence that the agency will take public comments and evidentiary submissions seriously have surely contributed to the public's strong and consistent support for the Act.  Administrator Pruitt's conduct, as described above, departs abruptly from these norms and threatens that legitimacy and public support.

Conduct and statements like those described above and in the State/Local Initial Comments break with the long tradition of EPA Administrators who, despite implementing shifts in policy, have demonstrated respect for the public rulemaking process and the ability to maintain an open mind on contested regulatory issues.  If EPA is to fulfill its Clean Air Act obligations and to preserve its legacy, it must reaffirm its commitment to the statute's public processes.

---

[34] *Ethyl Corp. v. EPA*, 541 F.2d 1, 85 (D.C. Cir. 1976); *see also Prometheus Radio Project v. FCC*, 652 F.3d 431, 450 (3d Cir. 2011); *N.C. Growers Ass'n, Inc*., 702 F.3d at 770.

[35] As the State/Local Initial Comments demonstrate, Administrator Pruitt's statements also demonstrate a lack of even the appearance of impartiality, in contravention of federal ethics regulations.  *See* Ex. 1: State/Local Initial Comments at 23-26.

[36] *See, e.g.,* EPA, "Highlights from the Clean Air Act 40th Anniversary," *available at* https://www.epa.gov/clean-air-act-overview/highlights-clean-air-act-40th-anniversary (collecting materials describing the benefits achieved under the first 40 years of the Clean Air Act's implementation); *see also* EPA, "The Benefits and Costs of the Clean Air Act, 1970 to 1990," *available at* https://www.epa.gov/sites/production/files/2015-06/documents/contsetc.pdf (reporting on the first 20 years of Clean Air Act implementation).

For the reasons stated above, Administrator Pruitt's involvement in the CPP repeal rulemaking is unlawful. The Proposed Repeal Rule must be withdrawn, and Administrator Pruitt must be recused from any further rulemaking on this matter.

Respectfully submitted,


Sean H. Donahue
Donahue, Goldberg & Weaver, LLP
1111 14th St., NW Suite 510A
Washington, D.C. 20002
(202) 277-7085
sean@donahuegoldberg.com


Counsel for Environmental Defense Fund


APPALACHIAN MOUNTAIN CLUB:

Georgia Murray
Staff Scientist
Appalachian Mountain Club
10 City Square
Boston, MA 02129
603.466.8111 | gmurray@outdoors.org


CENTER FOR BIOLOGICAL DIVERSITY:

Vera P. Pardee
Senior Counsel
Climate Law Institute
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (415) 632-5317
Fax: (510) 844-7117
http://www.biologicaldiversity.org


CLEAN AIR COUNCIL:

Joseph Otis Minott
Executive Director and Chief Counsel
Clean Air Council
135 South 19th Street, Suite 300
Philadelphia, PA 19103
215-567-4004 x116


CLEAN AIR TASK FORCE:

Ann Brewster Weeks
Legal Director
Clean Air Task Force
114 State Street, 6th floor
Boston, MA 02109
617-359-4077
aweeks@catf.us

CLEAN WISCONSIN:

Kathryn Nekola
General Counsel
Clean Wisconsin
634 W. Main St. #300
Madison, Wisconsin   53703

CONSERVATION LAW FOUNDATION:

Greg Cunningham
Vice President and Program Director
Clean Energy and Climate Change
Conservation Law Foundation
53 Exchange Street, Suite 200
Portland, ME 04101
P: 207-210-6439
gcunningham@clf.org

EARTHJUSTICE:

Howard I. Fox, Counsel
David S. Baron, Managing Attorney
EARTHJUSTICE
1625 Massachusetts Ave., NW, Suite 702
Washington, D.C. 20036
hfox@earthjustice.org, 202-797-5241
dbaron@earthjustice.org, 202-745-5203

ENVIRONMENTAL DEFENSE FUND:

Sean H. Donahue
Donahue, Goldberg & Weaver, LLP
1111 14th St., NW Suite 510A
Washington, D.C. 20002
(202) 277-7085
sean@donahuegoldberg.com

Tomás Carbonell
Martha Roberts
Surbhi Sarang
Environmental Defense Fund
1875 Connecticut Avenue NW
Suite 600
Washington, D.C. 20009
(202) 572-3243

ENVIRONMENTAL LAW AND
   POLICY CENTER:

Howard A. Learner
Executive Director & Senior Attorney
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, Illinois 60601
HLearner@elpc.org, 312-673-6500
*www.elpc.org*

NATIONAL PARKS CONSERVATION
   ASSOCIATION:

Stephanie Kodish
Senior Director & Counsel, Clean Air
Program
National Parks Conservation Association
777 6th St. NW Suite 700
Washington, DC 20001
865.964.1774
skodish@npca.org

SIERRA CLUB:                                UNION OF CONCERNED SCIENTISTS:

Joanne Spalding                             Kenneth Kimmell
Chief Climate Counsel                       President
& Deputy Legal Director                     Union of Concerned Scientists
Sierra Club                                 Two Brattle Square,
2101 Webster Street, Suite 1300             Cambridge, MA 02138
Oakland, CA 94612                           202-331-5420
Office: 415-977-5725                        www.ucsusa.org |
Cell: 510-612-4062


cc:

    E. Scott Pruitt, Administrator
    Matthew Z. Leopold, General Counsel
    Justina Fugh, Senior Counsel for Ethics



October 31, 2017

*Via regulations.gov*
EPA–HQ–OAR–2017–0355


Administrator Scott Pruitt
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Washington, DC 20460


*Re: Request for Public Hearings on Proposed Repeal of the Clean Power Plan*


Dear Mr. Pruitt:

On behalf of our more than three million members and supporters, Sierra Club requests that EPA conduct public hearings on the proposed repeal of the Clean Power Plan.  82 Fed. Reg. 48,035 (Oct. 16, 2017).  These hearings should be held in Washington, D.C. and in places where communities are experiencing the adverse impacts of climate change and the harmful effects of power plant pollution.

Under the Clean Air Act, the Administrator is legally required to give interested persons an opportunity for the oral presentation of data, views, or arguments during the rulemaking process.  42 U.S.C. § 7607(d)(5).  Sierra Club, its members, and supporters are keenly interested in providing oral testimony on the dire consequences of your proposed repeal for our communities.

Your proposed repeal would violate EPA's obligation to regulate greenhouse gas pollution from power plants.  The Supreme Court has held that greenhouse gases are air pollutants subject to regulation under the Clean Air Act, and that the Act "speaks directly" to emissions of carbon dioxide from power plants.  *Massachusetts v. EPA*, 549 U.S. 497, 528-529 (2007); *American Electric Power v. Connecticut*, 131 S.Ct. 2527, 2530 (2011).

The Clean Power Plan, our country's first federal limits on carbon pollution for existing power plants, will protect the health of our members and supporters, their families, and the

public at large, by curbing dangerous carbon pollution that is exacerbating extreme weather events, as well as reducing other harmful pollutants that cause respiratory illnesses, heart disease, and premature death.  In the final Clean Power Plan, EPA estimated that the rule will prevent 90,000 asthma attacks and up to 3,600 premature deaths annually, and that it will provide $20 billion of annual climate benefits and between $14 billion to $34 billion of annual health benefits by 2030.  The agency also projected that in 2030, when the rule is fully implemented, electricity bills will be roughly 8 percent lower than they would have been without the rule in place.  Repealing the Clean Power Plan would put our communities at risk of further climate disruption and negate them the opportunity to benefit from cleaner air and economic opportunities.

The Clean Power Plan is the result of unprecedented outreach to states, tribes, utilities, communities of color, and the public at large, including 4.3 million comments EPA received on the proposed rule. The agency held four public hearings on its proposal, in Atlanta, Denver, Pittsburgh, and Washington, D.C., as well as one hearing in Chicago on its proposed Clean Energy Incentive Program.  In those hearings, members of the public had the opportunity to express their support for this sensible regulation that reflects emission reduction strategies being used today to decrease carbon pollution from power plants.  At the very least, EPA must afford the public the same opportunities to comment on its proposed repeal.

Hearings should be conducted in Washington, D.C. and other locations, particularly those affected by recent extreme weather events, including hurricanes and wildfires.  Hearings should also be held in communities affected by power plant pollution.  In identifying these communities, the agency should rely on its own proximity analysis of the Clean Power Plan, which found that a higher percentage of communities of color and low-income communities live near power plants when compared to the national averages.  EPA should also use greenhouse gas emission data available under its own reporting programs, as well as air plume modeling of affected power plants, which is readily available to the agency.

