1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

SIERRA CLUB,

    Plaintiff,

v.

UNITED STATES ENVIRONMENTAL

PROTECTION AGENCY,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. 3:18-cv-3472-EDL

**DECLARATION OF BRIAN HOPE IN SUPPORT OF DEFENDANT'S RESPONSE TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGEMENT**

11

12

13

14

15

    I, BRIAN HOPE, declare that the following statements are true and correct to the best of my knowledge and are based on my own personal knowledge, on information contained in the records of the United States Environmental Protection Agency ("EPA" or "Agency"), or on information supplied to me by employees under my supervision or employees in other EPA offices.

16

17

18

19

20

21

22

23

    1.    I am the Deputy Director of the Office of Executive Secretariat ("OEX"), an office within the Office of the Administrator of the EPA. I have held this position since June 2006. From January 23, 2017 through September 22, 2017, I was Acting Director of OEX. OEX handles four business lines: overseeing Freedom of Information Act ("FOIA") request processing in the Office of the Administrator; managing the records management program for the Office of the Administrator; managing the Administrator's and Deputy Administrator's executive correspondence; and administering the EPA's Correspondence Management System.

24

25

26

27

28

    2.    I have read and am personally familiar with Plaintiff's July 17, 2017, July 19, 2017, July 21, 2017, and May 10, 2018 FOIA requests. EPA identified these four requests as EPA-HQ-2017-009482, EPA-HQ-2017-009615, EPA-HQ-2017-009684 and EPA-HQ-2018-007559, respectively. As the Deputy Director of OEX, I supervise staff in the office responsible for responding to these requests. I make this Declaration in support of EPA's Response to Plaintiff's Motion for

DECLARATION OF BRIAN HOPE      1

Partial Summary Judgment.

3.      The purpose of this declaration is to provide the background of EPA's efforts to process Sierra Club's four FOIA requests up to this point in time, explain the steps involved in processing a FOIA request in the Office of the Administrator at EPA, and to explain the extraordinary circumstances EPA faces which inhibit its ability to process more than 400 documents per month at this time for the requests at issue in this case.

## I.   **BACKGROUND OF REQUESTS**

4.      On July 17, 2017, Sierra Club submitted the first FOIA request at issue in this litigation using the FOIAonline website seeking the records of the external communications of seven EPA employees from January 20, 2017 through the date of the request. The request seeks all external communications between any of the following personnel and any person outside of EPA:

- Brittany Bolen
- Byron Brown
- Holly Greaves
- Albert Kelly
- Richard Yamada
- Nancy Beck
- Dennis Lee Forsgren

The request additionally seeks these employees' calendars, sign-in sheets or other records memorializing these employees' attendance at any meetings with persons outside EPA, and phone logs or other indices which memorialize communications with persons outside EPA. This request specifically excluded all communications to or from persons employed elsewhere within the Executive Branch of the United States, persons employed by the executive branch of any state, or persons who have executed a legal contract to provide consulting or other services to EPA if the communications post-date that contract.

5.      On July 17, 2017, FOIAonline generated an automated message confirming receipt of Sierra Club's FOIA request and provided Sierra Club with tracking number, EPA-HQ-2017-009482.

DECLARATION OF BRIAN HOPE          2

That same day, EPA's National FOIA Office assigned the request to the EPA Office of the Administrator. On July 18, 2017, the request was assigned to OEX.

6.     On July 19, 2017, Sierra Club submitted the second FOIA request at issue in this litigation using the FOIAonline website seeking the records of Michele Hale, a former employee who was an executive assistant to former EPA Administrator Scott Pruitt. The request seeks communications between Ms. Hale and parties outside EPA related to phone calls, meetings, or appearances with Scott Pruitt; calendars; and sign-in sheets or other records memorializing attendance at any meetings attended by Scott Pruitt and anyone outside EPA from February 17, 2017 through the present.

7.     On July 19, 2017, FOIAonline generated an automated message confirming receipt of Sierra Club's FOIA request and provided Sierra Club with tracking number, EPA-HQ-2017-009615. That same day, EPA's National FOIA Office assigned the request to the EPA Office of the Administrator. On August 4, 2018 the request was assigned to OEX. On August 22, 2017, EPA sent an email to the Sierra Club to provide contact information for the EPA staff assigned to the request and information about the unprecedented increase in the number of FOIA requests facing the Office of the Administrator.

8.     On July 21, 2017, Sierra Club submitted the third FOIA request at issue in this litigation using the FOIAonline website seeking the records of the external communications of seven additional EPA employees from January 20, 2017 through the date of the request. The request seeks all external communications between any of the following personnel and any person outside of EPA:

- Troy Lyons
- Elizabeth Bennett
- Christian Palich
- Layne Bangerter
- Aaron Ringel
- Kaitlyn Shimmin
- Kenneth Wagner

DECLARATION OF BRIAN HOPE                    3

The request additionally seeks these employees' calendars, sign in sheets or other records memorializing these employees' attendance at any meetings with persons outside EPA, and phone logs or other indices which memorialize communications with persons outside EPA. This request specifically excluded all communications to or from persons employed elsewhere within the Executive Branch of the United States and persons who have executed a legal contract to provide consulting or other services to EPA if the communications post-date that contract. Unlike the July 17, 2017 request above, this third request included communications between the EPA personnel identified in the request and state agencies.

