ANDREA ISSOD (CA Bar No. 230920)
ELENA SAXONHOUSE (CA Bar No. 235139)
MARTA DARBY (CA Bar No. 310690)
Sierra Club Environmental Law Program
2101 Webster St., Ste. 1300
Oakland, CA 94612
andrea.issod@sierraclub.org
elena.saxonhouse@sierraclub.org
marta.darby@sierraclub.org
(415) 977-5544

Attorneys for Plaintiff Sierra Club

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SIERRA CLUB, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, <br><br> Defendant. | CASE NO. 3:18-cv-3472-EDL <br><br> **PLAINTIFF'S REPLY BRIEF SUPPORTING SIERRA CLUB'S MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date: December 20, 2018 <br> Time: 9:30 a.m. <br> Place: San Francisco Courthouse <br>         Courtroom E, 15th Floor <br> Before: Hon. Elizabeth D. Laporte <br>          Magistrate Judge |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................................ii

INTRODUCTION .................................................................................................................................1

STATEMENT OF ISSUES AND STATEMENT OF FACTS ...............................................................1

ARGUMENT .........................................................................................................................................2

I.  EPA's Claimed Processing Capabilities Must Not Be the Court's Only Consideration in Setting a Pace for Production...................................................................................................2

    A.  Adopting EPA's Approach Would Undermine the Purpose of FOIA. ...............................2

    B.  Congress Made Clear That Timely Production of Records Is Paramount, Even Where The Agency Faces Difficulties. ................................................................................2

    C.  The Public Value of the Requested Documents and the Potential to Lose that Value Over Time Is Relevant in Setting an Appropriate Pace of Production. ....................3

II. EPA Has Not Demonstrated That Producing One Tier of Records Per Month, Approximately 1,870 E-mail Chains On Average, Is Unreasonable. .............................................7

    A.  EPA's Data on the Increase in FOIA Requests to the Agency Omits Relevant Context. ................................................................................................................................8

    B.  EPA Failed to Justify that it Cannot Release One Tier of Records per Month, as Sierra Club Proposed. ......................................................................................................9

    C.  EPA's Page-per-Hour Estimate is Not Likely Accurate for the Records Requested Here. ..................................................................................................................11

III. EPA Has Violated FOIA as a Matter of Law and the Court Need Not Defer Declaring as Much. .........................................................................................................................12

CONCLUSION ......................................................................................................................................15

# TABLE OF AUTHORITIES

## CASES

*ACLU of N. Cal. v. Dep't of Justice*, No. 12-CV-04008-MEJ, 2014 WL 4954121 (N.D. Cal. Sept. 30, 2014) .................................................................................. 14

*ACLU v. Dep't of Defense*, 2006 WL1469418 (N.D. Cal. May 25, 2006) ................................ 4

*AFGE v. Dep't of Commerce*, 907 F.2d 203 (D.C. Cir. 1990) ............................................... 15

*American Oversight v. EPA*, Case No. 1:18-cv-00364-TJK (D.D.C., filed Feb. 16, 2018) .................................................................................................................. 14

*Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016) ........................................................................................................................... 5

*Citizens for Responsibility & Ethics in Washington ("CREW") v. Fed. Election Comm'n*, 711 F.3d 180 (D.C. Cir. 2013) ............................................................. 4

*Clemente v. Fed. Bureau of Investigation*, 71 F.Supp.3d 262 (D.D.C. 2014) ................................................................................................................................. 4, 5

*Cty. of Santa Clara v. Trump*, 250 F.Supp.3d 497 (N.D. Cal) ..................................................... 8

*Elec. Frontier Found. v. Office of the Dir. of Nat. Intelligence*, 542 F.Supp.2d 1181 (N.D. Cal. 2008) ........................................................................................ 9

*Elec. Privacy Info. Center v. Dep't of Justice*, 416 F.Supp.2d 30 (D.D.C. 2006) ....................................................................................................................................... 9

*Fiduccia v. U.S. Dep't of Justice*, 185 F.3d 1035 (9th Cir. 1999) ...................................... 2, 3, 12

*General Services Administration v. Benson*, 415 F.2d 878 (9th Cir. 1969) ............................... 5

*Gilmore v. U.S. Dep't of Energy*, 33 F.Supp.2d 1184 (N.D.Cal.1998) ..................................... 13

*Judicial Watch, Inc. v. United States Dep't of Homeland Sec.*, 895 F.3d 770 (D.C. Cir. 2018) .................................................................................................................. 3

*Long v. U.S. Internal Revenue Serv.*, 693 F.2d 907 (9th Cir.1982) ...................................... 2, 5, 9

*Marks v. U.S. Dep't of Justice*, 578 F.2d 261 (9th Cir. 1978) ................................................ 13

*Muckrock, LLC v. Cent. Intelligence Agency*, 300 F.Supp.3d 108 (D.D.C. 2018) .................................................................................................................................... 14

*Nation Magazine, Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995) .................................................................................................................. 14

*Natural Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292 (9th Cir.1992) .................................... 13

*Open America v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976) ....................................................................................................................... 2

*Oregon Nat. Desert Ass'n v. Gutierrez*, 409 F.Supp.2d 1237 (D. Or. 2006) .......................................... 13

*Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.*, 85
    F.Supp.3d 1074 (N.D. Cal. 2015) ............................................................................................ 1, 13

*Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429 (D.C. Cir.
    1992) ................................................................................................................................................ 5

