1
2
3
4                   UNITED STATES DISTRICT COURT
5                 NORTHERN DISTRICT OF CALIFORNIA
6
7    SIERRA CLUB,                          Case No.  20-cv-03472-JCS
8                     Plaintiff,
                                           **ORDER REGARDING MOTION FOR**
9             v.                           **CLAWBACK AND SUMMARY**
                                           **JUDGMENT**
10   UNITED STATES ENVIRONMENTAL
     PROTECTION AGENCY,                    Re: Dkt. No. 80
11
                     Defendant.
12

13   **I.    INTRODUCTION**

14         This case arose from Plaintiff Sierra Club's request for documents from Defendant the

15   Environmental Protection Agency (the "EPA") under the Freedom of Information Act ("FOIA").

16   Most of the parties' disputes have been resolved by the Court or by the parties' themselves, and

17   the EPA has produced a large number of documents to Sierra Club.  Among those documents was

18   a series of emails exchanged among an EPA employee, a White House official, and several

19   individuals who work in government affairs—in other words, as lobbyists—for the petroleum

20   industry, discussing plans to meet for drinks.  The EPA inadvertently produced those emails

21   without redacting all instances of the lobbyists' names and email addresses.  The only remaining

22   dispute in the case is the EPA's present motion to claw back the documents lacking those intended

23   redactions.

24         The Court finds the matter suitable for resolution without oral argument and VACATES

25   the hearing previously set for December 11, 2020.  For the reasons discussed below, the EPA's

26   motion is DENIED.[1]

27   _____

28   [1] The parties have consented to the jurisdiction of a magistrate judge for all purposes pursuant to
     28 U.S.C. § 636(c).  This case was previously assigned to the Honorable Elizabeth Laporte, and

United States District Court
Northern District of California

## II. BACKGROUND

The emails at issue included Jeff Freeland (a Special Assistant to the President), Aaron Ringel (at the time, an EPA official),[2] and individuals whose names are not included in the record before the Court, but whose email addresses use the domain names of Valero, Marathon Petroleum, and the trade association American Fuel and Petrochemical Manufacturers. White Decl. (dkt. 80-1) Ex. 1. According to the EPA, those individuals "held mid-level management positions in the government relations departments of these organizations." White Decl. ¶ 4. The emails discuss plans to meet for drinks and to watch a hockey game, using a consistently informal tone suggesting that all individuals involved were friends. While Decl. Ex. 1. The emails do not indicate that the gathering would be for any purpose other than socializing; to the contrary, the Marathon Petroleum employee expressed interest in joining only "as long as we don't talk about RFS" (presumably, the EPA's "renewable fuel standards" program), to which Ringel and the Valero employee quickly and enthusiastically agreed. *See id.*

Sierra Club submitted a wide-ranging request under FOIA for communications by a number of EPA officials, including Ringel, with any person outside of the EPA. *See* Order Granting Pl.'s Mot. for Partial Summ. J. (dkt. 39) at 1–2.[3] Sierra Club selected those officials based on its view that they "have a history of close ties with industries regulated by EPA or anti-environmental politicians or political groups." Opp'n (dkt. 81) at 2. The EPA initially withheld the emails now at issue entirely, but after Sierra Club filed this action, the Court ordered production of documents, and the parties conferred regarding their disagreements, the EPA produced the emails with many names, email addresses, locations, and other details redacted based on FOIA's Exemption 6, governing personal privacy. Stip. (dkt. 78) at 2. The EPA inadvertently failed to redact all instances of the petroleum lobbyists' names and all instances of the first portions their email addresses[4] in that production of documents. *Id.*; *see also* White Decl. Ex. 1

---

was reassigned to the undersigned magistrate judge upon Judge Laporte's retirement.

[2] Ringel now works for the Department of State, which also deals with matters affecting the oil industry. Saxonhouse Decl. (dkt. 81-1) ¶ 10.

[3] *Sierra Club v. U.S. Envtl. Prot. Agency*, No. 18-cv-03472-EDL, 2018 WL 10419238 (N.D. Cal. Dec. 26, 2018).