Respectfully submitted,

Joanne Spalding
Chief Climate Counsel
joanne.spalding@sierraclub.org

Alejandra Núñez
Senior Attorney
alejandra.nunez@sierraclub.org

Exhibit 3

EXPLORE, ENJOY AND PROTECT
THE PLANET

(http://www.sierraclub.org)

# Our Nation's Biggest Climate Action Is Under Attack. Defend the Clean Power Plan!



Carbon pollution and other emissions from coal power plants continue to harm our families and make climate change worse. Issued under the Obama Administration, EPA's Clean Power Plan would have reduced carbon emissions from the electricity sector by 32 percent, avoided 90,000 asthma attacks per year, and prevented 3,200 premature deaths per year by 2030. Now, the Trump Administration has announced its intention to scrap the Clean Power Plan and replace it with a rule that does virtually nothing to reduce these dangerous emissions.

The harmful effects of coal plant pollution disproportionately affect communities of color and low-income families. That's why the Trump Administration's decision to get rid of the Clean Power Plan is an added assault on the most vulnerable among us. With the recent extreme weather events -- hurricanes, floods, and wildfires -- it's clear we need stronger climate action, not less.

Clean energy is winning nationwide, helping reduce the pollution that harms our climate, our air, and our water. We need to encourage the growth of our clean energy economy.


22.5K

**The EPA will look for comments on its recent decision and we want to demonstrate that there is a large and loud movement that supports strong climate action like the Clean Power Plan. Will you join us and submit a comment?**

# 56,179

**SIGNATURES** OF 70,000 GOAL

1                              2

**First Name**                  **Last Name**

[                         ]      [                         ]

**Email**                       **Zip**

[                         ]      [                         ]

By clicking continue, you will also receive periodic communications from the Sierra Club. You can unsubscribe at any time.

Continue

---

*Images owned by Sierra Club*

---

Home (http://www.sierraclub.org/) | Contact Us (http://www.sierraclub.org/contact) | Website Help
(mailto:webmaster@sierraclub.org) | Privacy Policy/Your California Privacy Rights
(http://www.sierraclub.org/privacy/) | Terms and Conditions of Use (http://www.sierraclub.org/terms/)

Sierra Club® and "Explore, enjoy and protect the planet"® are registered trademarks of the Sierra Club. ©
2018 Sierra Club (http://www.sierraclub.org/copyright).
The Sierra Club Seal is a registered copyright, service mark, and trademark of the Sierra Club.

Exhibit 4

11/9/2018    EPA Releases Fall 2018 Unified Agenda and Regulatory Plan Shows Commitment to Strong Environmental Protection and Regulatory R…

Case 3:18-cv-05471-EDL    Document 32-5    Filed 11/09/18    Page 35 of 75

An official website of the United States government.

We've made some changes to EPA.gov. If the information you are looking for is not here, you may be able to find it on the EPA Web Archive or the January 19, 2017 Web Snapshot.

Close

 United States Environmental Protection Agency

# News Releases from Headquarters

## EPA Releases Fall 2018 Unified Agenda and Regulatory Plan Shows Commitment to Strong Environmental Protection and Regulatory Reform

10/17/2018

Contact Information
EPA Press Office (press@epa.gov)

**WASHINGTON** – Today, the U.S. Environmental Protection Agency (EPA), along with the rest of the federal government, released the Fall 2018 *Unified Agenda of Regulatory and Deregulatory Actions* and *Regulatory Plan,* which provides updates to the public about regulatory activity. The Fall 2018 *Regulatory Agenda and Plan* show strong progress toward regulatory reform while advancing EPA's core mission of protecting human health and the environment.

**"To date, under President Trump, EPA has finalized 28 major deregulatory actions saving Americans over $1.6 billion and meeting the President's two-for-one regulatory order,"** said EPA Acting Administrator Andrew Wheeler. **"We are providing the states and regulated community the regulatory certainty they need to advance new technologies, improve environmental protections, and enhance economic growth."**

EPA's Fall 2018 *Agenda of Regulatory and Deregulatory Actions* shows continued progress in reducing regulatory burden as envisioned by Executive Order 13771. In the last fiscal year, EPA finalized 10 deregulatory actions and saved a total of $1.2 billion in regulatory costs. To date, under President Trump, EPA has finalized 28 major deregulatory actions saving Americans over $1.6 billion. For the next fiscal year, EPA has proposed a regulatory budget that anticipates saving a total of $818 million in regulatory costs. Additionally, the *Regulatory Agenda* includes 45 actions that are expected to be deregulatory. Thirty-four actions will appear for the first time.

EPA's 2018 *Regulatory Plan* describes 25 priority actions it plans to propose or complete in the coming year, including:

- The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks

Case 3:18-cv-03472-EDL Document 32-5 Filed 11/09/18 Page 36 of 75

- The Affordable Clean Energy Rule – Emission Guidelines for Greenhouse Gas Emissions From Existing Electric Utility Generating Units; Revisions to Emission Guideline Implementing Regulations; Revisions to New Source Review Program
- Revised Definition of "Waters of the United States"

To access EPA's Fall 2018 *Semiannual Agenda of Regulatory and Deregulatory Actions:* https://www.reginfo.gov/public/do/eAgendaMain.

To access EPA and other agencies' regulatory budgets: https://www.reginfo.gov/public/do/eAgendaEO13771

For more information about regulatory reform at EPA: https://www.epa.gov/laws-regulations/epa-deregulatory-actions

LAST UPDATED ON OCTOBER 17, 2018

Exhibit 5

## TIER ONE

**Domain Names:**

afandpa.org
afpm.org
agrium.com
api.org
bakerlaw.com
cement.org
chevron.com
dominionenergy.com
duke-energy.com
enbridge.com
evonik.com
exxonmobil.com
faegrebd.com
fhrnavigator.com
ge.com
hunton.com
kindermorgan.com
kochind.com
kochps.com
lehighhanson.com
lowes.com
mabrypublicaffairs.com
manta.com
nationalenergyresources.com
nssga.org
nutrien.com
pfizer.com
pseg.com
saferchemicals.org
spiritbank.com
srpnet.com

## TIER TWO

**Domain Names:**

819eagle.com
aeci.org
aep.com
alphanr.com
americanchemistry.com
americancoalcouncil.org
americaspower.org
aramcoservices.com
archcoal.com
artexfas.com
bio.org
biodiesel.org
bnsf.com
bockornygroup.com
bp.com
bplegal.com
cbsnews.com
cfacorp.com
chick-fil-a.com
cj-lake.com
coalsource.com
comcast.com
eei.org
ethanolrfa.org
feca.com
firstenergycorp.com
gazette.com
gdcillc.com
gibsondunn.com
hbwresources.com
hess.com
iadc.org
indianacoal.com
ipaa.org
kaec.org
lignite.com
lppc.org
magellanlp.com
marathonoil.com
marathonpetroleum.com
murexltd.com

nacoal.com
nma.org
nppd.com
nreca.org
ohiocoal.com
opayq.com
peabodyenergy.com
pebblepartnership.com
publicpower.org
regi.com
republicanags.com
rngcoalition.com
sands.com
sembler.com
shell.com
State.tx.us
statoil.com
swn.com
teapartypatriots.org
theoldefarm.com
thirdsecurity.com
total.com
tristategt.org
txoga.org
us.water-gen.com
uswag.org
valero.com
virginiacoalenergy.com
vistraenergy.com
wfs-dc.com
williams.com
wvcoal.com

2

## TIER THREE

**Domain Names:**

3m.com
afsinc.org
aga.org
brainerdchemical.com
cgcn.com
chemours.com
consolenergy.com
conturaenergy.com
cummins.com
depausa.org
donaldtrump.com
dow.com
eastman.com
freedomworks.org
hollyfrontier.com
lca.org
livingstongroupdc.com
michaelbeststrategies.com
monsanto.com
nacd.com
nationalbcc.org
nationalsbeap.org
paint.org
ruleoflawdefensefund.org
socma.com
spn.org
up.com
vzwpix.com

## TIER FOUR

**Domain Names:**

agaviation.org
babstcalland.com
balch.com
boydengrayassociates.com
bracewell.com
bracewelllaw.com
croplife.org
croplifeamerica.org
crowell.com
fb.org
feratepllc.com
hollandhart.com
jacksonlewis.com
jw.com
maryland.gov
mayerbrown.com
nasda.org
ncaeonline.org
perkinscoie.com
riggsabney.com
sidley.com
steptoe-johnson.com
troutmansanders.com
venable.com

## TIER FIVE

**Domain Names:**

aia.org
alec.org
arlp.com
atr.org
autoalliance.org
awwa.org
cato.org
cei.org
coloradomining.org
epri.com
ford.com
frc.org
frontierwater.com
globalautomakers.org
gm.com
heartland.org
heritage.org
listserv.okstate.edu
manhattan-
institute.org
mercatus.gmu.edu
miningamerica.org
nacwa.org
nawc.com
nevadamining.org
nrwa.org
ntmwd.com
okstate.edu
rosebudmining.com
toyota.com
utahmining.org
wyomingmining.org