9. On July 21, 2017, FOIAonline generated an automated message confirming receipt of Sierra Club's FOIA request and provided Sierra Club with tracking number, EPA-HQ-2017-009684. That same day, EPA's National FOIA Office assigned the request to the Office of Congressional and Intergovernmental Relations (OCIR) in the EPA Office of the Administrator.

10. On May 10, 2018, Sierra Club submitted the fourth FOIA request at issue in this litigation using the FOIAonline website seeking the records of the external communications of 10 additional EPA employees from January 20, 2017 through the date that EPA conducted its search. The request seeks all external communications between any of the following personnel and any person outside of EPA:

- Andrew Wheeler
- Madeline Morris
- Charles Munoz
- Sarah Greenwalt
- William Lovell
- Justin Schwab
- Patrick Davis
- Michael Abboud
- David Ross
- Bill Wehrum

This request did not make any of the exclusions of "external" communications made for EPA personnel identified in the three earlier requests.

DECLARATION OF BRIAN HOPE          4

11.     On May 10, 2018, FOIAonline generated an automated message confirming receipt of Sierra Club's FOIA request and provided Sierra Club with tracking number, EPA-HQ-2018-007559. That same day, EPA's National FOIA Office assigned the request to the EPA Office of the Administrator. On May 15, 2018 the request was assigned to OEX.

12.     On May 31, 2018, EPA emailed Sierra Club a notification that an interim release had been made in the third request, EPA-HQ-2017-009684. The release consisted of 15,761 pages of documents pertaining to email correspondence of the EPA "Beachhead" team for a portion of the timeframe of Sierra Club's request. A member of the "Beachhead" team, Layne Bangerter, was identified as a custodian in Sierra Club's third request. This interim production included external correspondence records which were releasable in full or in part in Mr. Bangerter's Outlook account while he was at EPA.

13.     On June 1, 2018, EPA emailed Sierra Club with estimated completion dates for the first three requests. These estimated completion dates were estimates which accounted for the significant increase in FOIA requests filed with the Office of the Administrator. Specifically, EPA advised Sierra Club that request EPA-HQ-2017-009482 (submitted July 17, 2017) was number 503 in the queue, request EPA-HQ-2017-009615 (submitted July 19, 2017) was number 521 in the queue, and EPA-HQ-2017-009684 (submitted July 21, 2017) was number 526 in the queue. The email also invited Sierra Club to narrow its requests, so that they could be processed more quickly. No response to this request was received from Sierra Club prior to the filing of the complaint in this matter.

14.     On July 23, 2018, Sierra Club filed the first amended complaint in above–referenced litigation.

15.     On November 2, 2018, EPA emailed Sierra Club a notification that another interim release had been made in the third request, EPA-HQ-2017-009684. The second interim release for this request consisted of 5,221 pages of documents pertaining to email correspondence of the EPA

"Beachhead" team for a portion of the timeframe of Sierra Club's request. Additional documents were released from Layne Bangerter, a member of the "Beachhead" team and custodian in Sierra Club's third request. Combining this interim production with the documents released on May 31, 2018 in the first interim release, approximately 408 records consisting of external email correspondence from Mr. Bangerter's Outlook account have been released in full or in part that are responsive to Sierra Club's third request.

## II.  EPA'S REVIEW AND PRODUCTION SCHEDULE

16.     On August 1, 2018, Sierra Club provided EPA a letter which defined "external communications" for email records in all four requests to mean that EPA should search the "To", "From", "cc" and "bcc" fields in each of the 25 custodians' Outlook accounts for any emails containing email addresses ending in any of the generic domain names ".com", ".net", ".org", ".edu", ".int", ".info" and ".biz." The letter also included an attachment identifying 57 specific domain names to search for communications with state agencies (*e.g.* alaska.gov). Sierra Club's letter requested that EPA produce all responsive records for 12 of the 25 custodians within an eight-month timeframe beginning on October 1, 2018 and ending on June 1, 2019.

17.     The August 1, 2018 letter was the first time Sierra Club provided the Agency with search parameters which would enable EPA to utilize electronic search tools to search for records responsive to these four requests. Prior to this clarification, EPA would have had to locate and collect all electronic and hard copy records received or sent by all 25 custodians and manually review each document to determine if it had been shared with an external party, as defined by each request's parameters. A manual review of that scale would have posed an extreme resource burden to the Agency. By providing the domain names, as they had previously provided to EPA for similar FOIA requests of this kind, Sierra Club modified their request in a manner that permitted EPA staff to conduct an electronic search for records that targeted records Sierra Club was seeking.