*Pub. Employees for Envtl. Responsibility ("PEER") v. EPA*, 314
    F.Supp.3d 68 (D.D.C. 2018) ................................................................................................. 13, 15

*Schrecker v. U.S. Dep't of Justice*, 254 F.3d 162 (D.C. Cir. 2001) .......................................... 14

*Shapiro v. CIA*, 170 F.Supp.3d 147 (D.D.C. 2016) ................................................................... 14

*Theriault v. United States*, 503 F.2d 390 (9th Cir. 1974) ............................................................ 5

*Truitt v. U.S. Dep't of State*, 897 F.2d 540 (D.C. Cir. 1990) ..................................................... 15

*Yagman v. Pompeo*, 868 F.3d 1075 (9th Cir. 2017) ................................................................... 13

*Yonemoto v. Dep't of Veterans Affairs,* 686 F.3d 681 (9th Cir. 2012) ....................................... 5

**STATUTES**

5 U.S.C. § 522(a)(3)(A) ................................................................................................................ 13

5 U.S.C. § 552(a)(3) ............................................................................................................... 2, 4, 7

5 U.S.C. § 552(a)(6)(A) .................................................................................................................. 3

5 U.S.C. § 552(a)(6)(B) .................................................................................................................. 3

5 U.S.C. § 552(a)(6)(C)(i) ........................................................................................................... 2, 3

5 U.S.C. § 552(a)(6)(E)(i) ............................................................................................................... 4

5 U.S.C. § 552(a)(6)(E)(v) .............................................................................................................. 4

5 U.S.C. § 552(b)(6) ..................................................................................................................... 12

**REGULATIONS**

6 C.F.R. § 5.5(d)(1)(ii) .................................................................................................................... 4

iii
PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-3472-EDL

**INTRODUCTION**

Sierra Club has demonstrated that EPA has violated FOIA by failing to meet the statute's deadlines, and that the documents sought by Sierra Club are relevant to crucial public debates occurring over the next year. ECF No. 32 at 8–16. Congress will need to confirm a permanent EPA Administrator in the first few months of 2019. *Id.* at 8. Over the course of the year, EPA, along with courts in some cases, will determine the extent to which a vast array of current public health safeguards keeping pollution out of air and water will be eliminated or weakened. *Id.* at 8–11. Sierra Club's proposed production schedule—for less than 10 percent of the documents that otherwise would be covered by its four requests, and only those documents of the greatest public value—is already conservative given the circumstances. EPA has not responded with any legally adequate reason for the Court to instead adopt a production schedule that will take *nearly four years* to complete.

While the volume of FOIA requests to EPA Headquarters no doubt increased in 2017, this was due in large part to increased secrecy among top officials, the Administration's extreme policies, and the arrival of a wave of new political staff with longstanding ties to the very polluters that EPA is meant to regulate. EPA suggests that its preferred processing rate of 7.2 documents per hour (a rate that Sierra Club disputes for the task at hand) should override FOIA's explicit statutory demand for timeliness, and the evident public interest in the documents sought by Sierra Club. For the reasons below, the Court should reject EPA's approach. Even where an "agenc[y's] resources are heavily taxed by the quantity and depth of FOIA requests, that does not grant the agency carte blanche to repeatedly violate congressionally mandated deadlines." *Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.*, 85 F.Supp.3d 1074, 1090 (N.D. Cal. 2015).

**STATEMENT OF ISSUES AND STATEMENT OF FACTS**

Sierra Club incorporates the Statements of Issues and Facts set forth in its Motion, ECF No. 32.

1

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-3472-EDL

**ARGUMENT**

**I. EPA'S CLAIMED PROCESSING CAPABILITIES MUST NOT BE THE COURT'S ONLY CONSIDERATION IN SETTING A PACE FOR PRODUCTION.**

EPA's justification for its scheduling proposal relies almost entirely on its current backlog of FOIA requests and understaffing. In essence, EPA urges the Court to ignore FOIA's statutory language and purpose, the import of the documents Sierra Club has requested, and EPA's delays to date, and to instead consider only EPA's claimed document processing capacity. ECF No. 34 at 10–13.

**A. Adopting EPA's Approach Would Undermine the Purpose of FOIA.**

EPA's narrow view of the Court's task in deciding the Motion is contrary to law and the discretion afforded this Court under FOIA. If Courts regularly adopted an approach of simply accepting the agency's existing practice—even in the face of a demonstrated need for timely production of documents—government officials seeking to evade public scrutiny could simply understaff their agency's FOIA offices to the point where FOIA responses are delayed so long they become useless to the requester. Because the volume of FOIA requests rises with controversial and ethically suspect behavior, this problem would be exacerbated at times when public scrutiny is most important. An agency's workload does not excuse the agency from making "promptly available" the requested documents except under exceptional circumstances that EPA has not alleged or demonstrated.[1] 5 U.S.C. § 552(a)(3). Rather, extreme delays in resolving FOIA requests "violate the intent and purpose of the FOIA, and the courts have a duty to prevent these abuses." *Long v. U.S. Internal Revenue Serv.*, 693 F.2d 907, 910 (9th Cir.1982).