[4] The EPA intentionally disclosed the domain names that make up the second part of each email

1    (copies of the emails with additional redactions added to obscure the information presently in

2    dispute).  Sierra Club's counsel circulated the emails to "internal stakeholders within Sierra Club,"

3    and requested that the EPA disclose additional names and email addresses based on its failure to

4    redact some such information.  Stip. at 2.  That request caused the EPA to realize that it had failed

5    to redact the emails as intended, and the EPA informed Sierra Club of the error and provided

6    corrected versions with further redactions.  *Id.*

7         Sierra Club "agreed as a courtesy to not further share the inadvertently produced

8    documents until the dispute over them was resolved."  *Id.*  The parties were unable to resolve their

9    disagreement as to whether the information at issue was properly subject to withholding under

10   FOIA, and Sierra Club took the position that it need not seek an order for production of the

11   material because it already possessed the information and saw no "legal or ethical barriers to

12   releasing the information should it come up."  *Id.* at 2–3.  After Sierra Club informed the EPA that

13   Sierra Club would not agree to keep the information confidential indefinitely if no ruling was

14   sought from the Court, the EPA filed the present motion.  *Id.* at 3.

15        In its production of separate emails more clearly addressing the EPA's official business,

16   the EPA did not redact the names or email addresses of petroleum lobbyists.  *See* Zack Decl. (dkt.

17   80-3) Exs. A–C.  The EPA has also released other emails containing the names and email

18   addresses of non-government employees who corresponded with EPA personnel on matters

19   unrelated related to EPA business.  Saxonhouse Decl. (dkt. 81-1) Exs. A, B.[5]

20        The EPA now moves for an order requiring Sierra Club to destroy the emails inadvertently

21   produced with incomplete redactions.  *See* Mot. (dkt. 80) at 12.  The EPA contends that the

22   lobbyists' names and email addresses fall within Exemption 6 because the lobbyists have a

23

24   _____
     address, which indicate the lobbyists' employers.

25   [5] While the EPA asserts in its reply that some of those emails included more senior EPA
     policymakers and some involved official business, Reply (dkt. 82) at 3, at least some of the emails

26   plainly related to personal matters.  *See, e.g.*, Saxonhouse Decl. Ex. B at ECF p. 27 (email from an
     EPA Deputy Assistant Administrator asking an ExxonMobil employee to provide career

27   counseling for a friend, with the name and email address of the ExxonMobil employee
     unredacted); *id.* at ECF pp. 21–22 (emails between an EPA Assistant Administrator and non-EPA

28   individuals discussing plans to meet for lunch, with the non-EPA individuals' names and email
     addresses unredacted).

United States District Court
Northern District of California

nontrivial privacy interest in that sort of personal information and there is no significant public interest in learning which individuals had been planning the happy hour.  *Id.* at 7–11.  Elizabeth White, director of the EPA office responsible for FOIA requests, states that Sierra Club has in the past provided records it obtained under FOIA to the press, and that "disclosure would expose these individuals to potential harassment from the media or potential harassment from individual actors."  White Decl. ¶ 5.  White notes that "[o]nline harassment or 'doxxing' is a reality," citing articles describing generally the practice of disseminating personal information to facilitate targeted harassment, but not linking that practice to Sierra Club disclosures, and providing no evidence or explanation of why the lobbyists at issue might be expected to receive such treatment. *See id.* ¶ 5 & n.3.  The EPA cites a handful of district court decisions ordering FOIA plaintiffs to return or destroy inadvertently produced documents based on those courts' inherent authority. Mot. at 11–12.

Sierra Club contends that Exemption 6 does not apply because the public interest in understanding government regulators' relationships with industry lobbyists outweighs any de minimis privacy interest in the lobbyists' names, and because the EPA has not shown any non-speculative risk of harm from disclosure.  Opp'n at 6–12.  Sierra Club argues that courts have rarely issued orders to claw back documents inadvertently produced under FOIA, and that even if the Court were to apply the standard for nonwaiver of privilege due to inadvertent production of documents from Rule 502(b) of the Federal Rules of Evidence—which Sierra Club contends is more permissive than is appropriate here—clawback would not be warranted because the EPA has not shown that it took reasonable efforts to prevent its own mistake.  *Id.* at 4–6.