**TIER SIX**

**Domain Names:**

agrigrowth.org

alfafarmers.org

awc.org

bciu.org

bcnys.org

brattle.com

bsdf-assbt.org

coloradolivestock.org

corn.org

dna.com

eog.myflorida.com

growthenergy.org

idahocattle.org

illinoisbeef.com

Iowa.gov

kfb.org

kla.org

mosaicco.com

nafoalliance.org

ndfb.org

newtrient.com

nmagriculture.org

noble.org

orcattle.com

ouragfuture.com

reason.org

sorghumgrowers.com

sugarcaneleague.org

syngenta.com

tfi.org

thepoultryfederation.com

usabiomass.org

wga.com

**TIER SEVEN**

**Domain Names:**

accf.org

action.gop.com

afphq.org

aham.org

alcoal.com

alpinegroup.com

aluminum.org

cagw.org

cldpk.com

cmsenergy.com

crcpublicrelations.com

dupont.com

fed-soc.org

forestfoundation.org

getliberty.org

gmu.edu

gop.com

hertiage.org

hhqventures.com

honeywell.com

ihs.gmu.edu

jamesmadison.com

kenpaxton.com

lehighanthracite.com

lime.org

limitgov.org

lincolnclub.org

millenniumbulk.com

nahb.org

nam.org

nei.org

nrdonline.org

oge.com

pacificlegal.org

pahousegop.com

rga.org

rubiconglobal.com

santeecooper.com

siemens.com

steel.org

steelnet.org

texaspolicy.com

tinyjewelbox.com

tommyforidaho.com

walmart.com

westerncaucusfoundation.org

xcelenergy.com

**TIER EIGHT**

**Domain Names:**

agc.org
akingump.com
anadarko.com
andeavor.com
arabtecku.com
ardaghgroup.com
arkema.com
artba.org
bakerbotts.com
bhpbilliton.com
boeing.com
burnsmcd.com
clr.com
commercelexington.com
conocophillips.com
cov.com
ecopetrol.com.co
eelegal.org
eni.com
environcorp.com
fitzgeraldtrucksales.com
gpreinc.com
haynesboone.com
hklaw.com
hoganlovells.com
ipc.org
iwpawood.org
lathamalumni.com
lwsl-law.com
mjbradley.com
morganlewis.com

nblenergy.com
noia.org
occemail.com
okagassn.org
okstatechamber.com
oxy.com
p66.com
pachamber.org
pestworld.org
pillsburylaw.com
pioga.org
poet.com
poetep.com
siouxlandchamber.com
thepetrousgroup.com
toyassociation.org
troutman.com
uschamber.com
uss.com
ustires.org
wilmerhale.com

## TIER NINE

**Domain Names:**

abrahamgroupllc.com
americanactionforum.org
americanaustraliancouncil.org
bat.com
betterseed.org
breitbart.com
capitolstrategies.com
castlelake.com
chk.com
congressionalsportsmen.org
dowcorning.com
duesouthinvestments.com
enviroanalyticsgroup.com
fox23.com
fox61.com
foxbusiness.com
foxnews.com
foxtv.com
freebeacon.com
georgeallen.com
globalexternal.com
goeasassociates.com
gowanco.com
gps-50.com
hdrinc.com
malvaney.com
michelekdavispllc.com
monumentpolicy.com
ncfb.org
ncga.com

ntknetwork.com
okeeffestrategies.com
okfb.org
okpork.org
orangelinecondo.com
owh.com
s-3group.com
sbgtv.com
sblstrategies.com
scipinion.com
shb.com
specialtycrops.org
tetratech.com
thepolicygroup.com
tyson.com
wardo.com
washingtontimes.com

**TIER TEN**

**Domain Names:**

Alaska.gov
Arkansas.gov
Georgia.gov
Illinois.gov
Kentucky.gov
Ks.gov
Maine.gov
Michigan.gov
Mo.gov
Mt.gov
Myflorida.com
Nc.gov
Nd.gov
Nebraska.gov
Nh.gov
Ohio.gov
Pa.gov
State.nm.us
State.sd.gov
Tn.gov
Utah.gov
Wisconsin.gov
Wyo.gov

# Exhibit 6



June 20, 2017

**SUBMITTED ELECTRONICALLY**
**HARD COPY TO FOLLOW BY U.S. MAIL**

National Freedom of Information Officer
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW (2822T)
Washington, DC 20460
(202) 566-1667

**Re: Freedom of Information Act Request for schedule and activities of Administrator E.
Scott Pruitt and senior managers**

Dear National Freedom of Information Officer:

Environmental Defense Fund ("EDF") respectfully requests records, as that term is defined at 5
U.S.C. § 552(f)(2) of the Freedom of Information Act ("FOIA"), of the U.S. Environmental
Protection Agency ("EPA" or the "Agency"). Specifically, EDF requests EPA Administrator E.
Scott Pruitt's schedule since his assumption of office on February 17, 2017, as well as the
schedules of his senior managers since they assumed office. EDF requests copies of all records
of the EPA produced, modified, or transmitted since February 17, 2017 that are related to the
Administrator's and senior managers' schedules, including: calendars, schedules, itineraries, logs
of daily activities and travel, and records of in-person, telephonic or electronic meetings,
including lists of meeting attendees. EDF requests these records on a rolling basis, from February
17, 2017 until the end of Administrator Pruitt's tenure.

This information request encompasses all agency records, whether in electronic, paper, or other
formats. This request specifically includes any attachments to responsive records. If any of the
information sought in this request is deemed by EPA to be properly withheld under a FOIA
exemption, 5 U.S.C. § 552(b), please provide EDF with an explanation, for each record or
portion thereof, sufficient to identify the record and the particular exemption(s) claimed.

*Request for Expedited Processing*

EDF respectfully seeks expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E)(i) and 40
C.F.R. § 2.104(e)(1)(ii), which applies when there is "[a]n urgency to inform the public about an
actual or alleged Federal government activity, if the information is requested by a person
primarily engaged in disseminating information to the public." With respect to two other FOIA

requests, EPA recently recognized EDF's eligibility for expedited processing on this basis.[1] In support of this request for expedited processing, I certify that the following information is true and correct to the best of my knowledge and belief:

(1) EDF engages in extensive, daily efforts to inform the public about matters involving environmental policy, including EPA activities. For example, EDF has multiple channels for distributing information to the public, including through direct communication with its more than 2 million members, press releases, blog posts, active engagement on social media, and frequent appearances by staff in major media outlets.[2]

(2) As highlighted in the attached letter, several of Administrator Pruitt's activities have raised substantial concerns regarding EPA activity that contravenes important legal activities and/or is in serious tension with pertinent ethics agreements and recusals.

(3) Recent developments highlight the urgent need to safeguard EPA's limited budget resources. On May 23, 2017, the White House Office of Management and Budget released "Budget of the U.S. Government: A New Foundation for American Greatness," covering fiscal year 2018 ("2018 Budget"). On page 42, Table S-8 of this document describes the President's request to reduce EPA's budget by more than 31 percent—the most severe cut of any Cabinet department or major agency. The 2018 Budget's dramatic cuts amplified existing concerns about EPA's limited budget resources.[3]

As we demonstrate in the attached letter, refusing to disclose the Administrator's and senior managers' schedules heightens concerns over the proper expenditure of EPA's limited resources. For example, it appears that Administrator Pruitt has traveled extensively during his tenure, and additional EPA funds have been allocated for his travel expenses. Without information about the nature of his travel—information that his schedule would reveal—it is difficult for the public to assess whether these expenses are an appropriate use of the agency's increasingly limited funds.

(4) Administrator Pruitt's activities, and those of his senior managers, continue each day with limited transparency. Expedited treatment is essential in order to rectify and avoid

---

[1] *See* Letter from Larry F. Gottesman (EPA) to Benjamin Levitan (EDF) re: Request Tracking Number EPA-HQ-2017-003545 (Feb. 23, 2017); Letter from Larry F. Gottesman (EPA) to Benjamin Levitan (EDF) re: Request Tracking Number EPA-HQ-2017-005587 (Apr. 12, 2017).