DECLARATION OF BRIAN HOPE              6

18.     On August 15, 2018, EPA began its centralized search for email records by searching the "To", "From", "cc" and "bcc" fields for the seven generic and 57 specific state domain names specified in Sierra Club's August 1, 2018 letter. The timeframe for the search spanned from January 20, 2017 through August 15, 2018 for all 25 custodians to ensure the timeframes specified by Sierra Club in all four requests were encompassed in the search.

19.     On September 4, 2018, EPA completed compiling the documents located by its centralized search software and created a review database in Relativity, EPA's document review software. Through counsel on September 10, 2018, EPA provided Sierra Club with an index listing the total number of documents located in the search for each custodian. EPA notified Sierra Club that after loading all documents from the custodians and de-duplicating exact duplicates across the database, this portion of the search located approximately 271,439 potentially responsive records.

20.     On September 11 and 12, 2018, in an effort to reduce the number of potentially responsive records from the 271,439 initially located, EPA provided Sierra Club with two additional indices. These indices provided Sierra Club the identities of all the domain names (*e.g.* sierraclub.org) contained in the 271,439 document database, as well as the total number of documents located for each identified domain name across all 25 custodians searched. EPA requested that Sierra Club use these indices to identify domain names they wanted to EPA include or exclude from the set of documents which EPA would need to review.

21.     On September 28, 2018, Sierra Club provided EPA a letter with a preliminary list of domain names to be used as search terms. Sierra Club grouped the list of domain names into 10 "tiers" in the order of priority for review and the calendars of 12 custodians as priorities.

22.     Sierra Club's September 28, 2018 letter also set forth additional proposals to remove documents already reviewed by EPA in a similar case with Sierra Club filed in the United States District Court for the District of Columbia, suggested other potential modifications to the selection

of documents ultimately to be included in the tiers and provided a list of domains that could be excluded from the review set if that excluded domain was the only external domain on the email.

23.     Additionally, the September 28, 2018 letter proposed a new production schedule for the identified tiers of documents. Sierra Club proposed that EPA review and produce one tier of documents per month commencing on November 15, 2018. This proposal was provided to EPA prior to Sierra Club or EPA knowing the actual size of each tier, or the effect of any of the potential modifications identified in Sierra Club's proposal on the size of each tier.

24.     After reviewing Sierra Club's proposal, EPA determined that it was more helpful for Sierra Club to provide domains that it wishes to prioritize, rather than exclude. This is because of the potential for both a prioritized domain name and an excluded domain name to be on the same email, resulting in the document being counted as excluded, but still included in the review set.

25.     Over the following weeks, EPA and Sierra Club discussed how to construct the review set of the 10 tiers in a manner that accurately reflected the documents Sierra Club wanted EPA to review. The parties agreed to exclude a portion of emails that were already released in earlier United States District Court for the District of Columbia FOIA litigation and the emails from Andrew Wheeler's public–facing Outlook account after he became the Acting Administrator. After the agreement to exclude these records from the search, the creation of the initial 10 tiers in EPA's Relativity database was completed on October 18, 2018, with minor updates reflecting the parties' continuing negotiations since then. These agreed-upon limitations and resulting creation of the tiers enabled EPA staff to begin to review the requested records as prioritized by Sierra Club.

26.     While the creation of the initial 10 tiers is complete, the potential scope of production for many additional records from communications with other federal agencies in Sierra Club's May 10, 2018 request and the non-Outlook portion of all four requests remains unresolved. Sierra Club also indicated that it plans to define two more tiers of domain names that are yet to be

DECLARATION OF BRIAN HOPE          8

1   identified by Sierra Club.

2       27.     As of November 8, 2018, after excluding the agreed–upon potentially responsive

3   records and running the appropriate searches within Relativity, the 10 tiers contain 18,706

4

5   documents in total with the following breakdown by tier.

6           • Tier 1: 2,115 documents.
7           • Tier 2: 2,743 documents
            • Tier 3: 1,050 documents
8           • Tier 4: 2,052 documents
9           • Tier 5: 1,796 documents
10          • Tier 6: 1,993 documents
11          • Tier 7: 1,915 documents
            • Tier 8: 1,803 documents
12          • Tier 9: 1,193 documents
13          • Tier 10: 2,046 documents[1]

14      28.     On October 22, 2018, EPA proposed to begin review of Tier 1 of Sierra Club's

15  requests with six productions, one every month, beginning on December 21, 2018. EPA committed

16  to complete review of the first 1,000 documents in Tier 1 by March 15, 2019, and the remaining

17  1,114 documents by May 15, 2019.[2] EPA made this good faith offer to begin work on Sierra Club's

18

19  highest-priority documents while still working with Sierra Club to reach agreement on the scope

20  and production schedule for the remainder of the documents the Agency will need to search for,

21  collect and review.

22      29.     With this offer, the Agency explained that coming to resolution on defining the full

23

24  universe of documents would enable the Agency to make a more accurate proposal regarding a

25  long-term offer for all 10 tiers based on its resources. The Agency also did not foreclose raising its

26

27  [1] The number of documents per tier do not reflect the changes Sierra Club proposed for the first time in its filing on
    November 9, 2018, specifically adding a domain to tier 3.