**B. Congress Made Clear That Timely Production of Records Is Paramount, Even Where The Agency Faces Difficulties.**

"The value of information [received in response to a FOIA request] is partly a function of time." *Fiduccia v. U.S. Dep't of Justice*, 185 F.3d 1035, 1041 (9th Cir. 1999). Congress thus recognized that a

---

[1] EPA refers in passing to the language in 5 U.S.C. § 552(a)(6)(C)(i) that allows Courts to stay judicial proceedings while allowing an agency time to complete its response to a request. ECF No. 34 at 2. EPA has not sought (much less justified) a stay of this case. *See Open America v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976) (describing standards for stay). That statutory provision is consequently irrelevant to this motion.

timely response is essential to fulfill the purpose of the Act. *See* 5 U.S.C. § 552(a)(6)(A) (setting 20-day deadline for agency to determine "whether to comply" with request and notify requester of "such determination"); *id.* § 552(a)(6)(C)(i) ("the records *shall* be made promptly available" upon such determination) (emphasis added)). Congress was aware of the challenges agencies might face in meeting these requirements, yet still refused to countenance indefinite or prolonged delay:

> Responding to agencies' concerns about the high volume of requests and lack of resources, Congress allowed agencies only ten additional days to respond where there were "unusual circumstances." *See* 5 U.S.C. § 552(a)(6)(B). … "[T]he 1974 Amendments were deliberately drafted to force increased expedition in the handling of FOIA requests: '[E]xcessive delay by the agency in its response is often tantamount to denial.  It is the intent of this bill that the affected agencies be required to respond to inquiries and administrative appeals within specific time limits.' . . . . The Congress even rejected a 30-day extension provision, narrowly drafted to take account of the special exigencies facing agencies."

*Judicial Watch, Inc. v. United States Dep't of Homeland Sec.*, 895 F.3d 770, 781 (D.C. Cir. 2018) (alterations in original) (emphasis and citations omitted); *see also id.* at 775.  The Ninth Circuit has held that complaints as to the burdens of compliance are to be directed to Congress, not the courts:

> Though FOIA doubtless poses practical difficulties for federal agencies, federal agencies can educate Congress on the practical problems they have, and attempt to persuade Congress to change the law or provide additional funds to achieve compliance.  So long as the Freedom of Information Act is the law, we cannot repeal it by a construction that vitiates any practical utility it may have.

*Fiduccia*, 185 F.3d at 1041.  EPA's claim that its current processing rate is the only, or even foremost, determinant of the appropriate pace of production is directly contradictory to that statutory mandate.

### C. The Public Value of the Requested Documents and the Potential to Lose that Value Over Time Is Relevant in Setting an Appropriate Pace of Production.

EPA argues that "the Court should not give weight to Sierra Club's stated reasons for requesting this information when determining a production schedule in this matter."  ECF No. 34 at 13.  To the contrary, Sierra Club's demonstration of an urgent public interest in the documents (which EPA does not seek to rebut) is highly relevant, as evidenced by the structure and purpose of FOIA and the relevant case law.  The very purpose of FOIA is to reveal to the public timely and valuable information about its government; that the information sought would lose significant value if provided on EPA's proposed

schedule is central to that purpose, and this case. *See* ECF No. 32 at 12 (citing cases that describe purpose and import of FOIA).

The statute explicitly recognizes a relationship between the public import of the requested documents and the speed at which the agency processes them, allowing for expedited processing where the requester shows a "compelling need." [2] 5 U.S.C. § 552(a)(6)(E)(i). EPA correctly notes that Sierra Club did not seek expedited processing in its original requests. But courts have applied the underlying congressional interest in ensuring that disclosure occurs before the passage of time erases the value of the requested information, even where expediting processing has not been sought. *E.g., Clemente v. Fed. Bureau of Investigation*, 71 F.Supp.3d 262, 269 (D.D.C. 2014) (setting production schedule based on "the importance of [plaintiff's] work and the possibility that she may have only a limited time in which to do it," even though the plaintiff had not expressly requested expedited processing under § 552(a)(6)); *see also ACLU v. Dep't of Defense*, 2006 WL1469418, at *7–8 (N.D. Cal. May 25, 2006) (finding, in a lawsuit challenging denial of expedited processing, that requesters established "public's need to know" as well as "urgency of the news" related to Pentagon intelligence program, and stating that "extensive media interest usually is a fact supporting . . . urgency").

EPA also casts aside the fact that Sierra Club already has waited 1.5 years for responsive documents to three of its FOIA requests. Although Sierra Club did not, at the time it made the requests, see a need to seek expedited processing, that fact has no bearing on what pace of production is now appropriate—especially given the extensive, and unjustified, delay. Regardless of whether "expedited" processing is requested, FOIA obligates EPA to make requested records "promptly available," 5 U.S.C. § 552(a)(3), which generally means "within days or a few weeks" of making a final determination, not months or years. *Citizens for Responsibility & Ethics in Washington ("CREW") v. Fed. Election Comm'n*, 711 F.3d 180, 188 (D.C. Cir. 2013). Sierra Club could not be expected to predict that EPA

---

[2] Such a need is established if either: (1) failure to obtain expedited processing would pose an "imminent threat to the life or physical safety of an individual"; or (2) the requester is "primarily engaged in disseminating information" and shows an "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v); *see also* 6 C.F.R. § 5.5(d)(1)(ii).

4
PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-3472-EDL

would unlawfully fail to address the requests, or in most cases even respond to Sierra Club's inquiries, for months on end, absent a request for expedited processing.