## III.    ANALYSIS

### A.    Overview of FOIA

"FOIA 'was enacted to facilitate public access to Government documents.'"  *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009) (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)).  Congress intended to "'ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.'"  *Id*. (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146,

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1   152 (1989)).  Thus, FOIA "provides public access to official information 'shielded unnecessarily'

2   from public view and establishes a 'judicially enforceable public right to secure such information

3   from possibly unwilling official hands.'"  *Id.* (quoting *Dep't of the Air Force v. Rose*, 425 U.S.

4   352, 361 (1976)).

5          Under FOIA, "each agency, upon any request for records which (i) reasonably describes

6   such records and (ii) is made in accordance with published rules stating the time, place, fees (if

7   any), and procedures to be followed, shall make the records promptly available to any person."  5

8   U.S.C. § 552(a)(3)(A).  There is a "strong presumption in favor of disclosure."  *Ray*, 502 U.S. at

9   173.  Congress also recognized, however, that government agencies can have legitimate reasons

10  for withholding information from the public.  *Id.*  Hence, FOIA "requires federal agencies to make

11  Government records available to the public, subject to nine exemptions for specific categories of

12  material."  *Milner v. Dep't of the Navy*, 562 U.S. 562, 564 (2011).  The nine exemptions are

13  "explicitly made exclusive and must be narrowly construed."  *Id.* at 565.  Further, under

14  amendments to FOIA enacted in 2016, "even if information falls within the scope of a

15  discretionary exemption, it cannot be withheld from the public unless the agency also shows that

16  disclosure will harm the interest protected by that exemption."  *Ctr. for Investigative Reporting v.*

17  *U.S. Dep't of Labor*, 424 F. Supp. 3d 771, 780 (N.D. Cal. 2019) (citing 5 U.S.C.

18  § 552(a)(8)(A)(i)), *appeal docketed*, No. 20-16416 (9th Cir. July 23, 2020).

19         **B.     Exemption 6**

20         Under Exemption 6—the only exemption asserted by the EPA in the present motion—

21  FOIA "does not apply to . . . personnel and medical files and similar files the disclosure of which

22  would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).

23  While the emails at issue here might not seem at first blush particularly similar to medical or

24  personnel files, "[t]he phrase 'similar files' has a 'broad, rather than a narrow meaning,'" such

25  "that '[g]overnment records containing information that applies to particular individuals satisfy the

26  threshold test of Exemption 6.'"  *Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv.*,

27  524 F.3d 1021, 1024 (9th Cir. 2008) (alteration in original; citations omitted).  Sierra Club does

28  not contest whether the emails are "similar files" within the meaning of the statute.  *See generally*

5

Opp'n.

The more salient question of whether a disclosure "would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), requires an agency to show "'some nontrivial privacy interest in nondisclosure'" that "is more than de minimis," *Cameranesi v. U.S. Dep't of Def.*, 856 F.3d 626, 637–38 (9th Cir. 2017) (citation omitted), and requires the court to "'balance the public interest in disclosure'"—specifically, the extent to which public disclosure would advance "'public understanding of the operations or activities of the government,'" regardless of what other purposes might have actually motivated the request—"'against the interest Congress intended the [e]xemption to protect,'" *Forest Serv. Employees*, 524 F.3d at 1024 (alteration in original; citations omitted).

The Ninth Circuit has recognized privacy interests sufficient to withhold disclosure of federal agents' "involvement in investigations of especially controversial events," such as an airline explosion that was the subject of conspiracy theories. *See Lahr*, 569 F.3d at 977; *see also Cameranesi*, 856 F.3d at 633–35, 642–46 (finding a sufficient privacy interest to withhold the names of participants and instructors at a U.S. institute for training foreign military personnel, where participants had been accused of human rights violations by an advocacy group and evidence indicated that they faced risks of violent retaliation in their home countries based on their association with the United States); *Forest Serv. Employees*, 524 F.3d at 1026 (finding a sufficient privacy interest to withhold the identities of Forest Service employees involved with a wildfire containment effort that "was met with heavy criticism, particularly because the fire claimed the life of two Forest Service employees"). "The potential for unwanted contact by third parties, including the plaintiff, media entities, and commercial solicitors . . . facilitated by disclosure of a connection to government operations and investigations is a cognizable privacy interest under Exemption[] 6 . . . ." *Lahr*, 569 F.3d at 975–76.