[2] *See, e.g.*, Statement of EDF President Fred Krupp, *Trump Budget Cuts Would Put Health and Safety of All Americans at Risk* (Mar. 16, 2017), https://www.edf.org/media/trump-budget-cuts-would-put-health-and-safety-all-americans-risk; Mandy Warner, *America's Leaders Weigh in on the Dangers of Proposed EPA Budget Cuts*, EDF Climate 411 Blog (Mar. 15, 2017), http://blogs.edf.org/climate411/2017/03/15/americas-leaders-weigh-in-on-the-dangers-of-proposed-epa-budget-cuts/; Jeremy Symons (EDF Associate Vice President), *Trump's War on the EPA: Deconstruction*, Huffington Post (Mar. 2, 2017), http://www.huffingtonpost.com/entry/58b88953e4b02b8b584df981.

[3] *See, e.g.*, Brady Dennis & Juliet Eilperin, *Trump's Budget Takes a Sledgehammer to the EPA*, Wash. Post (Mar. 16, 2017), https://www.washingtonpost.com/national/health-science/budget-reflects-trumps-vow-to-cut-epa-in-almost-every-form/2017/03/15/0611db20-09a5-11e7-a15f-a58d4a988474_story.html?utm_term=.07c64bfc8b72; Rafi Letzter, *Trump's EPA Cuts Are Great News for Polluters, But Bad News for His Voters*, Bus. Insider (Mar. 16, 2017), http://www.businessinsider.com/what-trumps-budget-would-really-mean-for-the-epa-2017-3; *Trump Wants to Cut $2 Billion from the EPA's Budget. Here's What That Money Does*, Time (Feb. 28, 2017), http://time.com/money/4685308/donald-trump-epa-cuts/.

ethically and legally problematic events as soon as possible. Withholding these records hinders the public's ability to confirm or allay concerns about the Administrator's and senior managers' events and the Agency's expenditure of public funds. Expedited treatment of this request is essential in order to assure effective oversight of EPA's limited budget resources as well as to identify and where possible address misuse of agency funds.

*Request for Fee Waiver*

As a non-partisan, non-profit organization that provides information that is in the public interest, EDF respectfully requests a waiver of fees associated with this request. We are not seeking information for any commercial purpose and the records received will contribute to a greater public understanding of issues of considerable public interest: the activities of the Administrator and senior leadership of a major federal agency with purview over matters affecting the public health and environment of millions of Americans. 5 U.S.C. § 552(a)(4)(A)(iii). EDF is well positioned to disseminate the records to the public, as we routinely issue press releases, action alerts, reports, analyses, and other public outreach materials. We fully intend to disseminate newsworthy information received in response to this request. Accordingly, we respectfully request that the documents be furnished without charge. 5 U.S.C. § 552(a)(4)(A)(iii).

For ease of administration and to conserve resources, we will accept records produced in a readily accessible electronic format. In the event EDF's request for a fee waiver is denied or if you have any questions about this request, please contact me immediately by telephone at (202) 572-3318 or by email at blevitan@edf.org.

Respectfully submitted,

Benjamin Levitan
Environmental Defense Fund
1875 Connecticut Avenue, NW
Suite 600
Washington, DC 20009

Exhibit 7

Yule Kim
Center for American Progress
1333 H Street NW, 10th Floor
Washington DC
(202) 741-6368
Ykim@americanprogress.org

National Freedom of Information Officer
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW (2822T)
Washington, DC 20460
(202) 566-1667

July 12, 2017

Re:     **Freedom of Information Act Request**

To Whom It May Concern:

Pursuant to the Freedom of Information Act, 5 U.S.C. §552 <u>et seq</u>. ("FOIA"), I am requesting copies of the following agency records and other public records under your agency's control:

(1) all correspondences, which include but are not necessarily limited to, written or electronic communications, letters, emails, attachments, phone logs, instant messages, instant communications, texts, and other documents transmitted between Administrator Scott Pruitt, Chief of Staff Ryan Jackson, Associate Administrator Samantha Dravis, Deputy Chief of Staff Byron Brown, Mandy Gunasekara, Denise Anderson,  Layne Bangerter, Millan Hupp, and their schedulers and secretarial staff, and employees of Murray Energy Corporation, including, but not limited to Robert Murray, his schedulers and secretarial staff, other C-Level executives, government relations employees, and regulatory employees, and email addresses with the domain names @murrayenergycorp.com and @coalsource.com, on matters related to:
> the Endangerment Finding and the Cause or Contribute Findings for Greenhouse Gases under Section 202(a) of the Clean Air Act, including any correspondence that includes the word "endangerment"; and

(2) all calendar files, which include but are not necessarily limited to, calendar invites, appointments, meetings, attachments, notations of conversations, meeting minutes, notations of conversation, guest lists, and other written or electronic documents of Administrator Scott Pruitt, Chief of Staff Ryan Jackson, Associate Administrator Samantha Dravis, Deputy Chief of Staff Byron Brown, Mandy Gunasekara, Denise Anderson,  Layne Bangerter, Millan Hupp, and their schedulers and secretarial staff, related to meetings with employees of Murray Energy Corporation, including, but not limited to Robert Murray, his schedulers and secretarial staff, other C-Level executives, government relations employees, and regulatory employees, and email addresses with the domain names @murrayenergycorp.com and @coalsource.com.

I also request that you state the specific legal and factual grounds for withholding any documents or portions of documents, should you withhold any.  Please identify each document that falls within the scope of this request but is withheld from release. If requested documents are located in, or originated in, another

installation or bureau, I would request that you please refer this request or any relevant portion of this request to the appropriate installation or bureau.

To the extent that the information is available in electronic format, I would prefer to receive that information via email or CD, particularly if providing the information reduces the time or expense involved.  Otherwise, I will expect to receive the information in paper form.

In order to help determine my status for purposes of assessing the applicability of any fees, please know that I am asking on behalf of the Center for American Progress, a non-profit organization, for analytical and noncommercial purposes.

I request a waiver of all fees for this request. Disclosure of the requested information to me is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Government and is not primarily in my commercial interest. The disclosure would significantly contribute to the public's understanding of the operations of the EPA and the federal government on a matter of great importance to the public's health, safety, and general welfare.

Please provide the records requested above regardless of your fee waiver decision. In order to expedite a response, the Center for American Progress will, if necessary, pay fees in accordance with FOIA regulations for all or a portion of the requested records. **Please contact me before doing anything that would cause the fee to exceed $50.**

I also request expedited processing. As a researcher for a non-profit organization geared towards disseminating information to the public on matters involving actual or alleged government activity, this request is urgently needed to inform the public on a government activity which will have profound effect on matters of national security, public health, public safety, and the overall general welfare of the public. The need for production on the above subject matter is urgent because of the profound and large-scale impact these government activities can have on the health, safety, and general welfare of the public which may be irreversible if not addressed in a timely manner. I certify that my statements concerning the need for expedited processing are true and correct to the best of my knowledge and belief.

I look forward to your reply within 10 business days, or, at the latest, 20 business days, as the statute requires.

Thank you for your cooperation with this request.  I am willing to discuss ways to make this request more manageable to your office.  Please do not hesitate to contact me at the number above or on my direct line at (202) 741-6368 or ykim@americanprogress.org

Sincerely,


Yule Kim

Exhibit 8

Yule Kim
Center for American Progress
1333 H Street NW, 10th Floor
Washington DC
(202) 741-6368
Ykim@americanprogress.org

National Freedom of Information Officer
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW (2822T)
Washington, DC 20460
(202) 566-1667

July 11, 2017

**Re:      Freedom of Information Act Request**

To Whom It May Concern:

Pursuant to the Freedom of Information Act, 5 U.S.C. §552 <u>et</u> <u>seq</u>. ("FOIA"), I am requesting copies of the following public records:

> (1) all documents, including but not necessarily limited to his appointment calendar, which outlines Administrator Scott Pruitt's schedule, itinerary, and meetings, dating from April 1, 2017 to the present; and
>
> (2) all documents, including but not necessarily limited to their appointment calendars, which outline Chief of Staff Ryan Jackson's, Associate Administrator Samantha Dravis's, Deputy Chief of Staff Byron Brown's, Mandy Gunasekara's, Layne Bangerter's, and Millan Hupp's schedule, itinerary, and meetings, dating from February 15, 2017 to the present.

I also request that you state the specific legal and factual grounds for withholding any documents or portions of documents, should you withhold any.  Please identify each document that falls within the scope of this request but is withheld from release. If requested documents are located in, or originated in, another installation or bureau, I would request that you please refer this request or any relevant portion of this request to the appropriate installation or bureau.

To the extent that the information is available in electronic format, I would prefer to receive that information via email or CD, particularly if providing the information reduces the time or expense involved.  Otherwise, I will expect to receive the information in paper form.

In order to help determine my status for purposes of assessing the applicability of any fees, please know that I am asking on behalf of the Center for American Progress, a non-profit organization, for analytical and noncommercial purposes.

**I request a waiver of all fees for this request.** Disclosure of the requested information to me is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Government and is not primarily in my commercial interest.