28      [2] At the time of this offer, Tier 1 consisted of 2,114 documents. However, due to later changes in the search
    parameters of Tier 1 resulting from discussions with Sierra Club, the total number of Tier 1 documents is presently 2,115.

DECLARATION OF BRIAN HOPE          9

review rate from this initial offer for the remaining tiers if more resources become available over time.

30.    EPA staff have begun processing Tier 1 consistent with its proposed schedule, and EPA plans to make the first production of responsive documents from Tier 1 on or before December 21, 2018. The Agency will continue to review and process 400 documents per month for the remaining tiers of documents until it is able to reach agreement with Sierra Club on an increased rate in the event that more resources become available or until otherwise ordered by the Court.

31.    EPA has continued to work with Sierra Club to reach agreement on the entire universe of records to be reviewed, but the parties have not yet reached agreement.

III.    **OEX's PROCESSING CAPACITY**

32.    ***EPA has experienced an immense increase in FOIA requests and litigation.*** Since at least January 2017, EPA has experienced an immense increase in the number of FOIA requests submitted to the Agency for processing. In fiscal years 2017 and 2018, EPA received between 11,300 and 11,500 FOIA requests in each year, respectively.  The fiscal year totals for 2017 and 2018 exceeded the previous 2016 fiscal year total by 1,115 and 920 requests respectively.

| Fiscal Year | Number of Requests Received |
|---|---|
| 2014 | 10,470 |
| 2015 | 10,981 |
| 2016 | 10,403 |
| 2017 | 11,518 |
| 2018 | 11,323 *estimated, pending final data validation* |

33.    The complexity and scope of FOIA requests received by the Agency has also

DECLARATION OF BRIAN HOPE          10

increased. For example, staff in my office and other offices across the Agency have identified an increasing number of requests that seek correspondence generally (*e.g.* "all communications"), rather than correspondence about a specific or precise subject matter. OEX has also seen many FOIA requests with multiple distinct subparts, seeking information that requires OEX to coordinate with multiple Agency components.

34.     The increase in overall FOIA requests has had a particularly significant impact on the Office of the Administrator, of which OEX is one component. For example, in the eight months following the 2017 Presidential Inauguration, OEX received 598 FOIA requests compared with 47 requests over the same period in 2016. In fiscal year 2016, the Office of the Administrator received 203 requests during the entire fiscal year. In fiscal years 2017 and 2018, the Office of the Administrator received 1,045 and 952 requests respectively, both years more than a 468 percent increase from fiscal year 2016.



35.     As of November 26, 2018, EPA has 66 FOIA lawsuits pending, down from a 2017 high of 74 FOIA lawsuits. Approximately 92 percent of the currently pending FOIA lawsuits have been filed since January 20, 2017. EPA is currently facing at least 23 pending lawsuits in various stages of litigation over FOIAs in which OEX is the lead office and at least 10 other suits involving

DECLARATION OF BRIAN HOPE          11

records from the Office of the Administrator. The number of currently pending cases is an approximately 500 percent increase over the pre-2017 year high. In addition, the complexity of the requests in litigation has also increased.  For example, EPA is currently responding to a lawsuit that includes 25 different FOIA requests in the complaint.

36.     ***EPA's Efforts to Address the FOIA Burden in the Office of the Administrator.*** The Agency has taken steps to respond to this large volume of FOIA requests and litigation focused within the Administrator's Office. In December 2017, the Agency began an initiative to centralize the FOIA process for four of the 12 staff offices within the Office of the Administrator that receive the majority of FOIA requests: the Office of the Executive Secretariat, the Office of Congressional and Intergovernmental Relations, the Office of Policy and the Office of Public Affairs. This initiative to centralize FOIA processing of these four staff offices is known as the "AO4 project." This initiative seeks to maximize the available resources and gain efficiencies from managing the responses centrally.

37.     The AO4 project engaged expertise from the Office of General Counsel's FOIA Expert Assistance Team to provide critical project management, legal guidance and training to staff. In August 2018, the Office of the Administrator organized a temporary team of 12 staff from multiple Agency offices who are dedicated to first-line review of records responsive to backlogged FOIA requests assigned to the Office of the Administrator. This team consists of a recently trained group of staff that do a basic, first-line review of FOIA requests not in litigation. The team is currently authorized through mid-December 2018, but employees' detail assignments may be extended to allow the team to operate for an additional four months. The primary focus of the AO4 project is to work to respond to FOIA requests submitted to the Office of the Administrator, in furtherance of meeting the Agency's FY 2018-2022 Strategic Plan to increase transparency and public participation.  Measures for meeting this goal include eliminating the backlog of pending

1  FOIA requests and meeting the requisite timelines for responding to FOIA requests.

2      38.    At EPA, each program office is generally required to complete the processing of

3  FOIA requests that are the subject of litigation because the Agency does not have a pool of staff

4  devoted specifically to processing FOIA requests in litigation. Since April 2016, OEX has employed

5  three full-time-equivalent ("FTE") staff dedicated to working on FOIA matters assigned to the Office

6  of the Administrator, whether the matter was in litigation or was part of a FOIA response. During the

7  second half of 2018, OEX hired three additional FOIA staff. Four of the total six staff are now

8  designated to spend a portion of their time on FOIA requests that are in litigation.