Even in the absence of an expedited processing request, the Court "may use its equitable powers to require the agency to process documents according to a court-imposed timeline," *Clemente*, 71 F.Supp.3d at 269, and has a duty to prevent extreme delays. *Long*, 693 F.2d at 910. Sierra Club has raised relevant considerations, such as the harm additional delay would cause to the value of the requested records,[3] and Sierra Club's ability to quickly and broadly disseminate the information to the public,[4] that guide this Court's determination of an equitable production schedule. *See generally Theriault v. United States*, 503 F.2d 390, 392 (9th Cir. 1974) (quoting *General Services Administration v. Benson*, 415 F.2d 878, 880 (9th Cir. 1969)) (when evaluating application of FOIA exemptions, a "court must weigh the effects of disclosure and nondisclosure, according to traditional equity principles, and determine the best course to follow in the given circumstances."). As in related FOIA contexts, "[t]he effect on the public is the primary consideration." *Id.*

EPA cites *Yonemoto v. Dep't of Veterans Affairs*, for the proposition that "[a] requestor's purpose for requesting the documents or his intended use of the information sought does not matter under the FOIA." 686 F.3d 681, 691 (9th Cir. 2012), *overruled on other grounds by Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016). But *Yonemoto* addressed a wholly distinct issue: whether the agency could condition its release of documents subject to restrictions on how the requester could use the information. *Id.* at 689–90. The court found such restrictions impermissible, concluding that the requesters' potential use of the documents was not grounds for the agency to withhold them. *Id.* That an agency cannot justify *withholding* documents based on the requester's use of the information does not mean that an agency cannot be required to *produce* documents while they still retain value to the public.[5]

---

[3] *See, e.g.*, ECF No. 32 at 7–11; Saxonhouse Decl. ¶¶ 22–23, 25–27; Darby Decl. ¶ 11; Chamberlain Decl. ¶¶ 6–7, 9.

[4] *See* Saxonhouse Decl. ¶¶ 19–20; First Am. Compl., Ex. G (also attached at Saxonhouse Decl., Ex. 23) (detailing Sierra Club's ability to disseminate information).

[5] *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1437 (D.C. Cir. 1992), is also inapposite as the language quoted by EPA was in reference to whether the fact that another version of

5
PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-3472-EDL

As Sierra Club's Motion demonstrates, and EPA has not rebutted, the documents covered by the proposed schedule are e-mails and meeting schedules of political staff at the agency who have a history of advocating for polluters and against environmental protection. A number of these employees were also hired into the agency through procedures which allow them to evade certain ethical obligations intended to prevent conflicts of interest.[6] The e-mails are—as evidenced by domain names provided by EPA—with representatives of polluting industries, right-wing think tanks and political action committees, and other opponents of environmental regulation. ECF No. 32-4 ("Chamberlain Decl.") ¶¶ 7–11. These communications may reveal whether EPA-regulated entities are having an undue say in EPA policy, in addition to other concerning conflicts of interest and potentially unethical behavior that should be rooted out as quickly as possible. *See, e.g.*, ECF No. 32 at 7–11; ECF No. 32-6 ("Saxonhouse Decl.") ¶¶ 22–23, 27–28; ECF No. 32-5 ("Darby Decl.") ¶ 11; Chamberlain Decl. ¶¶ 6–9. The communications also would be relevant to numerous ongoing regulatory and legal proceedings that will decide the fate of a litany of public health protections, and may reveal more subtle ways in which recent changes at the agency could undermine environmental protection. ECF No. 32 at 9–11; Saxonhouse Decl. ¶¶ 6–9, 21–26. Moreover, President Trump announced recently that he does indeed plan to nominate Mr. Wheeler to be permanent Administrator.[7] The impending confirmation hearings heighten the urgency of reviewing Mr. Wheeler's contacts with industry, especially where there are known conflicts of interest, as well as communications of his subordinates that will provide insights about how he is running the agency. The intense media attention and Congressional inquiries already spawned by

---

the requested records were already publicly available justified withholding the records (it did not).

[6] Saxonhouse Decl. ¶¶ 17, 24 & Ex. 11 (Letter to Government Accountability Office from two senators expressing concern that "[s]ome of the [EPA] appointees are in high-level positions, managing staff and making consequential decisions, yet they were hired in a manner that exempts them from compliance with Executive Order 13, 770: Ethics Commitments by Executive Branch Appointees. . . . We are additionally concerned that the authorities are being abused and that non-confirmed political appointees may not be complying with the ethics requirements that do apply to them in a timely or complete manner.").

[7] Lisa Lambert, *Trump Says Will Make Acting EPA Head Wheeler Permanent*, Reuters, Nov. 16, 2018, https://www.reuters.com/article/us-usa-trump-epa/trump-says-will-make-acting-epa-head-wheeler-permanent-idUSKCN1NL2CL.

6
PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-3472-EDL

the behavior of political staff at EPA (triggered in part by responses to similar Sierra Club FOIA requests) are an indication of the high public import of the requested records.  *See* Saxonhouse Decl. ¶¶ 7, 19, 23 & Exs. 5, 11, 16, 26 (letters from Congress), Ex. 12 (collecting news articles).

## II. EPA HAS NOT DEMONSTRATED THAT PRODUCING ONE TIER OF RECORDS PER MONTH, APPROXIMATELY 1,870 E-MAIL CHAINS ON AVERAGE, IS UNREASONABLE.