Whether the EPA could have properly withheld the lobbyists' names under Exemption 6 is a close question. Sierra Club asserts a public interest in understanding relationships between government officials and employees of the industries they regulate. Opp'n at 10. The EPA asserts in its reply that "even a few contacts from the press would be unwanted" by the lobbyists, citing

6

1    no evidence.  Reply at 2.  Neither side's interest in the identifying information at issue is

2    particularly strong.

3        There is certainly some public interest in understanding lobbying efforts and other

4    connections between government agencies and regulated industries.  *See Elec. Frontier Found. v.*

5    *Office of the Dir. of Nat'l Intelligence*, 639 F.3d 876, 889 (9th Cir. 2010) ("[D]isclosure of the

6    names of people seeking to influence the agencies' pursuit of a [policy outcome] does not

7    constitute 'a clearly unwarranted invasion of personal privacy.'" (quoting 5 U.S.C. § 552(b)(6)),

8    *abrogated on other grounds by Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d

9    987 (9th Cir. 2016) (en banc and per curiam).  Here, however, the emails in dispute do not on their

10   face evince efforts to influence government.  The EPA has also disclosed (and not sought to claw

11   back) the portions of the lobbyists' email addresses that reveal their employers, and has disclosed

12   other lobbyists' full names and email addresses on messages more clearly pertaining to official

13   business.  The interest in further disclosure to determine the identities of individual lobbyists who

14   made social plans with two government officials is marginal.

15       As for the lobbyists' privacy interest, it is not clear how the EPA reached its determination

16   that press contacts would be an unwelcome intrusion tantamount to harassment.  There is no

17   indication that the EPA has contacted the lobbyists to determine whether they object to disclosure

18   of their names and their business email addresses.  This is not a case of documents connected to

19   tragedy or widely publicized controversy, like the airline crash in *Lahr*, the deadly fire in *Forest*

20   *Service Employees*, or the accusations of human rights violations in *Cameranesi*.  There is nothing

21   inherently scandalous about friends meeting for drinks to watch hockey.  Even if contact by the

22   media would be "unwanted," and assuming that such contact might occur, it is not clear why the

23   government affairs professionals at issue would be unaccustomed to handling a press inquiry or

24   incapable of declining to comment if they so chose.

25       Any risk of "doxxing" and coordinated harassment would be a more significant concern,

26   *see Camarensi*, 856 F.3d at 642 (discussing "possible harassment, stigma, or violence"), but the

27   EPA has presented no evidence of any potential for such an outcome beyond pure speculation.

28   There is no indication that any of the other lobbyists whose names or email addresses the EPA

United States District Court
Northern District of California

7

intentionally left unredacted on work-related emails have been subject to harassment, that the subject matter of the emails at issue here would cause stigma, or that the versions of them that the EPA filed two months ago in the public docket of this case (with the lobbyists' names and email addresses redacted) have attracted public attention of any kind.

While the mere "*potential* for harassment" creates a *cognizable* interest even in the absence of any certainty that harassment would result, *see, e.g.*, *Cameranesi*, 856 F.3d at 639 (emphasis added), courts consider the degree of potential harm at issue and the evidence to support it in determining the weight that it should be afforded, *see id.* at 645 (concluding that "the public's marginal interests in disclosure" were outweighed by the Department of Defense's "evidence that disclosing the names of WHINSEC students and instructors would put them at risk of harassment, retaliation, or even death"). Where the EPA has offered no reason to believe that the particular individuals at issue in this case would face harassment if their names or email addresses were disclosed, the Court assigns relatively little weight to that potential harm.

Weighing the parties' fairly weak competing interests here against one another would require a sensitive scale. The question before the Court, however, is not whether the EPA would have been permitted to withhold the lobbyists' names and email addresses under Exemption 6, but instead whether the EPA is entitled to an order requiring Sierra Club to destroy those documents now that they have been produced. As discussed below, the Court is not persuaded that question turns solely on the same test as whether an exemption could have been invoked in the first instance.

### C.  Inherent Authority and FOIA Clawback

FOIA does not specifically provide for the return or destruction of inadvertently produced documents. Nevertheless, federal courts have long "understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,'" which "are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting  *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812); *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)).