Please provide the records requested above regardless of your fee waiver decision. In order to expedite a response, the Center for American Progress will, if necessary, pay fees in accordance with FOIA regulations for all or a portion of the requested records. **Please contact me before doing anything that would cause the fee to exceed $50. In the event that there are fees, I would be grateful if you would inform me of the total charges in advance of fulfilling my request.**

I look forward to your reply within 20 business days, as the statute requires.

Thank you for your cooperation with this request.  I am willing to discuss ways to make this request more manageable to your office.  Please do not hesitate to contact me at the number above or on my direct line at (202) 741-6368 or ykim@americanprogress.org

Sincerely,


Yule Kim

Exhibit 9

CENTER *for* B I O L O G I C A L   D I V E R S I T Y                    *Because life is good.*

June 30, 2017

*VIA FOIAONLINE.REGULATIONS.GOV*
U.S. Environmental Protection Agency

Re:      Freedom of Information Act Request: Nancy Beck's Schedules and Emails

Dear FOIA Officer:

This is a request under the Freedom of Information Act, 5 U.S.C. § 552, *as amended* ("FOIA"),
from the Center for Biological Diversity ("Center"), a non-profit organization that works to
secure a future for all species hovering on the brink of extinction through science, law, and
creative media, and to fulfill the continuing educational goals of its membership and the general
public in the process.

REQUESTED RECORDS

The Center requests the following records from the U.S. Environmental Protection Agency
("EPA") Headquarters from the date that Nancy Beck's ("Ms. Beck") employment as Deputy
Assistant Administrator at the Office of Chemical Safety and Pollution Prevention commenced at
the EPA to the date of this search:

1.   All records of schedules, including but not limited to travel and meeting schedules, of
     EPA employee Ms. Beck; and

2.   All records of correspondence, including but not limited to, all letters, emails, text
     messages, instant messages, voicemails, and phone logs for any phones utilized by Ms.
     Beck from any and all agency and EPA servers, cloud portals, secure websites,
     computers, tablets, and/or smart phones sent to or from Ms. Beck, with the exception of
     any records that are or will be publicly available (e.g., through regulations.gov). Please
     note, the Center is not requesting the actual email addresses utilized by Ms. Beck in the
     course of her official duties, but only the correspondence sent to and from her email
     address(es).

For this request, the term "all records" refers to, but is not limited to, any and all documents,
correspondence (including, but not limited to, inter and/or intra-agency correspondence as well
as correspondence with entities or individuals outside the federal government), emails, letters,
notes, telephone records, telephone notes, minutes, memoranda, comments, files, presentations,
consultations, biological opinions, assessments, evaluations, schedules, telephone logs, papers
published and/or unpublished, reports, studies, photographs and other images, data (including
raw data, GPS or GIS data, UTM, LiDAR, etc.), maps, and/or all other responsive records, in
draft or final form.

This request is not meant to exclude any other records that, although not specially requested, are reasonably related to the subject matter of this request.  If you or your office have destroyed or determine to withhold any records that could be reasonably construed to be responsive to this request, I ask that you indicate this fact and the reasons therefore in your response.

Under the FOIA Improvement Act of 2016, agencies are prohibited from denying requests for information under FOIA unless the agency reasonably believes release of the information will harm an interest that is protected by the exemption.  FOIA Improvement Act of 2016 (Public Law No. 114-185), codified at 5 U.S.C. § 552(a)(8)(A).

If you decide to invoke a FOIA exemption, please include sufficient information for us to assess the basis for the exemption, including any interest(s) that would be harmed by release.  Please include a detailed ledger which includes:

1.    Basic factual material about each withheld record, including the originator, date, length, general subject matter, and location of each item; and

2.    Complete explanations and justifications for the withholding, including the specific exemption(s) under which the record (or portion thereof) was withheld and a full explanation of how each exemption applies to the withheld material. Such statements will be helpful in deciding whether to appeal an adverse determination.  Your written justification may help to avoid litigation.

If you determine that portions of the records requested are exempt from disclosure, we request that you segregate the exempt portions and mail the non-exempt portions of such records to my attention at the address below within the statutory time limit.  5 U.S.C. § 552(b).

The Center is willing to receive records on a rolling basis.

Finally, FOIA's "frequently requested record" provision was enacted as part of the 1996 Electronic Freedom of Information Act Amendments, and requires all federal agencies to give "reading room" treatment to any FOIA-processed records that, "because of the nature of their subject matter, the agency determines have become the subject of subsequent requests for substantially the same records."  *See* 5 U.S.C. § 552(a)(2)(D)(ii)(I).  Also, enacted as part of the 2016 FOIA Improvement Act, FOIA's Rule of 3 requires all federal agencies to proactively "make available for public inspection in an electronic format" "copies of records, regardless of form or format … that have been released to any person … and … that have been requested 3 or more times."  5 U.S.C. § 552(a)(2)(D)(ii)(II).  Therefore, we respectfully request that you make available online any records that the agency determines will become the subject of subsequent requests for substantially the same records, and records that have been requested three or more times.

<u>FORMAT OF REQUESTED RECORDS</u>

Under FOIA, you are obligated to provide records in a readily accessible electronic format and in

the format requested.  *See, e.g.*, 5 U.S.C. § 552(a)(3)(B) ("In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format."). "Readily accessible" means text-searchable and OCR-formatted.  *See* 5 U.S.C. § 552(a)(3)(B). We ask that you please provide all records in an electronic format.  Additionally, please provide the records either in (1) load-ready format with a CSV file index or Excel spreadsheet, or; (2) for files that are in .PDF format, without any "portfolios" or "embedded files."  Portfolios and embedded files within files are not readily accessible.  *Please do not provide the records in a single, or "batched," .PDF file.*  We appreciate the inclusion of an index.

RECORD DELIVERY

We appreciate your help in expeditiously obtaining a determination on the requested records.  As mandated in FOIA, we anticipate a reply within 20 working days.  5 U.S.C. § 552(a)(6)(A)(i). Failure to comply within the statutory timeframe may result in the Center taking additional steps to ensure timely receipt of the requested materials.  Please provide a complete reply as expeditiously as possible.  You may email or mail copies of the requested records to:

Margaret E. Townsend
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
mtownsend@biologicaldiversity.org

If you find that this request is unclear, or if the responsive records are voluminous, please call me at (971) 717-6409 to discuss the scope of this request.

REQUEST FOR FEE WAIVER

FOIA was designed to provide citizens a broad right to access government records.  FOIA's basic purpose is to "open agency action to the light of public scrutiny," with a focus on the public's "right to be informed about what their government is up to."  *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773-74 (1989) (internal quotation and citations omitted).  In order to provide public access to this information, FOIA's fee waiver provision requires that "[d]ocuments shall be furnished without any charge or at a [reduced] charge," if the request satisfies the standard.  5 U.S.C. § 552(a)(4)(A)(iii).  FOIA's fee waiver requirement is "liberally construed."  *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003); *Forest Guardians v. U.S. Dept. of Interior*, 416 F.3d 1173, 1178 (10th Cir. 2005).

The 1986 fee waiver amendments were designed specifically to provide non-profit organizations such as the Center access to government records without the payment of fees.  Indeed, FOIA's fee waiver provision was intended "to prevent government agencies from using high fees to discourage certain types of requesters and requests," which are "consistently associated with requests from journalists, scholars, and *non-profit public interest groups*."  *Ettlinger v. FBI*, 596 F.Supp. 867, 872 (D. Mass. 1984) (emphasis added).  As one Senator stated, "[a]gencies should

not be allowed to use fees as an offensive weapon against requesters seeking access to Government information ... ."  132 Cong. Rec. S. 14298 (statement of Senator Leahy).

I.      The Center Qualifies for a Fee Waiver.

Under FOIA, a party is entitled to a fee waiver when "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the [Federal] government and is not primarily in the commercial interest of the requester."  5 U.S.C. § 552(a)(4)(A)(iii).  The EPA's regulations at 40 C.F.R. § 2.107(l)(1)-(3) establish the same standard.

Thus, the EPA must consider four factors to determine whether a request is in the public interest: (1) whether the subject of the requested records concerns "the operations or activities of the Federal government," (2) whether the disclosure is "likely to contribute" to an understanding of government operations or activities, (3) whether the disclosure "will contribute to public understanding" of a reasonably broad audience of persons interested in the subject, and (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities.  40 C.F.R. § 2.107(1)(2).  As shown below, the Center meets each of these factors.