9      39.    In OEX, we are implementing an approach to cap the amount of time the four OEX

10  employees devote to FOIA requests in litigation to 50 percent of their time, to ensure at least 50

11  percent of their time is spent on requests that are not yet in litigation.

12      40.    By dividing these employees' document review and processing time equally between

13  requests that are in litigation and requests that are not in litigation, my office is able to continue to

14  provide a level of service to all requesters, regardless of whether they have filed litigation.  This

15  approach also enables OEX to devote a meaningful amount of resources to managing its backlog of

16  older requests and reduce the growth of backlogged requests that result in part from extremely high

17  litigation demands.

18      41.    While the four OEX staff referenced in Paragraph 39 process FOIA requests in

19  addition to litigation review, they also have other normal duties including but not limited to: agency–

20  required training, continuing education requirements, special projects and ordinary administrative

21  tasks like staff meetings, that total approximately 20 percent of their total hours. This means 80

22  percent of their total available hours are spent on FOIA review and processing which are currently

23  divided equally between work spent on FOIA requests not in litigation, and FOIA requests that are in

24  litigation. These staff members are full-time employees working 80 hours every two weeks and can

DECLARATION OF BRIAN HOPE        13

1  therefore support a maximum total of 256 hours per month to process records for FOIA requests in

2  litigation.

3      42.    **OEX's review process.** OEX staff conduct document reviews for FOIA requests in

4  generally the same manner, whether or not the request is the subject of litigation. Consistent with the

5  Agency's FOIA Policy, OEX conducts at least two rounds of review of documents before they are

6  prepared for release.

7

8      43.    Each round of review serves a different function but is performed by the same team of

9  four staff in OEX. In the first round of review, each document is reviewed for responsiveness,

10  duplication of records (if any), applicability of exemptions, redaction when appropriate and to flag

11  internal equities or the need for consultation with another federal agency. A document has internal

12  equities when the document originates with, or is principally about, the work of one or more offices

13  outside of OEX. Staff in those offices are typically the subject matter expert(s) best suited to

14  understand the specific nature of the documents and to provide relevant information concerning the

15  applicability of FOIA exemptions. For example, OEX may need to consult with the Office of

16  Enforcement and Compliance Assurance to determine if a document is subject to withholding under

17  Exemption 7(a).

18

19      44.    Some documents also require the input of other federal agencies to determine the

20  proper application of FOIA exemptions. For these records, EPA will either consult with those

21  agencies on appropriate treatment of the record or refer treatment of the record entirely to the

22  appropriate agency.[3]

23

24      45.    OEX staff perform all the review tasks listed in paragraphs 43 and 44 in the first

25  round of review of a document.

26

27

28      [3] See DOJ Office of Information Policy Referral and Consultation Procedures.
https://www.justice.gov/oip/blog/foia-update-oip-guidance-referral-and-consultation-procedures

DECLARATION OF BRIAN HOPE          14

46.     In the second round of review, OEX staff take documents identified in the first round for internal equity review and documents identified for referral or consultation with another agency, and coordinate with the appropriate office or agency concerning those documents, as described in paragraph 43 above. To conduct the coordination, staff must spend time identifying subsets of documents, processing those documents into a PDF or other format for sharing internally or externally, leading the communication and coordination with the other offices and implementing any feedback or changes that result from that review.

47.     Within this second-round review, OEX staff also conduct a quality and consistency review of all of the documents that were identified as responsive in the first round. The quality and consistency review help to correct inconsistencies, identify any erroneous application of FOIA exemptions and correct any other errors in coding documents to ensure the overall quality of our response. This round of review enables OEX staff to make a recommendation to management regarding the release or withholding of a document, consistent with EPA's FOIA policy which requires review by "at least two knowledgeable individuals, including one manager or supervisor to ensure openness, transparency, consistency, and the appropriate application of FOIA exemptions."[4]

48.     Due to the central role of the Office of the Administrator in nearly all the Agency's work, it is extremely common for each FOIA request to involve multiple EPA offices, requiring the coordination of multiple, simultaneous equity reviews for each request.  Many requests also involve at least one other federal agency.

49.     For requests in litigation, either during OEX's second round of review or directly following, at least one attorney from the Office of General Counsel typically conducts a legal review of the processed records.

---

[4] Procedures for Responding to FOIA Requests, CIO Transmittal No.14-006, Step 11, p. 10, available at: https://www.epa.gov/sites/production/files/2015-03/documents/cio_2157-p-01.1.pdf.

DECLARATION OF BRIAN HOPE          15

50.      Before final production, records may also go through an awareness notification process. The awareness notification process is not an approval process. Rather, the process informs senior officials of the imminent release of information through FOIA that may be of particular interest to the press, the public and/or Congress. This allows senior leadership to respond efficiently to inquiries following the production of records. A copy of EPA's Awareness Notification Procedures is attached here as Exhibit A.