At EPA's proposed rate of 400 records per month,[8] ECF No. 34-1 ("Hope Decl.") ¶ 30, it would take nearly four additional years (more than 46 months) for Sierra Club to receive its first ten tiers of highest priority e-mail records[9]—in addition to the 1.5 years Sierra Club already has waited to receive records responsive to its three July 2017 requests and the seven months it has waited to receive records responsive to its May 2018 request. Had EPA begun to release records in September 2017, Sierra Club already would have about 5,600 records, even at EPA's desired pace.[10]  Yet, EPA did not even "beg[i]n" to search for records until August 15, 2018.  Hope Decl. ¶ 18.  And it now proposes a schedule by which its response would be complete half-way through the next Presidential term.

EPA does not claim that its proposed schedule would fulfill the obligation to make records "promptly available."  5 U.S.C. § 552(a)(3).  Instead, EPA claims that it is working on an "unprecedented" number of FOIA requests and that producing thousands of records per month, as EPA has in the past, would "vastly over extend[]" the resources it has chosen to allocate to the task.  ECF No. 34 at 4,12; Hope Decl. ¶¶ 32, 34, 58.  Contrary to EPA's loosely supported assertions, it is not clear that EPA is efficiently handling the claimed increase in requests, and its 22-page-per-hour review rate averaged across a variety of different types of requests is not indicative of EPA's capacity for reviewing the records requested here.

---

[8] Although EPA previously suggested that it would begin releasing records in December 2018, ECF No. 28 at 2–3, EPA's response brief is the first time that the agency has made any firm commitment to produce a specific number of documents in December.

[9] EPA has estimated that Sierra Club's ten highest priority tiers of records contain about 18,706 documents.  Hope Decl. ¶ 27.

[10] Moreover, if EPA were to comply with its "estimated dates of completion," Sierra Club would receive complete releases of its three July 2017 requests by January 2019, long before EPA's proposed timeline here for less than 10 percent of the requested records.  Saxonhouse Decl. ¶ 34, Ex. 22; Hope Decl. ¶ 20 (EPA's estimate of total e-mail records); Darby Decl. ¶ 14 (number of records in ten highest priority tiers).

7

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-3472-EDL

### A. EPA's Data on the Increase in FOIA Requests to the Agency Omits Relevant Context.

Contrary to EPA's claim that Fiscal Years 2017 and 2018 were "unprecedented" years for FOIA requests, Hope Decl. ¶ 58, EPA's data for the requests received across all EPA offices reveal that the number of requests EPA received in Fiscal Years 2017 (11,518 requests) and 2018 (11,323 requests) is in fact similar to Fiscal Year 2015 (10,981 requests). *See* Hope Decl. ¶ 32 (chart). Given the many thousands of FOIA requests EPA receives, an increase of 537 requests and 342 requests, respectively, is not particularly substantial across the agency as a whole. *See* Hope Decl. ¶ 32.

Although EPA testified that the Office of the Administrator received 468 percent more FOIA requests in Fiscal Years 2017 and 2018 than in Fiscal Year 2016, Hope Decl. ¶ 34, this number tells only a partial story. EPA does not note how many requests were duplicative and thus easily closed, how many requests EPA has closed without processing, or how that increase was allocated between the Office of the Administrator's various sub-offices. In addition, not all of the employees targeted by Sierra Club's requests work in the Office of the Administrator; some work in the Office of Water, Office of General Counsel, Office of Land and Emergency Management, and Office of Air and Radiation, each with their own staff who may be available to help process FOIAs.[11] EPA has made no showing that FOIA requests to these offices have experienced a similar increase. Nor does EPA acknowledge that the increase was in large part due to changes well within the agency's control: the hiring of an unprecedented number of industry-linked agency staff, along with an equally unprecedented termination of EPA's historical transparency practices. For example, because Administrator Pruitt at first refused to publicly post his calendars as prior Administrators had done, EPA had received more than 60 FOIA requests for his calendars by September 2017.[12] The lack of transparency surrounding the Regulatory

---

[11] Saxonhouse Decl. ¶16; EPA, *Organizational Chart for the Office of the Administrator*, https://www.epa.gov/aboutepa/organization-chart-office-administrator; EPA, *EPA Organization Chart*, https://www.epa.gov/aboutepa/epa-organization-chart.

[12] Attachment A hereto lists the EPA FOIA tracking numbers for these requests, all of which are available on EPA's online FOIA portal (https://www.foiaonline.gov/foiaonline/action/public/home). *Cty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 510 n.2 (N.D. Cal.), *reconsideration denied,* 267 F.Supp.3d 1201 (N.D. Cal. 2017)*, appeal dismissed as moot sub nom. City & Cty. of San Francisco v. Trump*, No. 17-16886, 2018 WL 1401847 (9th Cir. Jan. 4, 2018) (taking judicial notice of letter from Assistant U.S. Attorney General "as courts may judicially notice information and official documents

8
PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-3472-EDL

Reform Task Force also engendered a wave of FOIA requests on that topic.[13] Further, EPA's numbers do not reflect differences in how FOIA requests were handled in different years, which has implications for workload comparisons. Independent analysis has shown that EPA "rejected requests for not being 'reasonably described' in 2017," meaning it did no further work on those requests, "at four times the rate as in 2016."[14]

### B. EPA Failed to Justify that it Cannot Release One Tier of Records per Month, as Sierra Club Proposed.

"[C]ourts are not required simply to 'take at face value an agency's determination that more time is necessary.' " *Elec. Frontier Found. v. Office of the Dir. of Nat. Intelligence*, 542 F.Supp.2d 1181, 1186 (N.D. Cal. 2008) (quoting *Elec. Privacy Info. Center v. Dep't of Justice*, 416 F.Supp.2d 30, 37 (D.D.C. 2006)). "[U]nreasonable delays in disclosing non-exempt documents violate the intent and purpose of the FOIA, and the courts have a duty to prevent these abuses." *Long*, 693 F.2d at 910 (finding delay of seventeen months unreasonable and ordering injunctive relief).