United States District Court
Northern District of California

United States District Court
Northern District of California

> The extent of these powers must be delimited with care, for there is a danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980). In many instances the inherent powers of the courts may be controlled or overridden by statute or rule. *Carlisle v. United States*, 517 U.S. 416, 426 (1996); *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). Principles of deference counsel restraint in resorting to inherent power, *Chambers*, 501 U.S. at 44, and require its use to be a reasonable response to the problems and needs that provoke it, *Ortega-Rodriguez v. United States*, 507 U.S. 234, 244 (1993); *Thomas v. Arn*, 474 U.S. 140, 146–48 (1985).

*Degen v. United States*, 517 U.S. 820, 823–24 (1996) (format of citations altered). "[T]he Supreme Court [has] held that Congress did not intend to limit the court's exercise of its inherent equitable powers where consistent with the FOIA." *Long v. IRS*, 693 F.2d 907, 909 (9th Cir. 1982) (citing *Renegotiation Bd. v. Bannercraft Clothing Co., Inc.*, 415 U.S. 1, 19 (1974)).

The EPA cites three cases granting the sort of relief the EPA seeks here based on a district court's inherent authority to manage proceedings before it. In a 2008 decision from this district, the Honorable Phyllis Hamilton ordered a plaintiff to return documents inadvertently produced by the Department of Health and Human Services:

> Finally, defendants also request that the court instruct plaintiff to hand over the initial productions of March 2006 and February 2007, since defendants' August 2007 production superseded these productions, which contained inadvertently produced documents.
>
> As the court stated at the hearing, plaintiff must return the earlier productions in whole. Defendants' claim that they did not become aware of the inadvertently produced documents until July 2007 (when plaintiff attached the inadvertently produced documents to a motion to compel) is supported by the record. It is undisputed that in July 2007, defendants informed plaintiff that they had become aware of the inadvertent productions, and requested that the documents be returned. Since that time, defendants have requested, on several occasions, that plaintiff return the documents to defendants. It was only upon the failure to secure the cooperation of plaintiff in this regard, that defendants re-processed plaintiff's FOIA request in its entirety, and issued a revised production in August 2007.
>
> In light of defendants' consistent efforts at securing return of the documents, the fact that plaintiff was long ago placed on notice of this inadvertent production, and defendants' August 2007 production replacing all earlier productions, the court therefore orders plaintiff to return all previously produced documents to defendants. Any inadvertently produced documents that have been filed in the public docket pertaining to this action, shall be withdrawn from the docket.

1    According to the January 25, 2008 letter received from HHS, the
     affected docket nos. include docket nos. 67, 82, and 86.

2  *Hersh & Hersh v. U.S. Dep't of Health & Human Servs.*, No. C 06-4234 PJH, 2008 WL 901539,

3  at *9 (N.D. Cal. Mar. 31, 2008) (citations to evidence omitted without ellipses).

4         In a 2009 decision, the Southern District of the New York ordered the ACLU to "return an

5  inadvertently produced classified document that implicates national security and which [the

6  ACLU was] not authorized to possess," which the Department of Defense had produced in

7  response to a FOIA request.  *Am. Civil Liberties Union v. Dep't of Def.* ("*ACLU*"), No. 09 Civ.

8  8071 (BSJ)(FM), 2012 WL 13075284, at *5 (S.D.N.Y. Mar. 20, 2012).  The court relied on its

9  inherent authority, as well as *Hersh & Hersh* and a decision from the District of Oregon ordering

10 the return of a classified document inadvertently produced through the normal civil discovery

11 process rather than pursuant to FOIA.  *Id.* (citing *Hersh & Hersh*, 2008 WL 901539, at *9; *Al-

12 Haramain Islamic Found., Inc. v. Bush*, 451 F. Supp. 2d 1215, 1229 (D. Or. 2006), *rev'd in part

13 on other grounds*, 507 F.3d 1190 (9th Cir. 2007)).  As far as this Court is aware, *ACLU* is the only

14 FOIA clawback case to address First Amendment concerns, holding that the ACLU had no First

15 Amendment right to possess a classified document, regardless of how it came into the ACLU's

16 possession:

17         Plaintiffs assert that they have a First Amendment right to access a
           document which they came to possess lawfully. (Pls.' Opp. Mem. at
18         30.)   However,   classified   information   remains   classified
           notwithstanding "any unauthorized disclosure of identical or similar
19         information." Exec. Order No. 13,526, § 1.1(c). That Plaintiffs
           acquired the Document innocently does not change the fact that the
20         Document is classified and Plaintiffs are not authorized to possess it.
           *See Am. Civil Liberties Union v. Dep't of Def.*, 664 F. Supp. 2d 72,
21         79 (D.D.C. 2009).[6]

22         The production containing the Document occurred in accordance with
           a court-ordered stipulation and as part of a court-supervised process.
23         Plaintiffs initiated this FOIA action so that the Court would compel
           the Government to respond to their FOIA requests. That compelled
24         process has generated a situation in which Plaintiffs seek to maintain
           their unauthorized possession of a classified document. Plaintiffs may
25         not now claim the Court lacks the authority to supervise the very
           process that they themselves set in motion.
26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    6 This case from the District Court for the District of Columbia involved the Department of
28  Defense withholding information requested under FOIA, not a request to claw back inadvertently
    produced information.

1

2

3

4

> Surely, if a district court in a FOIA case [i.e., *Hersh & Hersh*] has the authority to order the return of two entire document productions which contained inadvertently produced documents wholly unrelated to national security, then this Court has the authority to order the return an inadvertently produced classified document that implicates national security and which Plaintiffs are not authorized to possess. [Citation omitted.]

5

*Id.*

6

7

8

9

10

11

12

13

14

15

16

17

In the third and final case granting a request to claw back FOIA material, a magistrate judge in the District of New Jersey granted a request by the Federal Emergency Management Agency ("FEMA") to claw back inadvertently produced documents that contained Social Security numbers for individual FEMA employees, and to enjoin the plaintiff from using or disclosing that information. *See Kielty v. Fed. Emergency Mgmt. Agency*, No. 14-CV-3269 (PGS)(LHG), ECF Doc. No. 8 (D.N.J. Dec. 8, 2014).  The magistrate judge used FEMA's proposed order, which did not address legal authority for the request, and added a note that the plaintiff had not opposed the motion. *See id.*  The magistrate judge declined to disturb that order on reconsideration, *id.*, ECF Doc. No. 19 (D.N.J. July 30, 2015), and a district judge affirmed the order on appeal because "no opposition was filed by Plaintiff, and the request was reasonable," *id.*, ECF Doc. No. 23 (D.N.J. Aug. 18, 2015).  No order issued in that case includes significant analysis of a district court's authority to order the return or destruction of material produced pursuant to FOIA.

18

19

20

21

22

23

24

The EPA also cites a decision from this district in which the Honorable Donna Ryu concluded based on *Hersh & Hersh*, *ACLU*, and *Kielty* "that the court may exercise its inherent powers to order the return of the documents if they are protected from release under an applicable FOIA exemption," but denied a motion for such relief because the defendant agency failed to establish that any exemption applied to the documents at issue.  *Ecological Rights Found. v. Fed. Emergency Mgmt. Agency*, No. 15-cv-04068-DMR, 2017 WL 24859, at *2, *8 (N.D. Cal. Jan. 3, 2017).

25

### D.    The EPA Is Not Entitled to Claw Back These Documents

26

27

28

In this Court's view, neither the EPA nor any of the decisions it cites addressing this issue offer a compelling rationale for holding that a court should wield its inherent authority to compel the return or destruction of documents produced under FOIA any time the producing agency could

United States District Court
Northern District of California

have invoked a statutory exemption but inadvertently failed to do so.  While such an order might be a valid and necessary exercise of inherent authority in an appropriate case, the circumstances of *this* case do not warrant use of that power to claw back the documents the EPA produced, even assuming for the sake of argument that the EPA could have properly withheld the names and email addresses at issue under Exemption 6.

Many mistakes by litigants have consequences.  The powers "necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases," which "must be exercised with restraint and discretion," *see  Chambers*, 501 U.S. at 43, are not an appropriate tool to undo all such errors.  On the facts this case, where the parties have already resolved all other disputes and the EPA has identified no serious and non-speculative harm likely to result from Sierra Club's continued possession of the lobbyists' names and business email addresses, it is not clear how the denial of the EPA's motion would undermine this Court's ability to see all questions directly raised under FOIA in this action—what documents the EPA *must* produce—through to a just resolution.