        A.      The Subject of This Request Concerns "The Operations and Activities of the Government."

The subject matter of this request concerns the operations and activities of the EPA.  This request asks for from the date that Ms. Beck's employment as Deputy Assistant Administrator at the Office of Chemical Safety and Pollution Prevention commenced at the EPA to the date of this search: (1) all records of schedules, including but not limited to travel and meeting schedules, of EPA employee Ms. Beck; and (2) all records of correspondence, including but not limited to, all letters, emails, text messages, instant messages, voicemails, and phone logs for any phones utilized by Ms. Beck from any and all agency and EPA servers, cloud portals, secure websites, computers, tablets, and/or smart phones sent to or from Ms. Beck, with the exception of any records that are or will be publicly available (e.g., through regulations.gov). Please note, the Center is not requesting the actual email addresses utilized by Ms. Beck in the course of her official duties, but only the correspondence sent to and from her email address(es).

This FOIA request will provide the Center and the public with crucial insight into Ms. Beck's meeting schedules and correspondence.  It is clear that Ms. Beck's meeting schedules and communications involve extensive and specifically identifiable activities of the government, in this case the EPA.  *Judicial Watch*, 326 F.3d at 1313 ("[R]easonable specificity is all that FOIA requires with regard to this factor") (internal quotations omitted).  Thus, the Center meets this factor.

B.  Disclosure is "Likely to Contribute" to an Understanding of Government Operations or Activities.

The requested records are meaningfully informative about government operations or activities and will contribute to an increased understanding of those operations and activities by the public.

Disclosure of the requested records will allow the Center to convey information to the public about what agencies, businesses, and other leadership Ms. Beck has been meeting with, which will reflect her objectives and direction as the lead official of the EPA Office of Chemical Safety and Pollution Prevention.  Ms. Beck previously worked for the American Chemistry Council and has recently weakened the regulations for Toxic Substances Control Act, 15 U.S.C. ch. 53, subch. I §§ 2601–2629.  As the acting head of the EPA office of chemical safety, she is the top political appointee that may be involved in efforts by Dow Chemical to stop the assessments of endangered species from pesticide exposure.  Once the information is made available, the Center will analyze it and present it to its 1.3 million members and online activists and the general public in a manner that will meaningfully enhance the public's understanding of Ms. Beck's leadership of the Office of Chemical Safety and Pollution Prevention.

Thus, the requested records are likely to contribute to an understanding of EPA operations and activities.

C.  Disclosure of the Requested Records Will Contribute to a Reasonably Broad Audience of Interested Persons' Understanding of Ms. Beck's Schedules and Emails

The requested records will contribute to public understanding of how the EPA's operations and activities are consistent with the EPA's mandated duties.  As explained above, the records will contribute to public understanding of the EPA's operations and activities.

How the EPA fulfills its mission and manages its priorities generally, and specifically what information is gleaned from Ms. Beck's schedules and correspondence, are areas of interest to a reasonably-broad segment of the public.  The Center will use the information it obtains from the disclosed records to educate the public at large about the EPA's operations and activities.  *See W. Watersheds Proj. v. Brown*, 318 F.Supp.2d 1036, 1040 (D. Idaho 2004) ("... find[ing] that WWP adequately specified the public interest to be served, that is, educating the public about the ecological conditions of the land managed by the BLM and also how … management strategies employed by the BLM may adversely affect the environment.").

Through the Center's synthesis and dissemination (by means discussed in Section II, below), disclosure of information contained in and gleaned from the requested records will contribute to a broad audience of persons who are interested in the subject matter.  *Ettlinger v. FBI*, 596 F.Supp. at 876 (benefit to a population group of some size distinct from the requester alone is sufficient); *Carney v. Dep't of Justice*, 19 F.3d 807, 815 (2d Cir. 1994), *cert. denied*, 513 U.S. 823 (1994) (applying "public" to require a sufficient "breadth of benefit" beyond the requester's own interests); *Cmty. Legal Servs. v. Dep't of Hous. & Urban Dev.*, 405 F.Supp.2d 553, 557 (E.D. Pa. 2005) (in granting fee waiver to community legal group, court noted that while the

requester's "work by its nature is unlikely to reach a very general audience," "there is a segment of the public that is interested in its work").

Indeed, the public does not currently have an ability to easily evaluate the requested records, which concern Ms. Beck's meeting and travel schedules that are not currently in the public domain. *See Cmty. Legal Servs. v. HUD*, 405 F.Supp.2d 553, 560 (D. Pa. 2005) (because requested records "clarify important facts" about agency policy, "the CLS request would likely shed light on information that is new to the interested public."). As the Ninth Circuit observed in *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1286 (9th Cir. 1987), "[FOIA] legislative history suggests that information [has more potential to contribute to public understanding] to the degree that the information is new and supports public oversight of agency operations… ."[1]

Disclosure of these records is not only "likely to contribute," but is certain to contribute, to public understanding of the operations and activities of the EPA. The public is always well served when it knows how the government conducts its activities, particularly matters touching on legal questions. Hence, there can be no dispute that disclosure of the requested records to the public will educate the public about Ms. Beck's predominate concerns and strategies under the new administration.

> D. Disclosure is Likely to Contribute Significantly to Public Understanding of Government Operations or Activities.

The Center is not requesting these records merely for their intrinsic informational value. Disclosure of the requested records will significantly enhance the public's understanding of the operations and activities of the EPA, as compared to the level of public understanding that exists Indeed, public understanding will be *significantly* increased as a result of disclosure because the requested records will help reveal more about Ms. Beck's predominate concerns and strategies under the new administration.

The records are also certain to shed light on EPA's compliance with its mission and purpose. Such public oversight of agency action is vital to our democratic system and clearly envisioned by the drafters of the FOIA. Thus, the Center meets this factor as well.

II.  The Center has a Demonstrated Ability to Disseminate the Requested Information Broadly.

The Center is a non-profit organization that informs, educates, and counsels the public regarding environmental issues, policies, and laws relating to environmental issues. The Center has been substantially involved in the activities of numerous government agencies for over 25 years, and has consistently displayed its ability to disseminate information granted to it through FOIA.

---

[1] In this connection, it is immaterial whether any portion of the Center's request may currently be in the public domain because the Center requests considerably more than any piece of information that may currently be available to other individuals. *See Judicial Watch*, 326 F.3d at 1315.

6

In consistently granting the Center's fee waivers, agencies have recognized: (1) that the information requested by the Center contributes significantly to the public's understanding of the government's operations or activities; (2) that the information enhances the public's understanding to a greater degree than currently exists; (3) that the Center possesses the expertise to explain the requested information to the public; (4) that the Center possesses the ability to disseminate the requested information to the general public; (5) and that the news media recognizes the Center as an established expert in the field of imperiled species, biodiversity, and impacts on protected species.  The Center's track record of active participation in oversight of governmental activities and decision making, and its consistent contribution to the public's understanding of those activities as compared to the level of public understanding prior to disclosure are well established.

The Center intends to use the records requested here similarly.  The Center's work appears in more than 2,500 news stories online and in print, radio and TV per month, including regular reporting in such important outlets as *The New York Times*, *Washington Post*, and *Los Angeles Times*.  Many media outlets have reported on top EPA officials meeting with industry leaders, utilizing information obtained by the Center from federal agencies including the EPA.  In 2016, more than 2 million people visited the Center's extensive website, viewing a total of more than 5.2 million pages.  The Center sends out more than 277 email newsletters and action alerts per year to more than 1.3 million members and supporters.  Three times a year, the Center sends printed newsletters to more than 58,016 members.  More than 233,000 people have "liked" the Center on Facebook, and there are regular postings regarding how EPA's leadership may impact domestic environmental policy.  The Center also regularly tweets to more than 52,200 followers on Twitter.  The Center intends to use any or all of these far-reaching media outlets to share with the public information obtained as a result of this request.

Public oversight and enhanced understanding of the EPA's duties is absolutely necessary.  In determining whether disclosure of requested information will contribute significantly to public understanding, a guiding test is whether the requester will disseminate the information to a reasonably broad audience of persons interested in the subject.  *Carney v U.S. Dept. of Justice*, 19 F.3d 807 (2nd Cir. 1994).  The Center need not show how it intends to distribute the information, because "[n]othing in FOIA, the [agency] regulation, or our case law require[s] such pointless specificity."  *Judicial Watch*, 326 F.3d at 1314.  It is sufficient for the Center to show how it distributes information to the public generally.  *Id.*

III.     <u>Obtaining the Requested Records is of No Commercial Interest to the Center.</u>

Access to government records, disclosure forms, and similar materials through FOIA requests is essential to the Center's role of educating the general public.  Founded in 1994, the Center is a 501(c)(3) nonprofit conservation organization (EIN: 27-3943866) with more than 1.3 million members and online activists dedicated to the protection of endangered and threatened species and wild places.  The Center has no commercial interest and will realize no commercial benefit from the release of the requested records.