51.      ***OEX Review Capacity.*** Over the past several years, EPA has increased its use of the Relativity review software to conduct document reviews for FOIA responses. Use of the software to review documents generates data which can be used to calculate approximate or average rates for the number of documents or pages per hour that a reviewer has reviewed. EPA has begun to make use of that data to try to accurately measure the time it takes EPA staff to review documents as a foundation for calculating reliable and predictable production schedules.

52.      Two offices in particular have evaluated data available from large review projects within their respective offices: the Office of Air and Radiation ("OAR"), which has a centralized FOIA team, and the Office of General Counsel's FOIA Expert Assistance Team ("FEAT"). Both offices analyzed information about larger review projects where multiple employees were conducting the document review as a team. The FEAT analyzed data from a review project that involved approximately 19,873 documents consisting primarily of Outlook emails and their attachments.  OAR analyzed data from ten review projects of varying degrees of complexity and calculated review rates and the average number of pages per document to help estimate FOIA costs.

53.      In both analyses, the data indicated an average rate of review of approximately 43 pages per hour.

54.      Analyses of 12 relevant document collections, which consisted of Outlook email records and attachments, determined an average length of three pages per Outlook record. Therefore,

it is estimated that OEX staff on average can review approximately 43 pages per hour, or approximately 14.3 documents per hour. This estimate represents the time it takes one employee to complete one round of review. As noted above, OEX conducts at least two rounds of review for each document, utilizing the same staff to conduct each round. The review time for each of the two rounds is the same: an average of 43 pages or 14.3 documents per hour. Since the two-level review essentially means that each page is reviewed twice, OEX staff are able to complete their review at an average rate of 22 pages per hour (roughly half of 43 pages per hour). This estimated rate of review is the same for processing records whether or not the request is in litigation.

55.    This estimated rate of review is reasonable because the rate of review was calculated, in part, on data available from offices outside the Office of the Administrator. In many instances, the document sets used to calculate the review rate required less complex or voluminous equity reviews. For example, the Office of Air and Radiation would tend to have fewer unique offices to coordinate with, given the inherent subject matter limitation to matters in the expertise of the Office of Air and Radiation, rather than matters spanning the entire Agency.  The rate is also reasonable for email correspondence with external parties because those records frequently contain information subject to FOIA Exemption 6, such as personal email addresses, phone numbers or even sensitive personal information like Social Security numbers, requiring redaction. For example, documents produced in *Sierra Club v. EPA,* C.A. No. 17-cv-01906, (D.D.C.**)** to Sierra Club contained numerous redactions of this type of personal information across the productions.

56.    As explained in paragraph 41, OEX currently has a maximum number of 256 FTE hours per month for processing FOIA requests that are the subject of litigation. Applying the standard estimated rate of production of 22 pages per hour, or 7.2 documents per hour, OEX's overall maximum litigation production capacity each month is approximately 5,632 pages or 1,843 documents per month.

57.     As explained in paragraph 51, EPA has recently started to use data to better understand the actual average rates of review in document review projects. Prior to using this type of data to measure staff rates of review, my office would make a good faith estimate when proposing production schedules, based on our experience and knowledge of the scope and nature of the request and of the amount of time a review project would take, and would propose a production schedule. In many FOIA cases, plaintiffs sought higher rates of production than OEX proposed, and EPA agreed to faster rates of production in many cases to try to be as responsive as possible to the requests. These faster production rates negatively impacted our ability to process requests not in litigation.

58.     Negotiating production schedules as described in paragraph 57 for a historically unprecedented number of FOIA cases resulted in a significant overextension of available staff resources. For example, for November 2018, OEX committed to processing approximately 4,350 documents in that month for eight other Office of the Administrator cases in litigation, exceeding OEX's estimated capacity by more than 2,000 documents. In the previous month, OEX committed to processing 4,450 documents, almost doubling OEX's estimated capacity of 1,843 documents. While the number of documents committed to be processed per month has fluctuated since January 2017, these months are typical of the rate of review EPA has committed to in litigation, creating a sustained and disruptive strain on EPA staff resources. In the past, employees would frequently spend almost all of their time on litigation productions, diminishing the employee's ability to work on non-litigation requests and therefore increasing the backlog of open requests.

59.     To help alleviate at least some of this burden on OEX staff, EPA staff from multiple offices have been directed or volunteered to assist with document review. In some cases, the EPA legal staff serving as Agency counsel in the 66 active FOIA cases were required to perform first- and second-rounds of review of documents in order to meet Agency deadlines. In other instances, the document review is being performed by staff in other EPA offices in consultation with OEX and

OGC staff.  While EPA has been able to implement these short–term, temporary measures, staffing the FOIA review process in this manner creates a number of inefficiencies in the review process, and dilutes the ability of Agency counsel to provide OEX and other offices across the Agency with necessary legal counseling. It also negatively impacts the ability of the other offices to service FOIA requests assigned to the home office of the employee assisting with the FOIA review for OEX requests and interferes with their Agency mission work.