Although EPA claims that it is experiencing a FOIA crisis, the agency has done surprisingly little to address that problem. Instead, EPA identified only recently adopted measures many of which are only "short-term" in nature, *see, e.g.*, Hope Decl. ¶¶ 37, 59, and an unexplained operational change that appears to exacerbate the agency's non-compliance with FOIA.

Regarding the latter change, EPA testified that beginning in December 2017, the agency began "centraliz[ing] the FOIA process" for the four sub-offices that receive the most FOIA requests within the Office of the Administrator, an office that EPA identified as "particularly" burdened with FOIA requests. Hope Decl. ¶¶ 34, 36. Yet, why EPA "centralize[d]" the process within the offices most taxed

---

contained on official government websites").

[13] Saxonhouse Decl., Ex. 5 at 1–2 (Letter from Rep. Cummings noting that Regulatory Reform Tasks Forces "have been 'conducted in large part out of public view and often by political appointees with deep industry ties and potential conflicts.'. . . Some agencies, such as the Environmental Protection Agency (EPA), have refused to disclose whether Task Force members are working on matters related to their former employers. . . .;" also noting lack of "record of the meeting notes, the matters discussed, or subsequent actions taken by government employees serving on these Task Forces."); *see also* Attachment A, listing FOIA requests related to Regulatory Reform Task Force.

[14] Saxonhouse Decl., Ex. 26 ("Rep. Cummings June 2018 Letter") at 5 & n.14.

with FOIA requests, rather than combining the resources of its most- and least-burdened staff, is entirely unclear. EPA does not explain how centralization helps to "maximize the available resources" or "eliminate[] the backlog" of FOIA requests. Hope Decl. ¶¶ 36–37. This operational change thus does not demonstrate a serious effort to comply with FOIA—rather, it appears to create an artificial bottleneck for the records of most acute public interest.

EPA also has done little to increase the number of staff available to work on FOIA, and the few steps it has taken have occurred only in the past few months or weeks—long after EPA was aware of its FOIA problem. During the "second half of 2018," EPA hired three FOIA staff in the Office of the Executive Secretariat ("OEX"), the office to which Sierra Club's four FOIA requests have been assigned. ECF No. 34 at 7; Hope Decl. ¶ 38. But the "full-time" OEX FOIA staff in fact have "other normal duties" including "special projects" that take 20 percent of their time (the equivalent of one workday per week). Hope Decl. ¶¶ 38–39, 41. And in light of the centralization project described above, it is unclear whether time spent on FOIA by *non*-OEX staff may have correspondingly decreased, such that the overall resources devoted to FOIA would be the same.

Compounding this staffing problem, EPA is diverting resources away from FOIA requests in litigation, despite the apparent "500 percent increase" in litigation.[15] Hope Decl. ¶¶ 35, 40. For example, the four part-time OEX staff above are allowed to spend only 16 hours each per week working on FOIA requests in litigation. Hope Decl. ¶¶ 39, 41. Meanwhile, in August 2018, EPA assigned twelve staff to work for five months on Office of Administrator FOIA requests that also were not in litigation. Hope Decl. ¶¶ 37. While EPA disclaims such "short-term" measures as an effective use of resources, Hope Decl. ¶ 59, it is not clear why EPA could not continue to make use of such measures to better comply with the statute until it finds a permanent solution.

---

[15] Sierra Club does not dispute the importance of timely responses to all the FOIA requests EPA receives. *See* ECF No. 34 at 11; Hope Decl. ¶ 40 (expressing concerns about equity). But, as explained, EPA has done little to actually address its FOIA backlog. Moreover, EPA did not dispute Sierra Club's assertion that responding to Sierra Club's four FOIA requests will help EPA clear the longstanding backlog. ECF No. 32 at 20–21; Darby Decl. ¶¶ 16–18.

10
PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-3472-EDL

EPA's testimony also supports Sierra Club's well-founded concern that EPA's "political review" process has been unjustifiably delaying responses, and suggests that EPA should now be able to process documents more quickly. In an attempt to make that process appear benign, EPA pointed to a November 16, 2018 memorandum from EPA Chief of Staff Ryan Jackson that "clarified" the process. ECF No. 34 at 12; Hope Decl. ¶ 50, Ex. A. The fact that Mr. Jackson believed it necessary to outline in six steps the agency's "Awareness Notification Process" and specify a timeline, Hope Decl. ¶ 50, Ex. A, shows that at minimum there was significant confusion about the policy, likely contributing to delays. EPA did not explain whether Mr. Jackson's November 16 memorandum altered EPA's previous practice or policy. Instead, EPA simply stated: "*an* awareness notification process has been utilized over many years." ECF No. 34 at 12 (emphasis added). A June 11, 2018 letter from U.S. Representative Cummings to former Administrator Pruitt helps fill in EPA's omission. That letter expressed concern about EPA's "[n]ew [p]olitical [r]eview [p]rocess" under which "political appointees were 'chastising career employees who released documents in accordance with FOIA.'" Saxonhouse Decl. at Ex. 26 at 3. The letter also noted that a former EPA attorney and member of the political team stated in a May 22, 2018 interview with the House Oversight Committee "that she reviewed responses to FOIA requests and identified potential additional redactions as part of EPA's awareness review[.]" *Id* at 4. The testimony cited in Representative Cumming's letter indicates that EPA's more recent practice likely departed from its past practice, and that this most recent practice likely did not follow the "clarified" process outlined in Mr. Jackson's November 16 memorandum.