Moreover, any use of inherent authority must "be a reasonable response to the problems and needs that provoke it." *Degen*, 517 U.S. at 823–24.  The remedy that the EPA seeks— requiring Sierra Club to destroy the documents at issue—would not prevent disclosure of the information at issue, which appears to consist of at most three names and email addresses.  That information has already been disseminated to multiple people at Sierra Club.  *See* Stip. (dkt. 78) at 2 (noting that "the inadvertently produced . . . had already been transferred from counsel to internal stakeholders within Sierra Club," who have since "agreed as a courtesy to not further share the inadvertently produced documents until the dispute over them was resolved").  Given the discrete and uncomplicated nature of the information at issue, it will presumably remain within those individuals' knowledge even if the documents are destroyed.  The EPA's motion does not specifically seek an order prohibiting Sierra Club personnel from disclosing the names and email addresses, as opposed to the documents that contain them.  The Court is not inclined to invoke its inherent authority for an order that will have no practical effect on the (relatively weak) privacy interests at issue, nor will the Court restrain Sierra Club employees' speech in the absence of any

12

United States District Court
Northern District of California

1    showing that EPA could meet its heavy burden to obtain such an order, or even any clear request

2    that the Court do so.  *See generally, e.g.*, *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976)

3    (discussing the First Amendment presumption against "prior restraints on speech and

4    publication"); *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1023 (9th

5    Cir. 2009) (same).

6         The EPA contends that it "should not be punished for acting quickly to remedy an

7    inadvertent error."  Reply at 5 n.1.  Nothing in this order is intended to "punish" the EPA.  To the

8    contrary, the present motion arises from the EPA's request for judicial assistance to remedy its

9    own error, by ordering the Sierra Club to destroy documents already in its possession, despite no

10   provision of FOIA authorizing such an order.  The denial of that extraordinary relief is not

11   punishment.

12        Sierra Club states that it "seeks only names and does not oppose EPA continuing to

13   withhold full email addresses."  Opp'n at 7.  While the parties presumably could have reached a

14   compromise on those terms had the EPA agreed to them, and the EPA likely could have redacted

15   the email addresses under Exemption 6, *see Elec. Frontier Found.*, 639 F.3d at 888–89 (affirming

16   a decision finding Exemption 6 inapplicable to lobbyists' names, but reversing as to their email

17   addresses), the motion before the Court is the EPA's request to claw back documents it has

18   already produced.  The Court's conclusion that the motion must be denied is based not on any

19   entitlement of Sierra Club to the production of those documents, but on the EPA's lack of

20   entitlement on this record to a non-statutory remedy ordering Sierra Club to destroy documents

21   already in its possession.  And as noted above, the EPA advanced no argument that Sierra Club

22   should be barred from disseminating *information*, as opposed to *documents*, that Sierra Club

23   acquired as a result of the EPA's error.  The EPA has also offered no evidence that the work-

24   related email addresses at issue are kept private and would not be readily ascertainable with

25   knowledge of the individuals' names and employers.  The Court therefore declines to limit Sierra

26   Club's use of any email addresses the EPA erroneously produced.[7]

27   _____

28   [7] While this order does not itself prohibit Sierra Club using or disclosing the email addresses at
     issue, there is no evidence in the current record as to whether the parties reached an agreement that

13

**IV.      CONCLUSION**

For the reasons discussed above, the circumstances of this case do not warrant exercising the Court's inherent authority to order the destruction of the documents at issue. The EPA's motion is therefore DENIED.

The Court understands this order to resolve the parties' only remaining dispute. The Clerk is therefore instructed to close the case. If one or both of the parties believe that entry of judgment is necessary, they may file a motion or stipulation to that effect no later than two weeks from the date of this order.

**IT IS SO ORDERED.**

Dated: December 8, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge

---

Sierra Club would not do so after this dispute is resolved. To the extent they might have done so, or might wish to do so, this order is not intended to undermine or invalidate any such agreement.

14