IV.   <u>Conclusion</u>

For all of the foregoing reasons, the Center qualifies for a full fee waiver.  We hope that the EPA will immediately grant this fee waiver request and begin to search and disclose the requested records without any unnecessary delays.

If you have any questions, please contact me at (971) 717-6409 or <u>foia@biologicaldiversity.org</u>. All records and any related correspondence should be sent to my attention at the address below.

Sincerely,

Margaret E. Townsend
Open Government Staff Attorney
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211-0374
<u>foia@biologicaldiversity.org</u>

Exhibit 10

CENTER for BIOLOGICAL DIVERSITY                    Because life is good.

July 11, 2018

*VIA FOIAONLINE.REGULATIONS.GOV*
U.S. Environmental Protection Agency Headquarters

Re:     Freedom of Information Act Request: Andrew Wheeler's Communications

Dear FOIA Officer:

This is a request under the Freedom of Information Act, 5 U.S.C. § 552, *as amended* ("FOIA"),
from the Center for Biological Diversity ("Center"), a non-profit organization that works to
secure a future for all species hovering on the brink of extinction through science, law, and
creative media, and to fulfill the continuing educational goals of its membership and the general
public in the process.

REQUESTED RECORDS

The Center requesting records from EPA from April 1, 2018 to the date EPA commences this
search for:

> The communications, including but not limited to, all letters, emails, text messages,
> instant messages, transcripts, recordings, voicemails, and phone logs for any phones
> utilized by Andrew Wheeler ("Mr. Wheeler") from any and all agency and EPA
> servers, cloud portals, secure websites, computers, tablets, smart phones, etc., sent to or
> from Mr. Wheeler, with the exception of any records that are or will be publicly
> available (e.g., through regulations.gov). Please note, the Center is not requesting the
> actual email addresses utilized by Mr. Wheeler in the course of his official duties, but
> only the correspondence sent to and from his email addresses.

For this request, the term "records" refers to, but is not limited to, any and all documents,
correspondence (including, but not limited to, inter and/or intra-agency correspondence as well
as correspondence with entities or individuals outside the federal government), emails, letters,
notes, recordings, telephone records, voicemails, telephone notes, telephone logs, text messages,
chat messages, minutes, memoranda, comments, files, presentations, consultations, biological
opinions, assessments, evaluations, schedules, papers published and/or unpublished, reports,
studies, photographs and other images, data (including raw data, GPS or GIS data, UTM,
LiDAR, etc.), maps, and/or all other responsive records, in draft or final form.

This request is not meant to exclude any other records that, although not specially requested, are
reasonably related to the subject matter of this request.  If you or your office have destroyed or
determine to withhold any records that could be reasonably construed to be responsive to this
request, I ask that you indicate this fact and the reasons therefore in your response.

Under the FOIA Improvement Act of 2016, agencies are prohibited from denying requests for information under FOIA unless the agency reasonably believes release of the information will harm an interest that is protected by the exemption.  FOIA Improvement Act of 2016 (Public Law No. 114-185), codified at 5 U.S.C. § 552(a)(8)(A).

If you decide to invoke a FOIA exemption, please include sufficient information for us to assess the basis for the exemption, including any interest(s) that would be harmed by release.  Please include a detailed ledger which includes:

1.      Basic factual material about each withheld record, including the originator, date, length, general subject matter, and location of each item; and

2.      Complete explanations and justifications for the withholding, including the specific exemption(s) under which the record (or portion thereof) was withheld and a full explanation of how each exemption applies to the withheld material. Such statements will be helpful in deciding whether to appeal an adverse determination.  Your written justification may help to avoid litigation.

If you determine that portions of the records requested are exempt from disclosure, we request that you segregate the exempt portions and mail the non-exempt portions of such records to my attention at the address below within the statutory time limit.  5 U.S.C. § 552(b).

The Center is willing to receive records on a rolling basis.

Finally, FOIA's "frequently requested record" provision was enacted as part of the 1996 Electronic Freedom of Information Act Amendments, and requires all federal agencies to give "reading room" treatment to any FOIA-processed records that, "because of the nature of their subject matter, the agency determines have become the subject of subsequent requests for substantially the same records."  *See* 5 U.S.C. § 552(a)(2)(D)(ii)(I).  Also, enacted as part of the 2016 FOIA Improvement Act, FOIA's Rule of 3 requires all federal agencies to proactively "make available for public inspection in an electronic format" "copies of records, regardless of form or format … that have been released to any person … and … that have been requested 3 or more times."  5 U.S.C. § 552(a)(2)(D)(ii)(II).  Therefore, we respectfully request that you make available online any records that the agency determines will become the subject of subsequent requests for substantially the same records, and records that have been requested three or more times.

## FORMAT OF REQUESTED RECORDS

Under FOIA, you are obligated to provide records in a readily accessible electronic format and in the format requested.  *See, e.g.,* 5 U.S.C. § 552(a)(3)(B) ("In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format.").  "Readily accessible" means text-searchable and OCR-formatted.  *See* 5 U.S.C. § 552(a)(3)(B).  Pursuant to this requirement, we hereby request that you produce all records in an electronic format and in their native file formats.  Additionally, please provide the records in a load-ready

2

format with a CSV file index or Excel spreadsheet.  If you produce files in .PDF format, then please omit any "portfolios" or "embedded files."  Portfolios and embedded files within files are not readily accessible.  Please do not provide the records in a single, or "batched," .PDF file.  We appreciate the inclusion of an index.

If you should seek to withhold or redact any responsive records, we request that you: (1) identify each such record with specificity (including date, author, recipient, and parties copied); (2) explain in full the basis for withholding responsive material; and (3) provide all segregable portions of the records for which you claim a specific exemption.  5 U.S.C. § 552(b).  Please correlate any redactions with specific exemptions under FOIA.

## RECORD DELIVERY

We appreciate your help in expeditiously obtaining a determination on the requested records.  As mandated in FOIA, we anticipate a reply within 20 working days.  5 U.S.C. § 552(a)(6)(A)(i). Failure to comply within the statutory timeframe may result in the Center taking additional steps to ensure timely receipt of the requested materials.  Please provide a complete reply as expeditiously as possible.  You may email or mail copies of the requested records to:

Ann K. Brown
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
foia@biologicaldiversity.org

If you find that this request is unclear, or if the responsive records are voluminous, please email me to discuss the scope of this request.

## REQUEST FOR FEE WAIVER

FOIA was designed to provide citizens a broad right to access government records.  FOIA's basic purpose is to "open agency action to the light of public scrutiny," with a focus on the public's "right to be informed about what their government is up to."  *NARA v. Favish*, 541 U.S. 157, 171 (2004) quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773-74 (1989) (internal quotation and citations omitted).  In order to provide public access to this information, FOIA's fee waiver provision requires that "[d]ocuments shall be furnished without any charge or at a [reduced] charge," if the request satisfies the standard.  5 U.S.C. § 552(a)(4)(A)(iii).  FOIA's fee waiver requirement is "liberally construed."  *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003); *Forest Guardians v. U.S. Dept. of Interior*, 416 F.3d 1173, 1178 (10th Cir. 2005).

The 1986 fee waiver amendments were designed specifically to provide non-profit organizations such as the Center access to government records without the payment of fees.  Indeed, FOIA's fee waiver provision was intended "to prevent government agencies from using high fees to discourage certain types of requesters and requests," which are "consistently associated with requests from journalists, scholars, and *non-profit public interest groups*."  *Ettlinger v. FBI*, 596

F.Supp. 867, 872 (D. Mass. 1984) (emphasis added).  As one Senator stated, "[a]gencies should not be allowed to use fees as an offensive weapon against requesters seeking access to Government information ... ."  132 Cong. Rec. S. 14298 (statement of Senator Leahy).

I.      The Center Qualifies For A Fee Waiver.

Under FOIA, a party is entitled to a fee waiver when "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the [Federal] government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).  EPA's regulations at 40 C.F.R. § 2.107(1)(2) and (3) establish the same standard.

Thus, the EPA must consider four factors to determine whether a request is in the public interest: (1) whether the subject of the requested records concerns "the operations or activities of the Federal government," (2) whether the disclosure is "likely to contribute" to an understanding of government operations or activities, (3) whether the disclosure "will contribute to public understanding" of a reasonably-broad audience of persons interested in the subject, and (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities.  22 C.F.R. § 171.16(a)(1)(i) – (iv).  As shown below, the Center meets each of these factors.