60.  ***EPA Production Rates Agreed to in Recent Cases***. In contrast to the monthly rate of at least 1,050 to 2,743 documents that Sierra Club has requested in this case, of the eight current production schedules in litigation involving AO4 offices, the monthly production review rates agreed upon with Plaintiffs range from 300 documents per month to 750 documents per month. This includes one case in this Court with Sierra Club where a production schedule ranging from 500 to 700 documents per month was agreed upon by the parties without briefing. The rate proposed by Sierra Club for review of the documents at issue in this case more than doubles the highest rate agreed to in any case with a production schedule currently assigned to OEX. In addition, the AO4 offices also have at least two other FOIA litigation cases where the production schedules are in the process of being set, which will be an additional sustained demand on OEX resources.

61.  ***The rate of production in the case Sierra Club v. EPA, C.A. No. 17-cv-01906, (D.D.C.).*** To the best of my knowledge, Sierra Club's proposed rate of production would be the highest rate of production OEX has agreed to since January 2017. The production schedule in *Sierra Club v. EPA, C.A. No. 17-cv-01906, (D.D.C.)* was negotiated in December of 2017, before EPA had begun to analyze its review capacity.  The schedule agreed to in that matter resulted in commitments that exceeded the capacity of my office and resulted in a significant portion of the review being conducted by staff outside OEX. In addition, EPA's backlog of FOIA requests continued to climb during this time since much of the OEX's FOIA resources were being used in litigation to the

detriment of non-litigation requests. During this time, the Agency was also sued over requests that were pending in the backlog of the Office of the Administrator, some of which were matters my staff were not able to work on given their work supporting the Sierra Club case in the District of Columbia and other litigation cases.

62.    ***Reasonableness of EPA's Proposed Schedule.*** EPA proposes to review for production 400 documents per month, proceeding through the "tiers" as identified by Sierra Club and further narrowed by the parties' discussions. The first production will occur on December 21, 2018, with rolling monthly productions thereafter. EPA also intends to produce the calendars of Andrew Wheeler and Bill Wehrum on or before January 15, 2019. From that date, EPA will continue processing two calendars of the remaining custodians identified in Sierra Club's September 28, 2018 proposal every six weeks.

63.    EPA's proposed schedule, which commits EPA to process an average of 400 documents every month for this request, is consistent with OEX's workload and available resources. First, the Office of the Administrator currently has approximately 1,563 pending FOIA requests. Of those pending FOIA requests, 70 were granted expedited processing by EPA's National FOIA Office. Plaintiff did not seek expedited processing for any of the four requests at issue in this litigation. Thus, EPA is proposing to process records for this matter now, despite the fact that it could direct those resources to requests that have been granted expedited processing.

64.    Based on requests that were filed earlier in time than requests EPA-HQ-2017-009482, EPA-HQ-2017-009615, EPA-HQ-2017-009684 and EPA-HQ-2018-007559, and accounting for the 70 requests that were granted expedited processing, Sierra Club's requests are currently placed at 447, 462, 467, and 1,209 in the queue, respectively, out of the 1,563 FOIA requests assigned to the Office of the Administrator. The processing schedule of 1,050 to 2,743 documents per month proposed by Sierra Club would effectively allow Sierra Club's FOIA requests to be processed even

more out of order than the Agency is already proposing.

65.     If EPA were to divide the total FTE hours available to OEX for FOIA litigation equitably across all nine pending AO4 FOIA cases where productions are ongoing, EPA could only commit to produce 208 documents per month in each case. EPA's proposed schedule in this case exceeds this rate. EPA is offering a higher proposed rate of review to balance Sierra Club's desire to receive the documents at a faster pace with the Agency's legitimate need to bring production commitments in line with actual resources available in OEX.  To offer this higher rate of review for this matter, EPA will continue to need to draw upon staff FTE resources in other Agency offices.

66.     The calendars requested by Sierra Club span almost one-and-a-half years for some custodians. In a previous case, the calendars for three of the custodians in this case – Nancy Beck, Brittany Bolen, and Byron Brown - were produced for less than a one-year timeframe. They ranged from 1,486 to 1,648 pages in length. These calendars are burdensome to review, based on their length and potential for deliberative process privileged material from internal meetings and personal privacy information.

67.     The average of Plaintiff's proposed rate of production - 1,870 per month for 10 months - would absorb 100 percent of OEX's litigation response capacity. Such an inequitable distribution of Agency resources would prejudice other requesters and prevent EPA from attempting to provide an equitable distribution of resources to all its matters.

Pursuant to 28 U.S.C. § 1746, I hereby affirm under penalty of perjury that the forgoing declaration is true and correct.

Executed this 28th day of November 2018.