In short, although EPA has long been aware of its FOIA problem, EPA did not until recent months hire any new staff or clarify the timing of political review, and even those are only half-measures that appear to be failing to resolve its backlog.

### C. EPA's Page-per-Hour Estimate is Not Likely Accurate for the Records Requested Here.

If the changes above, most of which EPA made only in late 2018, are in fact effective at speeding up the review process, that would render suspect EPA's estimate that OEX staff can review only 22 pages per hour. Hope Decl. ¶ 54. If EPA is correct that its new measures are effective, EPA should be able to process records far more quickly than its old data indicate.

11
PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-3472-EDL

Further, EPA's 22-page-per-hour estimate was based on projects of "varying degrees of complexity" that included various levels of coordination with other offices and federal agencies. Hope Decl. ¶¶ 52, 55. By contrast, the records at issue here include only external communications with parties outside EPA and the federal government.[16] Generally such records, as EPA conceded, ECF No. 34 at 11; Hope Decl. ¶ 55, are only subject to lawful withholding under FOIA exemption (b)(6), which protects from disclosure information that "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Typically, for external e-mails, the exemption has been applied to redact information such as personal e-mail addresses, phone numbers, and social security numbers, Hope Decl. ¶ 55—information that is quick to spot and that does not require any coordination with outside offices or agencies. Moreover, an e-mail chain (one record) often quotes all of the previous e-mails in the chain. This repetition significantly expedites processing: a reviewer already reviewed the information just moments before. Given these significant differences, EPA's 22-page-per-hour rate has little meaning here.

As EPA admitted, Hope Decl. ¶¶ 60–61, the agency has the ability to produce records at rates similar to the rate Sierra Club has proposed, about 1,870 records (e-mail strings) on average. ECF No. 32 at 17. Although doing so may require EPA to shift resources from other agency priorities, Hope Decl. ¶¶ 59, 61, "[i]t may be that agency heads . . . can be forced by the Freedom of Information Act to divert staff from programs they think more valuable to Freedom of Information Act compliance." *Fiduccia*, 185 F.3d at 1041. Whereas the agency's FOIA obligations are mandated by Congress, many of the agency's employees are hard at work on regulatory rollback initiatives that are not. *See* ECF No. 32 at 8–9. Because EPA failed to prove that a 400 document per month rate is justified, the Court should require EPA to meet Sierra Club's proposed schedule.

### III. EPA HAS VIOLATED FOIA AS A MATTER OF LAW AND THE COURT NEED NOT DEFER DECLARING AS MUCH.

Sierra Club has moved for *partial* summary judgment because the issue of whether EPA is unlawfully delaying in releasing documents is ripe for a decision as a matter of law. *See Gilmore v. U.S.*

---

[16] Although two of Sierra Club's FOIA requests also sought external communications with federal officials outside EPA, those records are not included in Sierra Club's ten highest priority tiers of records. *See* ECF No. 34 at 6 (explaining limited nature of EPA's search for records to date).

12
PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-3472-EDL

*Dep't of Energy*, 33 F.Supp.2d 1184, 1187 (N.D.Cal.1998) ("[A]n agency's failure to comply with the FOIA's time limits is, by itself, a violation of the FOIA, and is an improper withholding of the requested documents."); *Oregon Nat. Desert Ass'n v. Gutierrez*, 409 F.Supp.2d 1237, 1248 (D. Or. 2006) (holding that "an untimely response is a violation of FOIA, regardless of the final outcome of the request"). EPA, however, urges that the Court treat the motion as a simple motion for a production schedule instead. ECF No. 34 at 9–10. The appropriate time to raise this concern was when the parties were negotiating the stipulation for a briefing schedule, which noted that Sierra Club would file a "motion for partial summary judgment." ECF No. 30. In any event, now that the issue has been fully briefed on both sides, it makes sense for the Court to decide it. "As the Ninth Circuit has explained, '[a] court declaration delineates important rights and responsibilities and can be 'a message not only to the parties but also to the public and has significant educational and lasting importance.'" *Our Children's Earth Found.*, 85 F.Supp.3d at 1090 (quoting *Natural Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292, 1299 (9th Cir.1992) (internal quotation omitted)).

EPA's only defense to its untimely responses to Sierra Club's four FOIA requests is that they were "not proper FOIA requests." ECF No. 34 at 14. EPA's arguments to this effect—that EPA could not reasonably locate the external emails of its employees before Sierra Club provided a specific search method—are squarely and thoroughly contradicted by both the law and the facts. For support, EPA cites 5 U.S.C. § 522(a)(3)(A), which requires that a request "reasonably describe" the records sought. While this language implies a requirement that agency be able to locate requested the documents "with a reasonable amount of effort," *Marks v. U.S. Dep't of Justice*, 578 F.2d 261, 263 (9th Cir. 1978), "courts have been wary to prohibit this requirement from becoming a loophole through which federal agencies can deny the public access to legitimate information," *Yagman v. Pompeo*, 868 F.3d 1075, 1081 (9th Cir. 2017)—and accordingly have strongly rejected an overbroad reading of the requirement. *See Pub. Employees for Envtl. Responsibility* ("*PEER*") *v. EPA*, 314 F.Supp.3d 68, 74 (D.D.C. 2018) ("The D.C. Circuit has long cautioned that federal agencies may not use the 'reasonably describes' requirement to deny the public access to responsive records."). Courts have also specifically rejected the type of argument EPA makes here: that a requester must explain in detail how the agency should conduct its