        A.      The Subject Of This Request Concerns "The Operations And Activities Of The Government."

The subject matter of this request concerns the operations and activities of the Administrator of the EPA.  The Center is requesting records from EPA from April 1, 2018 to the date EPA commences this search for:  all communications, including but not limited to, all letters, emails, text messages, instant messages, transcripts, recordings, voicemails, and phone logs for any phones utilized by the EPA Administrator Mr. Wheeler from any and all agency and EPA servers, cloud portals, secure websites, computers, tablets, smart phones, etc., sent to or from Mr. Wheeler, with the exception of any records that are or will be publicly available (e.g., through regulations.gov). Please note, the Center is not requesting the actual email addresses utilized by Mr. Wheeler in the course of his official duties, but only the correspondence sent to and from his email addresses.

This FOIA request will provide the Center and the public with crucial insight into Mr. Wheeler's communications as EPA's Deputy and Acting Administrator.  It is clear that Mr. Wheeler's communications involve extensive and specifically identifiable activities of the government, and in this case it is the federal agency of the EPA.  *Judicial Watch*, 326 F.3d at 1313 ("[R]easonable specificity is all that FOIA requires with regard to this factor") (internal quotations omitted). Thus, the Center meets this factor.

B.  Disclosure is "Likely to Contribute" to an Understanding of Government Operations or Activities.

The requested records are meaningfully informative about government operations or activities and will contribute to an increased understanding of those operations and activities by the public.

Disclosure of the requested records will allow the Center to convey information to the public about the communications and correspondence of Mr. Wheeler, which will reflect his actions, objectives, and priorities as EPA Deputy and Acting Administrator.  Once the information is made available, the Center will analyze it and present it to its 1.6 million members and online activists and the general public in a manner that will meaningfully enhance the public's understanding of how the Administrator has been acting and operating within the EPA.

Thus, the requested records are likely to contribute to an understanding of EPA's operations and activities under its Administrator.

C.  Disclosure Of The Requested Records Will Contribute To A Reasonably Broad Audience Of Interested Persons' Understanding Of Mr. Wheeler's Communications.

The requested records will contribute to public understanding of EPA's operations and activities.

How the EPA fulfills its mission and manages its priorities, generally, and specifically what actions are included within Mr. Wheeler's communications, are areas of interest to a reasonably broad segment of the public.  The Center will use the information it obtains from the disclosed records to educate the public at large about the EPA's operations and activities.  *See W. Watersheds Proj. v. Brown*, 318 F.Supp.2d 1036, 1040 (D. Idaho 2004) ("... find[ing] that WWP adequately specified the public interest to be served, that is, educating the public about the ecological conditions of the land managed by the BLM and also how … management strategies employed by the BLM may adversely affect the environment.").

Through the Center's synthesis and dissemination (by means discussed in Section II, below), disclosure of information contained and gleaned from the requested records will contribute to a broad audience of persons who are interested in this subject matter.  *Ettlinger v. FBI*, 596 F.Supp. at 876 (benefit to a population group of some size distinct from the requester alone is sufficient); *Carney v. Dep't of Justice*, 19 F.3d 807, 815 (2d Cir. 1994), *cert. denied*, 513 U.S. 823 (1994) (applying "public" to require a sufficient "breadth of benefit" beyond the requester's own interests); *Cmty. Legal Servs. v. Dep't of Hous. & Urban Dev*., 405 F.Supp.2d 553, 557 (E.D. Pa. 2005) (in granting fee waiver to community legal group, court noted that while the requester's "work by its nature is unlikely to reach a very general audience," "there is a segment of the public that is interested in its work").

Indeed, the public does not currently have an ability to easily evaluate the requested records because they are not currently in the public domain.  *See Cmty. Legal Servs. v. HUD*, 405 F.Supp.2d 553, 560 (D. Pa. 2005) (because requested documents "clarify important facts" about agency policy, "the CLS request would likely shed light on information that is new to the interested public.").  As the Ninth Circuit observed in *McClellan Ecological Seepage Situation v.*

*Carlucci*, 835 F.2d 1282, 1286 (9th Cir. 1987), "[FOIA] legislative history suggests that information [has more potential to contribute to public understanding] to the degree that the information is new and supports public oversight of agency operations… ."[1]

Disclosure of these records is not only "likely to contribute," but is certain to contribute, to public understanding of Mr. Wheeler's priorities as EPA Deputy and Acting Administrator.  The public is always well served when it knows how the government conducts its activities, particularly matters touching on legal questions.  Hence, there can be no dispute that disclosure of the requested records to the public will educate the public about the operations and activities of EPA.

> D.  Disclosure is Likely to Contribute Significantly to Public Understanding of Government Operations or Activities.

The Center is not requesting these records merely for their intrinsic informational value. Disclosure of the requested records will significantly enhance the public's understanding of the operations and activities of EPA, as compared to the level of public understanding that exists prior to disclosure.  Indeed, public understanding will be *significantly* increased as a result of disclosure because the requested records will help reveal more about what Mr. Wheeler's communications demonstrate about his priorities for EPA.

The records are also certain to shed light on EPA's compliance with its mission and purpose. Such public oversight of agency action is vital to our democratic system and clearly envisioned by the drafters of the FOIA.  Thus, the Center meets this factor as well.

> II.  The Center has a Demonstrated Ability to Disseminate the Requested Information Broadly.

The Center is a non-profit organization that informs, educates, and counsels the public regarding environmental issues, policies, and laws relating to environmental issues.  The Center has been substantially involved in the activities of numerous government agencies for over 25 years, and has consistently displayed its ability to disseminate information granted to it through FOIA.

In consistently granting the Center's fee-waivers, agencies have recognized: (1) that the information requested by the Center contributes significantly to the public's understanding of the government's operations or activities; (2) that the information enhances the public's understanding to a greater degree than currently exists; (3) that the Center possesses the expertise to explain the requested information to the public; (4) that the Center possesses the ability to disseminate the requested information to the general public; (5) and that the news media recognizes the Center as an established expert in the field of imperiled species, biodiversity, and impacts on protected species.  The Center's track record of active participation in oversight of governmental activities and decision-making, and its consistent contribution to the public's

---

[1] In this connection, it is immaterial whether any portion of the Center's request may currently be in the public domain because the Center requests considerably more than any piece of information that may currently be available to other individuals.  *See Judicial Watch*, 326 F.3d at 1315.

understanding of those activities as compared to the level of public understanding prior to disclosure are well established.

The Center intends to use the records requested here similarly.  The Center's work appears in more than 2,500 news stories online and in print, radio and TV per month, including regular reporting in such important outlets as *The New York Times*, *Washington Post*, *The Guardian*, and *Los Angeles Times*.  Many media outlets have reported on the priorities of the Trump Administration, utilizing information obtained by the Center from federal agencies including EPA.  In 2017, more than 2.7 million people visited the Center's extensive website, and viewed pages a total of 5.7 million times.  The Center sends out more than 277 email newsletters and action alerts per year to more than 1.6 million members and supporters.  Three times a year, the Center sends printed newsletters to more than 63,000 members.  More than 304,800 people have "liked" the Center on Facebook, and there are regular postings regarding the EPA's changing leadership, and how the agency may impact domestic environmental policy.  The Center also regularly tweets to more than 57,900 followers on Twitter.  The Center intends to use any or all of these far-reaching media outlets to share with the public information obtained as a result of this request.

Public oversight and enhanced understanding of Mr. Wheeler's duties and correspondence is absolutely necessary.  In determining whether disclosure of requested information will contribute significantly to public understanding, a guiding test is whether the requester will disseminate the information to a reasonably-broad audience of persons interested in the subject.  *Carney v U.S. Dept. of Justice*, 19 F.3d 807 (2nd Cir. 1994).  The Center need not show how it intends to distribute the information, because "[n]othing in FOIA, the [agency] regulation, or our case law require[s] such pointless specificity." *Judicial Watch*, 326 F.3d at 1314.  It is sufficient for the Center to show how it distributes information to the public generally.  *Id.*

III.     Obtaining the Requested Records is of No Commercial Interest to the Center.

Access to government records, disclosure forms, and similar materials through FOIA requests is essential to the Center's role of educating the general public.  Founded in 1994, the Center is a 501(c)(3) nonprofit conservation organization (EIN: 27-3943866) with more than 1.6 million members and online activists dedicated to the protection of endangered and threatened species and wild places.  The Center has no commercial interest and will realize no commercial benefit from the release of the requested records.

IV.     Conclusion

For all of the foregoing reasons, the Center qualifies for a full fee-waiver.  We hope that EPA will immediately grant this fee waiver request and begin to search and disclose the requested records without any unnecessary delays.

If you have any questions, please contact me at foia@biologicaldiversity.org.  All records and any related correspondence should be sent to my attention at the address below.

Sincerely,

Ann K. Brown
Open Government Coordinator
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211-0374
foia@biologicaldiversity.org