Brian T. Hope
Deputy Director, Office of the Executive Secretariat
Office of the Administrator
U.S. Environmental Protection Agency

DECLARATION OF BRIAN HOPE          22

# EXHIBIT A



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

November 16, 2018

OFFICE OF THE
ADMINISTRATOR

## MEMORANDUM

**SUBJECT:**   Awareness Notification Process for Select Freedom of Information Act Releases

**FROM:**   Ryan Jackson
Chief of Staff

**TO:**   General Counsel
Assistant Administrators
Inspector General
Chief Financial Officer
Associate Administrators
Regional Administrators
Regional Counsels
Deputy Regional Counsels
FOIA Coordinators

Earlier this week, in a November 13, 2018, memorandum to all staff, Acting Administrator Wheeler reaffirmed the agency's commitment to transparency, noting that the Freedom of Information Act is both a statutory obligation and an important tool for promoting transparency and building public trust in agency actions.

For years, spanning several Administrations, senior leaders at the U.S. Environmental Protection Agency have been notified of the imminent release of information through FOIA. This "awareness notification process" is intended to inform senior officials of the release of information through FOIA that may be of particular interest to the press, the public and/or Congress. Indeed, having such awareness has allowed agency senior leadership to respond efficiently to inquiries about such releases. In an effort to ensure consistency and provide clarity, this memorandum sets forth the awareness notification process to be followed at the agency.

This awareness notification process is not an approval process, nor does this process alter or eliminate any part of the agency's existing procedures for collecting, reviewing or redacting documents, or preparing responses to FOIA requests. Consistent with the agency's FOIA policy and procedures, FOIA staff, program staff and program managers will continue to determine whether information should be released or withheld under FOIA's exemptions. The awareness notification process described below is effective immediately and controls and supersedes any prior process, procedure, guidance or instruction, either formal or informal, to the extent such is

inconsistent with the awareness notification process described below. The aspects of the awareness notification process described in paragraphs 1 through 3 below will run concurrently with the Action Office's[1] preparation of the FOIA response.

PROCESS

1.   The National FOIA Office will provide a list of select FOIA requests received that week to the Director of the Office of Executive Secretariat, the Associate Administrator for the Office of Public Affairs and the Associate Administrator for the Office of Congressional and Intergovernmental Relations, with a courtesy copy to the deputy in each of those three offices.

2.   As promptly as possible but within five business days of transmittal of the list, the OEX Director and the OPA and OCIR Associate Administrators, or their designees, will notify the National FOIA Office Director, or designee, identifying any specific FOIA requests for which they would like to receive an awareness notification.

3.   For those FOIA requests identified for awareness notification, the National FOIA Office Director or Assistant Directors, or their designees, will promptly indicate in FOIAonline that the FOIA response will require an awareness notification. The National FOIA Office Director, or designee, will also notify the Deputy Assistant Administrator or Deputy Regional Administrator of the Action Office by email, specifying which FOIAs have been identified for awareness notification.

4.   Following Action Office management approval of the FOIA determination, in accordance with applicable authorities,[2] and prior to issuing the determination, the Action Office shall prepare an "awareness notification email" containing the following information:
     - The name of the Action Office;
     - The FOIAonline tracking number;
     - The name of the requester/organization;
     - The date the FOIA request was perfected;
     - A brief description of the request, as clarified/modified;
     - Whether the response is interim or final;
     - The number of documents and/or pages to be released;
     - An attachment of, or link to, the documents to be released;
     - A list of offices with an equity in the documents and a statement that those offices have reviewed the relevant documents; and
     - The name of the manager responsible for making the FOIA determination.
     A copy of the email will be saved in FOIAonline.

---

[1] The Action Office, as defined in EPA's Procedures for Responding to Freedom of Information Act Requests CIO 2157-P-01.1, is the organizational unit that has responsibility for responding to a FOIA request.

[2] *See* 5 U.S.C. § 552(a)(6)(A)(i), 40 C.F.R. §§ 2.103(b), 2.104(h), and EPA Delegation of Authority 1-30 Freedom of Information (12/15/2016); *see also* EPA Freedom of Information Act Policy CIO 2157.1 (09/30/2014) and EPA Procedures for Responding to Freedom of Information Act Requests CIO 2157-P-01.1 (09/30/2014).

5.  The Action Office will send the "awareness notification email" to the OEX Director and Deputy Director, the National FOIA Office Director and Assistant Directors, the OPA and OCIR Associate Administrator and Deputy Associate Administrator, the Deputy Assistant Administrator or Deputy Regional Administrator of the Action Office and the individual assigned to the request in FOIAonline.

6.  The recipients of the "awareness notification email" will have up to three business days following transmission of that email to review the documents to be released. There is no requirement for the recipients of the awareness notification email to respond or otherwise take action. After 4 p.m. on the third business day after transmission of the awareness notification email, the Action Office shall issue the Agency's FOIA determination. The determination should be issued promptly, but in no event later than one business day following completion of the three-day awareness notification period. After issuance, the determination should be properly documented in FOIAonline.

The awareness process discussed above does not affect the statutory timelines or, when applicable, litigation deadlines facing the agency.

As Acting Administrator Wheeler shared in his November 13, 2018, memorandum, the EPA is committed to conducting its business in an open and transparent manner and will continue to take steps to improve the efficacy and efficiency of its FOIA process. I look forward to working with all of you to make the EPA a flagship example of transparent, efficient and effective government.

cc: Andrew R. Wheeler
    Henry Darwin