search.  *See, e.g.*, *Muckrock, LLC v. Cent. Intelligence Agency*, 300 F.Supp.3d 108, 136 (D.D.C. 2018) (rejecting CIA's policy that records were not "reasonably described" because requester did not specify sender, recipient, subject, and time frame where CIA had "done nothing to demonstrate that the agency's employees need all four pieces of information. . . . in order to locate email records in the agency's information systems."); *Shapiro v. CIA*, 170 F.Supp.3d 147, 154 (D.D.C. 2016) (records reasonably described what requesters sought when they mentioned or referenced a specified person); *ACLU of N. Cal. v. Dep't of Justice*, No. 12-CV-04008-MEJ, 2014 WL 4954121, at *7 (N.D. Cal. Sept. 30, 2014) (that DOJ "did, in fact, craft a search that enabled it to locate 349 of 12,669 matters . . . likely to have responsive records" was evidence that request was phrased with "sufficient particularity").[17]

To prove that the search for records would be unreasonably burdensome, EPA was required to "provide sufficient explanation as to why such a search would be unreasonably burdensome" in a "detailed affidavit[]."  *Nation Magazine, Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 892 (D.C. Cir. 1995); *see also Schrecker v. U.S. Dep't of Justice*, 254 F.3d 162, 165 (D.C. Cir. 2001) (reversing grant of summary judgment to agency, which had "point[ed] to nothing in the record to suggest that the search actually required will be unduly burdensome").  But EPA's affidavit in this case, and other facts in the record, demonstrate quite the opposite. EPA claims that in order to locate "communications [from or to the identified custodians with] any person outside of EPA", as requested by Sierra Club, "EPA would have had to collect and review each and every electronic or hard copy record sent or received by each of the 25 requested custodians to determine if they involved a person outside of EPA." ECF No. 34 at 14.  This is patently false, as EPA well knows. With its sophisticated software allowing for centralized searches of email records, EPA could—and did—easily locate the electronic records requested by Sierra Club "with a reasonable amount of effort." *See* ECF No. 34 at 14; Hope Decl. ¶¶ 18–19 (describing centralized searches of email records based on external domain names).  As for hard copies, it is not unreasonable to expect that these 25 agency officials—all new

---

[17] In fact, EPA is currently defending against a lawsuit claiming that it follows an unlawful pattern and practice of rejecting requests for not being "reasonably described." *American Oversight v. EPA*, Case No. 1:18-cv-00364-TJK (D.D.C., filed Feb. 16, 2018).

14
PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-3472-EDL

employees as of 2017—kept records of their hard-copy correspondence, with the correspondent easily identifiable as internal or external to EPA by title and address. The searches required in the cases cited by EPA were far more burdensome. Searching all of an agency's independent field offices for records is a far cry from searching the communications of a defined list of 25 EPA Headquarters' employees when there is a software system specifically enabled to do so. *See Marks*, 578 F.2d at 263; *AFGE v. Dep't of Commerce*, 907 F.2d 203, 208–09 (D.C. Cir. 1990) (requiring search of "every chronological office file and correspondent file, internal and external, for every branch office, staff office [etc.]").

EPA makes much of the fact that Sierra Club's August 1, 2018 settlement letter was the "first time" Sierra Club suggested a specific search methodology for EPA to use to identify external e-mails. Hope Decl. ¶ 17. But, prior to this litigation, EPA never indicated that Sierra Club's requests for "external communications" required clarification. The communications Sierra Club had received from EPA about these requests prior to the litigation did not identify any portions of the requests that were unclear. *See* Saxonhouse Decl., Exs., 20-21. And EPA had in December 2017 agreed upon a search methodology for external e-mails in response to earlier Sierra Club requests that were nearly identical in format, though regarding different personnel. Cowan Decl. ¶¶5–6. Sierra Club's request for "external communications" was thus familiar to EPA and entirely appropriate; FOIA does not require the public to instruct EPA as to the detailed application of the agency's own internal document-processing systems.

Sierra Club's requests therefore triggered the statutory clock for EPA to respond. "The fact that EPA was 'reasonably clear as to the materials desired,' . . . means that it had an 'obligation to bring them forth.'" *PEER*, 314 F.Supp.3d at 78 (quoting *Truitt v. U.S. Dep't of State*, 897 F.2d 540, 544 (D.C. Cir. 1990)). Partial summary judgment is consequently appropriate. *See* ECF No. 32 at 12–14.

## CONCLUSION

For these reasons, Sierra Club respectfully requests that the Court declare EPA to be in violation of FOIA and order the agency to produce documents according to Sierra Club's proposed schedule.

DATED:  December 4, 2018                           Respectfully submitted,

15
PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-3472-EDL

      */s/Elena Saxonhouse*
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
Elena Saxonhouse (CA Bar No. 235139)
Marta Darby (CA Bar No. 310690)
2101 Webster Street, Suite 1300
Oakland, CA 94612

*Attorneys for Sierra Club*